**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NETCHOICE,                                    *

       *Plaintiff*,                              *

     v.                                         *      No. 1:25-cv-00322-RDB

ANTHONY G. BROWN, ET AL.,                     *

       *Defendants*.                          *

   *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Howard R. Feldman
_____

HOWARD R. FELDMAN
Federal Bar No. 05991
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland  21202
HFeldman@oag.state.md.us
(410) 576-6445
(410) 576-6995 (facsimile)

March 28, 2025                          Attorneys for Defendant

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

STATEMENT OF FACTS......................................................................................2

    Children Are Exposed to Serious Risks When They Use the Internet ...............................2

    The Kids Code Provides Important Basic Protections...........................................................3

    Data Protection Impact Assessments Ensure Companies Consider Children's Well-Being in the Design and Function of Their Products.................................................5

    The Kids Code Is Meant to Protect Children, Not Punish Companies or Chill Speech.................................................................................................6

    NetChoice's Complaint Is Premised on the Unsupported Assumption that the Kids Code Impedes Speech, Access to Speech, or Editorial Judgment .........................6

ARGUMENT .........................................................................................................8

I.    STANDARD OF REVIEW. ...............................................................................8

II.    NETCHOICE CANNOT SUCCEED ON ITS FACIAL CHALLENGES AND LACKS STANDING TO BRING AS-APPLIED CHALLENGES.................................................................9

    A.    NetChoice's Facial Challenges To Counts III and IV Fail as a Matter of Law. ..........................................................................................9

    B.    NetChoice Lacks Representational Standing Because Resolving Its Claims Requires Fact Finding Specific to Individual Members. ........................................12

III.    THE KIDS CODE DOES NOT REGULATE PROTECTED SPEECH. .............................................14

    A.    NetChoice Fails to Allege That the Kids Code Has Actually Impacted Its Members' Speech or Expression. .........................................................16

    B.    Both the Assessment Requirement and the Data Processing Regulations Are Constitutional.....................................................................17

        1.    The Assessment Requirement Does Not Impermissibly Compel Speech.....................................................................................17

        2.    The Kids Code at Most Incidentally Burdens Speech in a Content-Neutral Manner. .....................................................................20

IV.   AFFECTED ENTITIES HAVE A CLEAR UNDERSTANDING AS TO WHAT CONDUCT IS
      PROHIBITED. ........................................................................................................23

V.    THE KIDS CODE IS NOT PREEMPTED BY COPPA OR SECTION 230. ...................................27

      A.    The Kids Code Is Consistent With and Not Preempted by COPPA......................28

      B.    The Kids Code Is Consistent With and Not Preempted by Section 230...............30

CONCLUSION.......................................................................................................................30

**INTRODUCTION**

The Maryland Age-Appropriate Design Code (the "Kids Code") does not regulate speech. Instead, the Kids Code puts necessary guardrails on online products and services that Maryland children use every day. The law, codified at Md. Code Ann., Com. Law §§ 14-4801 – 14-4813 (LexisNexis Supp. 2024), and enacted in 2024, requires for-profit companies that process the personal data of children do so in a responsible manner to avoid exposing children to reasonably forseeable material physical or financial harm, severe psychological or emotional harm, highly offensive intrusions on privacy, or discrimination. Crucial to the present lawsuit, the General Assembly crafted the Kids Code both to prohibit misuse of children's personal data and to avoid intruding on any person or company's right to disseminate or access information. And as the General Assembly explicitly required, "[n]othing" in the Kids Code "may be construed to require a covered entity to monitor or censor third-party content." *Id.* § 14-4803(5).

NetChoice asks the Court to declare the Kids Code unlawful. NetChoice claims that the law is impermissibly vague, violates the First Amendment, and is preempted by (1) the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501 – 6506 and (2) Section 230 of the Communications Decency Act ("Section 230"), 47 U.S.C. § 230.

But NetChoice fails to allege facts sufficient to plausibly state a claim and fails to demonstrate that the Kids Code's unconstitutional applications substantially outweigh its permissible applications. *See Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). NetChoice also lacks standing to bring as-applied challenges on behalf of its members. And, contrary to NetChoice's allegations, the Kids Code is not impermissibly vague, does not regulate content or expressive speech, does not infringe on the First Amendment rights of NetChoice's members or

the users of NetChoice's members' products, and is not preempted by federal law. Accordingly, each of NetChoice's claims must be dismissed.

## STATEMENT OF FACTS

### Children Are Exposed to Serious Risks When They Use the Internet

In considering the Kids Code, the General Assembly learned that technology companies design their products and target children in ways that lead to "[c]ompulsive overuse, exposure to harmful and age-inappropriate content, cyberbullying, eating disorders, harms to mental health, and . . . sexual exploitation."[1] Social media use has been directly linked to children's deaths, including a Maryland child who died after taking part in the "blackout" challenge on TikTok[2] and another child who took her own life after suffering relentless cyberbullying.[3] The General Assembly received testimony that not only is regular or excessive use of online products harmful to children's mental health, but it is also linked to a decreased ability to focus, increased impulsive behaviors, and suicidal ideation and self-harm.[4]

According to testimony received by the General Assembly, children are online constantly: teenagers can spend up to eight hours a day on their phones, and even pre-schoolers average 2.5 hours of screen-based media use per day.[5] This is by design. Online products are optimized to be

---

[1] Written Testimony of FairPlay ("FairPlay Testimony"), at 1 (Feb. 13, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1DBKSL2UBn0WlTp0yCg6jrtzNQ3P0lRTJ.pdf.

All written testimony was submitted to the General Assembly and is part of the legislative history of the Kids Code, House Bill 603 (2024) or Senate Bill 571 (2024).

[2] Testimony of Minor Family (Feb. 14, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1tX_vOUdcAhi6xqlSXcj2b2HE5FeU5OzP.pdf

[3] Testimony of Christine McComas (Feb. 9, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1LXqP6-Qq6Zr2IWO5IkFi7RGBBreqBM2e.pdf

[4] Fairplay Testimony, at 7-8.

[5] Preschool-age children average 2.5 hours of screen media use per day; five-to- eight-year-olds average about 3 hours; teens average about 4.5 hours on their phones, with "nearly a quarter averaging 5 to 8 hours in front of their screens" a day. *See* Written Testimony of Common Sense (Feb. 13, 2024), https://mgaleg.maryland.gov/

addictive, employing algorithms to keep children using the product so that advertisers can target them.[6]  Because of all the data that companies collect, they are able to target children based on their interests and time delivery of advertising messages to correspond to a child's specific mood, so that advertisers can reach children when they are most vulnerable.[7]

The General Assembly also learned that without strong privacy protections, children are targeted by malicious actors and predators.[8]  Even the most engaged and vigilant parents cannot control their children's online privacy and safety.[9]  After hearing and considering all of these facts, the General Assembly passed the Kids Code to "[e]nsur[e] robust privacy, and thus safety, protections" for children "by ensuring that those online products are designed in a manner that recognizes the distinct needs of children within different age ranges."  (*See* Exhibit 1, at 2.)

### The Kids Code Provides Important Basic Protections

The Kids Code applies to "covered entities" that (1) operate for profit; (2) collect consumers' personal data; (3) determine the "purposes and means" of processing consumers' personal data; and (4) meet certain criteria related to annual revenue or the amount of personal data that the entity processes.  Com. Law § 14-4801(h).  If a covered entity provides an online product that is "accessed or reasonably likely to be accessed by children,"[10] it must not process a

---

cmte_testimony/2024/ecm/1BJXmS7wHOAWJVuFK08CTFv5KUmM6n57C.pdf; FairPlay Testimony, at 3; *see also* Preamble, H.B. 603.  A copy of the final version of H.B. 603 is attached hereto as Exhibit 1.

[6] FairPlay Testimony, at 13-15.

[7] FairPlay Testimony, at 18-19.

[8] Written Testimony of Maryland Coalition Against Sexual Assault ("MCASA Testimony") (Feb. 13, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1tRDd4GxDk_pNBVftHo0XuUE5MUFUKI_t.pdf

[9] Written Testimony of Maryland School Psychologists' Association (Feb. 9, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1ibjZZUh73KxTb1Igqn2ns9rYXKszB1LE.pdf.

[10] "Reasonably likely to be accessed by children" means it would be reasonable to expect children to use the product either because the product or marketing on the product is directed to children; the company knows that "a significant number of children" "routinely access[]" the product or substantially similar products; or the covered entity knows or should have known that a user is a child.  Com. Law § 14-4801(s).

child's personal data in a manner inconsistent with the best interests of children[11] likely to access the online product. *Id.* § 14-4806(a).

The Kids Code also forbids (1) "profil[ing] a child by default"[12] without appropriate safeguards unless profiling is necessary to provide the product and is in the best interests of children; (2) processing a child's personal data that is not "reasonably necessary to provide an online product that the child is actively and knowingly engaged with;"[13] (3) processing precise geolocation data of a child without alerting the child or by default, subject to certain limited exceptions; (4) using dark patterns to cause a child to provide more personal data than necessary, to circumvent privacy protections, or to take "any action" that is not in the best interest of children; (5) processing data of children for reasons other than the purpose for which the data was collected; (6) allowing a person other than a parent or guardian to monitor a child without alerting the child and the child's parent or guardian; or (7) processing more personal data than necessary for age estimation when age estimation is necessary to provide a product; or (8) when determining whether a product is likely to be accessed by children, collect or process more of a child's data than reasonably necessary. *Id.* § 14-4806(a), (c). Covered entities must also configure default privacy settings for children to offer a high level of privacy; provide privacy information and their policies and terms of service "concisely" and "prominently," "using clear language suited to the age of

---

[11] "Best interests of children" is defined as using personal data or designing a product in a way that does not "[b]enefit the covered entity to the detriment of children" and does not result in reasonably foreseeable severe or material physical, financial, psychological, or emotional harm to children; a highly offensive intrusion on children's reasonable expectation of privacy; or discrimination. *Id.* § 14-4801(c).

[12] "Profiling" means "any form of automated processing of personal data" used to "analyze or predict certain aspects relating to an individual" such as the individual's "economic situation, health, personal preferences, interests, reliability, behavior, or movements." *Id.* § 14-4801(q).

[13] "Processing" data includes any set of operations by manual or automated means on personal data such as collecting, using, analyzing, and modifying. *Id.* § 14-4801(p).

children likely to access the online product;" and provide "prominent, accessible, and responsive tools" for managing privacy and reporting concerns. *Id.* § 14-4805(3)–(5).

### Data Protection Impact Assessments Ensure Companies Consider Children's Well-Being in the Design and Function of Their Products

The Kids Code requires covered entities to prepare a data protection impact assessment (the "Assessment") for any online product reasonably likely to be accessed by children. *Id.* § 14-4804(a)(1). Each Assessment must identify the purpose of the product, how it uses a child's data, and assess whether the product is designed in a manner "consistent with the best interest of the children reasonably likely to access the online product." *Id.* § 14-4804(b). The Assessment considers a number of factors, including whether the product's algorithms or its data collection, management, or processing practices could lead to children being targeted by harmful contacts; whether the product could lead to children participating in harmful conduct or being exploited; whether the product is designed to encourage excessive use; and whether the product's algorithms or data collection or processing practices could otherwise cause reasonably foreseeable and material or severe harm or discrimination. *Id.* As to each of the factors, a covered entity must assess the risks to a child of physical or financial harm, psychological or emotional harm, intrusion on privacy, and discrimination. *Id.* Assessments must describe the "steps the entity has taken and will take to . . . act in a manner consistent with the best interests of children." *Id.*

Covered entities must retain and periodically review Assessments. *Id.* § 14-4805. Upon written request by the Office of the Attorney General's Consumer Protection Division (the "Division"), a covered entity must provide a list of all Assessments the entity completed and the Assessments themselves. *Id.* § 14-4807. Disclosure of Assessments to the Division does not waive any applicable privileges shielding any other disclosure, and Assessments may not be released by the Division pursuant to a Public Information Act request. *Id.* §§ 14-4807(c), 14-4811.

**The Kids Code Is Meant to Protect Children, Not Punish Companies or Chill Speech**

The General Assembly explicitly codified its intent to protect children without impeding free speech and expression, and provided a safe harbor for covered entities that may accidentally be in violation of the Kids Code. Entities that "develop and provide online products" that children will likely use "shall ensure the best interest of children" in the design, development, and provision of those products, and "privacy, safety, and well-being of children" must be prioritized over "commercial interests." *Id.* § 14-4803(2)-(4). At the same time, "[n]othing in [the Kids Code] may be construed to require a covered entity to monitor or censor third-party content or otherwise impact the existing rights and freedoms of any person." *Id.* § 14-4803(5). Likewise, nothing in the Kids Code "may be construed to: [p]revent a child from deliberately or independently searching for or specifically requesting content; or [r]equire a covered entity to implement an age-gating requirement." *Id.* § 14-4810(3)-(4).

Violations of the Kids Code are subject to a fine of $2,500 per affected child for each negligent violation and $7,500 per affected child for each intentional violation. *Id.* § 14-4808. However, if covered entities are substantially compliant with the Assessment requirements, the Division will notify the entity and provide an opportunity to cure any violations before initiating an enforcement action. *Id.* § 14-4809.

**NetChoice's Complaint Is Premised on the Unsupported Assumption that the Kids Code Impedes Speech, Access to Speech, or Editorial Judgment**

NetChoice alleges that it is a non-profit trade association that "promote[s] online commerce and speech" and seeks to "increase consumer access and options via the Internet." (ECF 1 ¶ 17.) Its members include social media companies that "create, curate, and disseminate" compilations of speech, by allowing users to search for particular information or content or by making

recommendations based on user preferences. (ECF 1 ¶¶ 21, 30-35.) In making their offerings available to users, those members collect and process users' data. (ECF 1 ¶ 37.)

NetChoice alleges that most, if not all, of its members who offer online services are subject to the Kids Code. (ECF 1 ¶ 20.) Those members collect and use data from their users, including data needed for the services to function properly, such as device data required for online products to display properly or "activity logs" to identify malicious actors. (ECF 1 ¶¶ 41-44.) They also collect information related to user accounts. (ECF 1 ¶ 45-49.) Finally, some members collect "information that enables websites to better disseminate and display expressive content," such as activity or preference data that allows a social media company to offer individualized content preferred by users and deprioritize content users do not want to see. (ECF 1 ¶¶ 41, 50, 54-55.)

"[S]ome NetChoice members" offer parental controls and options for parents to monitor their children's activities on their services. (ECF 1 ¶ 65.) NetChoice notes that many of its members "expend vast resources" to ensure that their services are appropriate for their user communities through content moderation or prioritization of positive and age-appropriate speech and content, while others "take a more hands-off approach" on the basis that users can decide for themselves what to engage with or filter out. (ECF 1 ¶ 66.)

In NetChoice's first two causes of action, it claims that the "best interests of children" and "reasonably likely to be accessed by" children standards are impermissibly vague. (ECF 1 ¶¶ 84-86, 125-73 (Count I); ¶¶ 175-87 (Count II)). NetChoice's third cause of action is a facial and as-applied challenge to the Assessment requirement on the basis that it impermissibly compels speech by "requiring [its members] to disparage their services and opine on far-ranging and ill-defined harms" (ECF 1 ¶ 99) which, according to NetChoice, requires an evaluation of content and will force entities to "alter their dissemination and display of content" (ECF 1 ¶ 100) or "remove

content from their services" altogether.  (ECF 1 ¶¶ 189-233).  The fourth cause of action is a facial and as-applied First Amendment challenge to the Kids Code's restrictions "to the extent they limit an online service's right to collect and use information for the purposes of curating, recommending, and delivering protected speech."  (ECF 1 ¶¶ 236-57.)  NetChoice alleges that the Kids Code unduly restricts speech by requiring covered websites to demonstrate that their processing of children's data and profiling of those children is consistent with the best interests of children.  (ECF 1 ¶¶ 246-47.)  Finally, NetChoice claims that the Kids Code is preempted by COPPA and Section 230.  (ECF 1 ¶¶ 258-74 (Count V); ¶¶ 276-84 (Count VI)).[14]

## ARGUMENT

### I.    STANDARD OF REVIEW.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this Court is required to "take the facts in the light most favorable to the plaintiff," it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (citation omitted).  Nor may this Court credit "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678.

---

[14] In its prayer for relief, NetChoice asserts that the unchallenged provisions of the Kids Code are not severable. (ECF 1, p. 41.)  But Maryland law presumes that valid provisions of a law should be severed from invalid provisions whenever possible.  *See Davis v. State*, 294 Md. 370, 383-84 (1982).  Here, even if the challenged provisions of the Kids Code are found to be unconstitutional, there is no reason why other provisions, such as Com. Law § 14-4806(5), which prohibits the processing of precise geolocation data of children by default or without providing an obvious signal to the child, should also be enjoined.

A party asserting claims must also have standing to bring those claims before the court. *See Maryland Election Integrity, LLC v. Maryland State Bd. of Elections* 127 F.4th 534, 537-41 (4th Cir. 2025). The plaintiff has the burden of demonstrating standing for each of its claims. *Id.* at 537. On a facial challenge to subject-matter jurisdiction, such as this one, defendants must show that the complaint, accepted as true, fails to state sufficient facts upon which to base subject-matter jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Challenges to Article III standing are brought under Rule 12(b)(1), and challenges to prudential standing are brought under Rule 12(b)(6). *Harris v. Wells Fargo Corp. Office Headquarters*, GJH-22-00580, 2023 WL 155244, at *2 (D. Md. Jan. 11, 2023); *see also United States v. Day*, 700 F.3d 713 (4th Cir. 2012).

## II. NETCHOICE CANNOT SUCCEED ON ITS FACIAL CHALLENGES AND LACKS STANDING TO BRING AS-APPLIED CHALLENGES.

NetChoice cannot succeed on either its facial or as-applied challenges to the Kids Code because (1) NetChoice cannot show that unconstitutional applications of the law or its relevant provisions substantially outweigh constitutional ones; and (2) NetChoice is not the appropriate party to bring as-applied challenges due to the individualized factual inquiry that would be required to resolve those claims as to each of NetChoice's members.

### A. NetChoice's Facial Challenges To Counts III and IV Fail as a Matter of Law.

To prevail on a facial challenge in a First Amendment case, a plaintiff must show that a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (quoting *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). To make its determination, a court must "explore the law['s] full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Moody*, 603 U.S. at 726. A successful challenge is premised both on the text of the challenged law, "and from actual fact that a substantial number of instances exist in

which the Law cannot be applied constitutionally." *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988). "The need for NetChoice to carry its burden" to show which applications of the law are constitutional and which are impermissible "is the price of its decision to challenge the law[] as a whole." *Moody*, 603 U.S. at 744.

Facial challenges are "hard to win" by design. *Id.* at 723. First, "'[c]laims of facial invalidity often rest on speculation about the law's coverage and its future enforcement." *Id.* (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008)); *see also United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020) (noting facial challenges contradict the principle that a court should not speculate as to constitutional questions not before it). Second, "'facial challenges threaten to short circuit the democratic process' by preventing duly elected laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723 (quoting *Washington State Grange*, 552 U.S. at 450-51).

NetChoice falls far short of meeting its burden to address all applications of the Kids Code as a whole or in specific provisions. NetChoice does not allege any facts as to how the law actually interacts with its members, or even which of its members would feel the alleged impermissible effects of the law. Its challenges under Count III to the Assessment provision rest on unsupported conclusions that an Assessment requires public self-condemnation and effectively "deputize[] covered businesses into serving as censors for the state" by requiring entities to remove content from their platforms. (ECF 1 ¶¶ 205-09.) And, as to its contention under Count IV that the Kids Code's "restrictions on 'processing' and 'profiling' information to disseminate content to minors violate the First Amendment," (ECF 1 ¶ 236), NetChoice offers only a broad, conclusory statement that "[w]hen NetChoice's members curate[15] and disseminate compilations of protected speech on

---

[15] NetChoice alleges that by curating a personalized feed, at least some of its members employ algorithms to choose content to show to a user based on that user's preferences. (ECF 1 ¶¶ 50-55.) It relies on *Moody* to claim that

their services, they engage in protected speech dissemination and editorial discretion protected by the First Amendment," (ECF 1 ¶ 240).  There is no allegation that the way its members disseminate and curate content always reflects human editorial choices.  *Compare* (ECF 1 ¶ 66 (noting some members restrict harmful content, while "[o]thers take a more hands-off approach")), *with Moody*, 603 U.S. at 740; *id.* at 745-47 (Barrett, J., concurring) (noting that personalized feeds determined by algorithms that suggest content based solely on what a customer previously clicked on, with no human input, may not have First Amendment protection); *see also id.* at 749 (Jackson, J., concurring) ("[C]ourts must make sure they carefully parse not only what entities are regulated, but how the regulated activities *actually function*." (emphasis original)).

NetChoice offers no specific factual allegations linking limitations on how much of a child's data its members can use or a limitation on using that data in a way that could lead to foreseeable, material or severe harm or discrimination will prevent some unspecified members from speaking their message.  Nor does NetChoice address the constitutionality of the law when applied to other functions that rely on data-processing, such as messaging features, search functions, or any other features.  (*See* ECF 1 ¶¶ 42-49 (generally describing data use and processes

---

curated feeds are protected expressive speech.  But that decision was made as part of an analysis of laws that restricted social media platforms' ability to remove, deprioritize, or otherwise disfavor posts containing certain types of speech or viewpoint.  *Moody*, 603 U.S. at 720-21.  The Court concluded that "the editorial judgments influencing the content of" Facebook's News Feed and YouTube's homepage constituted creative expressive activity.  This is because the two companies' moderation policies evidenced a human decision that certain content should be deprioritized or hidden.  *See id.*, 603 U.S. at 735-39 (describing intentional content moderation policy).  The *Moody* Court did not decide as to any other social media companies or any other features, even personalized ones, because NetChoice did not offer facts necessary to make such determinations.  *Id.* at 746-48 (Barrett, J., concurring).

*Moody* stands for the proposition that human choices that shape social media feeds, even if programmed into an algorithm, constitute creative expression.  *Id.* at 735, 738-40 (majority opinion).  It does not, however, support an assertion that all data collection and processing related to curated feeds are part of that creative expression and entitled to First Amendment protections.  For instance, NetChoice does not allege facts sufficient to show that limiting the amount of data that its members collect or use would impact members' ability to make editorial choices as to what types of content appears more or less frequently on their platform.  *See NetChoice v. Bonta*, 2024 WL 5264045, at *10-11 (N.D. Cal. Dec. 31, 2024), *appeal docketed*, No. 25-0146 (9th Cir. Jan. 2, 2025) (distinguishing between personalizing or removing content in furtherance of a moderation policy and noting that "it is difficult to say that restricting use of personalized feeds would alter the overall speech environment on any social media platform in any appreciable way").

that are unrelated to personalized feeds); ¶¶ 95, 97 (noting that some of its members may offer many features that would require multiple Assessments)).

NetChoice even constructs its allegations and claims in a way inconsistent with a facial challenge. For instance, it asserts that the Assessments "violate the First Amendment . . . *to the extent* they compel speech and interfere with protected editorial discretion," (ECF 1 ¶ 191 (emphasis added)), and "the Act's restrictions on collecting and using information are unconstitutional *to the extent* they limit covered NetChoice members' rights to collect and use information for the purposes of curating, recommending, and delivering protected speech to users," (ECF 1, ¶¶ 236, 238 (emphasis added)). By using this language, NetChoice omits all other applications of the law, thereby ignoring applications that are constitutional.[16] But NetChoice's burden is not to claim, even vaguely, that some unspecified restrictions are unconstitutional: to bring a facial challenge it must weigh the impermissible applications against the constitutional ones. *See United States v. Hansen*, 599 U.S. 762, 770 (2023) ("In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case."). NetChoice has failed to carry its burden and its facial claims in Counts III and IV must fail.

**B.    NetChoice Lacks Representational Standing Because Resolving Its Claims Requires Fact Finding Specific to Individual Members.**

To establish Article III standing, an individual plaintiff must allege (1) an "injury in fact" (2) that is "fairly traceable" to the defendant's conduct and (3) that is "likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A legally

---

[16] For instance, there is no constitutional concern when the Kids Code prevents a company that provides an online game from profiling a child by default for the purpose of selling that child's data when profiling is not necessary to provide the gaming service. Nor is there a constitutional concern when the Kids Code would prohibit an online game from idly gathering information to profile a child based upon a child's use of other applications on a device.

cognizable injury is "concrete and particularized; the threat must be actual and imminent, [and] not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

An association has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington Area Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). But if the participation of individual members "is essential to a proper understanding and resolution" of the claims at issue, then the association lacks standing. *Harris v. McRae*, 448 U.S. 297, 321 (1980) (free exercise challenge to enjoin abortion funding restriction required members to show coercive effect on their individual practice of religion); *see also Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (no associational standing when court must perform "an *ad hoc* factual inquiry for *each* [member]" (emphasis in original)).

NetChoice's standing to bring as-applied challenges under Counts III and IV of the complaint fails on the first and third prongs of the *Hunt* test because, even if this Court found that the Kids Code regulates speech, individual inquiry is required to determine whether the Kids Code caused actual or imminent injury to any individual member. *See Harris*, 448 U.S. at 321. The Supreme Court recently noted that the curated content on Facebook's News Feed and YouTube's homepage constituted expressive speech. *Moody*, 603 U.S. at 740. But Justice Barrett's concurrence makes clear that, without additional facts, the Court could not determine whether any other functions of Facebook or YouTube or any of NetChoice's members' products or features constituted protected expressive activity. *Id.* at 745-47 (Barrett, J., concurring). As Justice Barrett noted, there are any number of "questions that might arise in litigation that more thoroughly expose[] the relevant facts about particular social media platforms and functions" that would

determine whether and when First Amendment protections might apply.  *Id.* (Barrett, J., concurring); *see also id.* at 780-81 (Alito, J., concurring) ("Because not all compilers express a message of their own, not all compilations are protected by the First Amendment.").

As discussed above, NetChoice alleges no facts as to which of its members' speech would be impacted by the Kids Code and in what ways,[17] offering instead only a broad, conclusory assertion that "[w]hen NetChoice's members curate and disseminate compilations of protected speech on their services, they engage in protected speech dissemination and editorial discretion protected by the First Amendment." (ECF 1 ¶ 240.)  This is insufficient to show that any individual member "ha[s] standing to sue in their own right." *See Hunt*, 432 U.S. at 343; *Maryland Highways Contractors Ass'n, Inc. v. State*, 933 F.2d 1246, 1252 (4th Cir. 1991) (association lacked standing when it could not show its members suffered any injury).  And any determination that the Kids Code impacted protected speech of an individual member will require individual inquiry not suitable for a case in which those members are not a party. *See Warth v. Seldin*, 422 U.S. 490, 515-16 (1975) (association lacked standing when "both the fact and extent of [members'] injury would require individualized proof); *see also Bonta*, 2024 WL 5264045, at \*10-13 (explaining how and why First Amendment inquiry as to personalized feeds on social media products "depends on a close inspection of how regulated feeds actually function").

## III.    THE KIDS CODE DOES NOT REGULATE PROTECTED SPEECH.

NetChoice's First Amendment claims in Counts III and IV also fail as a matter of law because the Kids Code does not regulate speech.  The Kids Code regulates data use: it prohibits covered entities from collecting and using more data from children than is needed to offer a

---

[17] As noted, NetChoice relies on *Moody* for the proposition that curated feeds deserve First Amendment protections.  But NetChoice does not, for example, allege that Facebook and YouTube now utilize the practices they utilized when the *Moody* Court concluded that moderating feeds is expressive conduct.  In other words, the complaint does not establish that Facebook's News Feed or YouTube's homepage currently constitute protected expression.

product; prohibits a product from using data in a way that could lead to reasonably foreseeable, severe or material harm to children; and requires entities to review the design and data practices of their products to ensure that those products are not going to seriously harm children. Com. Law §§ 14-4804, 14-4806.

The purpose of the Kids Code is to "afford[] protections" to children on "all online products they are reasonably likely to access" without "censor[ing] third-party content or otherwise impact[ing] the existing rights and freedoms of any person." Com. Law § 14-4803. Because the law does not seek to regulate content, to read First Amendment implications into the Act would be contrary to basic principles of statutory interpretation. *Sabisch v. Moyer*, 466 Md. 327, 350 (2019) ("[T]he General Assembly is presumed to have meant what it said and said what it meant."). Courts may not "add []or delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute" or "construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State*, 378 Md. 378, 387 (2003). But NetChoice's interpretation of the Kids Code does just that. The Kids Code not only omits any reference to speech or content, but the General Assembly also codified its intent that the Kids Code is not meant to censor or restrict children's access to content. *See* Com. Law §§ 14-4803(5), 14-4810(3)-(4).

NetChoice's alleges that the Kids Code requires its members to opine on harms to children that arise from content (*e.g.*, ECF 1 ¶¶ 88-93, 207-11) and impacts its members ability to curate personalized feeds (*e.g.*, ECF 1 ¶¶ 237-43). This elides the plain statutory text that imposes no requirement to assess content and no regulation of content or editorial decision-making relating to the presentation of that content. Further, despite NetChoice's contentions, the Kids Code permits profiling of children, so long as children opt-in themselves, Com. Law § 14-4804(a)(2)(i), or by default with appropriate safeguards and when either profiling is necessary for the product to

15

function or the company can show a compelling reason profiling serves the best interests of children, Com. Law § 14-4804(a)(2)(ii). None of NetChoice's legal conclusions are supported by the plain language of the law, and NetChoice offers no plausible allegations sufficient to overcome that deficiency. NetChoice bears the burden of alleging facts showing that its members were required to or prevented from engaging in speech or creative expression by the Kids Code. *See Moody*, 603 U.S. at 743-44. It has not, and cannot, do so.

NetChoice's reliance throughout the complaint on its litigation in California is misplaced. Unlike Maryland's law, the California law expressly required covered entities to consider content when considering potential harms to children. *See* Cal. Civ. Code § 1798.99.31(a)(1)(B)(i); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (noting provisions of California's age-appropriate design code "expressly" require consideration of content). California's law also defines products "likely to be accessed by children" as those including, among other criteria, "design elements that are known to be of interest to children . . . [or] content that appeals to children," *id.* § 1798.99.30(b)(4)(E), and requires companies to mitigate the harms caused by content, Cal. Civ. Code § 1798.99.31(a)(2). But Maryland's Kids Code contains no such provisions and, therefore, decisions interpreting the California law are distinguishable.

### A. NetChoice Fails to Allege That the Kids Code Has Actually Impacted Its Members' Speech or Expression.

The Kids Code has been in effect since October 1, 2024. NetChoice, however, does not allege that its members have altered their speech or expressive conduct to comply with the law or that its members have faced or been threatened with enforcement actions. For instance, NetChoice makes a conclusory assertion that the Kids Code "would impede users' access to protected speech" "[t]o the extent these provisions would require websites to age-gate or otherwise restrict users' access to certain content." (ECF 1 ¶ 249.) But NetChoice offers no factual allegations indicating

that the law has prompted its members to institute age-gating or to restrict users' access to content, that its members cannot comply with the law without instituting age-gating or restricting users' access to content, or that the Division intends to bring enforcement actions against entities who do not age-gate or restrict children's access to content. Without some allegation that a member actually suffered a harm, NetChoice's as-applied challenges fail. *See Summers*, 555 U.S. at 493. NetChoice's facial challenges also fail because it does not allege facts sufficient to demonstrate how the law works in all of its applications such that a substantial number of applications are actually unconstitutional.. *See Moody*, 603 U.S. at 744. Counts III and IV of the complaint must be dismissed.

### B.     Both the Assessment Requirement and the Data Processing Regulations Are Constitutional.

#### 1.     The Assessment Requirement Does Not Impermissibly Compel Speech.

Count III of the complaint must be dismissed because the Assessment requirement does not offend First Amendment protections or impermissibly compel speech. The government may not force a speaker to "alter its own message" or to publish a viewpoint it opposes. *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 11 & n.7, 16 (1986) (government cannot require utility to include third party's newsletter with opposing viewpoint in its billing envelopes). Compelled speech violations arise when "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006).

Assessments are a risk analysis and record-keeping requirement imposed by the Kids Code that allow covered entities to measure their risks and engage in the thoughtful data processing practices the Kids Code seeks to encourage. *See* Com. Law § 14-4804. Contrary to NetChoice's assertions, they do not "require[] a company to publicly condemn itself." (*See* ECF 1 ¶ 205

(quoting *National Ass'n of Mfrs. v. S.E.C.*, 800 F.3d 518, 530 (D.C. Cir. 2015)).  Unlike the regulation found unconstitutional in *National Association of Manufacturers*, the Assessments do not require public disclosure, do not require the use of specific language provided by the government, and carry no moral or political judgment or "self-criticism" (Compl. ¶¶ 2, 7). *Compare* Com. Law § 14-4804(b), *with National Ass'n of Mfrs.*, 800 F.3d at 529-30 (finding statutory requirement that an entity tell consumers its products are "[not] conflict free" unconstitutional because phrase is not factual and conveys moral responsibility that the covered entity may not agree with).

First, Assessments are not public because they remain internal to the covered entity, are only disclosed to the Division upon request, and are shielded from Public Information Act requests. *Id.* § 14-4807.  Second, Assessments do not require any particular message, any moral or political judgment, or any statement a company disagrees with.  Instead, entities must undertake an honest self-assessment of reasonably foreseeable risks, and, if necessary, describe how they will mitigate those risks.[18] *See* Com. Law § 14-4804(b)(4).  In other words, entities must make their own factual conclusions about their products or services. *Cf. Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (in an advertising context, factual and uncontroversial required disclosure does not intrude upon First Amendment rights as severely as prohibition on speech).

---

[18] Because the Assessment requirement does not ask covered entities to evaluate whether children are exposed to harmful content, it is unclear why NetChoice alleges that mitigation of data processing risks would necessarily include censorship or age-gating.  (*See* ECF 1 ¶¶ 206-11.)  In any event, a company would be free to choose the mitigation method it desired, which may include the kinds of parental controls that some of NetChoice's members already employ.  (ECF 1 ¶ 65.)

Notably, the fact that some members may already employ safeguards like parental controls is another reason why NetChoice is not an appropriate party to bring as-applied challenges to the Assessment requirement, because the method and extent of safeguards members may already have in place is another factor where individualized inquiry would be required to determine whether any entity faces potential enforcement action by the Division.  *See* § II.B.

18

The Southern District of New York analyzed a similar question in *S.E.C. v. AT&T, Inc.*, 626 F. Supp. 3d 703 (S.D.N.Y. 2022). There, the court determined that the public reporting requirement mandated by Regulation Fair Disclosure ("Reg FD") was not subject to strict scrutiny. *See id.* at 750. Reg FD prohibits a public company from selectively disclosing material nonpublic information about itself or its securities unless it also discloses that information to the public. *Id.* at 710. The court noted that the regulation "does not implicate political speech; . . . restrict speech; [or] . . . implicate expressions of opinion" but instead "concerns only factual information." *Id.* at 750. And because the defendant "had already embraced the identical factual message that the SEC would have it share," disclosure would "not offend core First Amendment values." *Id.* at 747 (quoting *Sorrell*, 654 U.S. at 113-14). Just as it is not offensive to "core First Amendment values" to announce certain information that wholly originates form the covered entity to the public when the information was initially only selectively disclosed, *see id.*, it does not offend core First Amendment values to require a covered entity to disclose to the Division the conclusions of the covered entity's own risk analysis.

As noted, Assessments conducted under Maryland's Kids Code are not comparable to requirements that a company publicly disclose a government-supplied message that implies moral culpability, *see National Ass'n of Mfrs.*, 800 F.3d at 530, or that a utility company include speech it does not agree with in its billing envelopes, *Pacific Gas & Elec. Co.*, 475 U.S. at 11 & n.7, 16 (1986). Maryland's requirement is also distinguishable from the assessments required by California's Age-Appropriate Design Code Act. The Ninth Circuit's decision that assessments were subject to strict scrutiny was narrowly premised on the law's requirement that businesses "measure and disclose . . . the risk that children will be exposed to disfavored speech." *See Bonta*, 113 F.4th at 1120-21. The court noted that its decision would not threaten other assessment

19

schemes, and acknowledged that risk assessments, like Maryland's, that do not focus on children's exposure to "harmful or potentially harmful" content can be constitutional.  *Id.*  County III must be dismissed because the Assessment requirement does not impermissibly compel speech.

## 2.    The Kids Code at Most Incidentally Burdens Speech in a Content-Neutral Manner.

Counts III and IV also fail because, even if the Kids Code burdens speech, it does so incidentally and in a content-neutral manner and therefore does not offend the First Amendment. The First Amendment does not prevent restrictions directed at commerce or conduct which have only "incidental burdens on speech."[19]  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  Even when a regulation prohibits conduct that contains both "'speech' and 'nonspeech' elements," then "a sufficiently important governmental interest" as to the nonspeech element "can justify incidental limitations" on speech.  *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  And when the government regulates speech but its regulations are content-neutral, the regulation is subject to an intermediate level of scrutiny.  *TikTok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025).

The Kids Code regulates data collection and how that data is used by covered entities.  To the extent that the Kids Code incidentally burdens speech, it does so in a content-neutral manner. Accordingly, to the extent that the law triggers First Amendment review, intermediate scrutiny should apply.  *See TikTok*, 145 S. Ct. at 69 (restriction is constitutional when it furthers an "important Government interest unrelated to the suppression of free expression" and does not "burden substantially more speech than necessary to further that interest"); *O'Brien*, 391 U.S. 367 at 377; *Satellite Broadcasting & Comm'ns Assoc. v. FCC*, 275 F.3d 337, 353, 355 (4th Cir. 2001) (applying intermediate scrutiny as to content-neutral incidental burdens on speech of satellite

---

[19] NetChoice does not appear to argue that any applications of the Kids Code impermissibly impact advertising.  If such applications are raised later in litigation, defendants reserve their right to argue that any burdens on advertising survive constitutional scrutiny.

carriers and cable operators under "carry one, carry all" rule that may impact ability to "exercise editorial discretion over the menu of channels they offer to their subscribers").

The Kids Code is content-neutral. The "principal inquiry" as to whether a law is content-neutral "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys" even if there is "an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Wag More Dogs*, 680 F.3d at 366. A regulation is content-neutral, if "(1) the regulation is not a regulation of speech, but rather a regulation of the places where some speech may occur; (2) the regulation was not adopted because of disagreement with the message [the speech] conveys; or (3) the government's interests in the regulation are unrelated to the content of the [affected] speech." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 432-33 (4th Cir. 2007) (quoting *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000) (internal quotation marks omitted; other alterations original)). The Kids Code's regulations and Assessment requirement apply to foreseeably harmful data processing practices without regard to the content of any message. For instance, it would prohibit an application from using manipulative methods to prolong children's use of products or exploit them, like those described in testimony to the General Assembly,[20] even if that application disseminates speech the State agrees with. *See Covenant Media*, 493 F.3d at 432-33 (regulation is content neutral if not adopted due to disagreement with message of speech or if governmental interests are unrelated to content of speech). And, to the extent that the Kids Code applies "to only the platforms that have a chance of attracting the children the Act seeks to protect," that fact, standing alone, does not make a law content-based. *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 556 (S.D. Ohio 2024) ("'Websites that children might access' is not a topic or subject matter.").

---

[20] *E.g.*, FairPlay Testimony, at 13-15 (describing slot-machine-like variable reward design features).

The Kids Code passes intermediate scrutiny. A law is constitutional under an intermediate scrutiny standard when "the regulation materially advances an important or substantial interest" by redressing or preventing real harms. *Satellite Broadcasting*, 275 F.3d at 356. If it does, the Court must ask whether the regulation is narrowly tailored, which in an intermediate scrutiny context means that it "promotes a substantial government interest that would be achieved less effectively absent the regulation," without "burden[ing] substantially more speech than is necessary to further the government's legitimate interests." *Id.* (citing *Ward*, 491 U.S. at 799).

The Kids Code furthers a substantial government interest. *See United States v. Malloy*, 568 F.3d 166, 175 (4th Cir. 2009) (recognizing a "surpassing importance of the government's interest in safeguarding the physical and psychological wellbeing of children"). The General Assembly passed the Kids Code to provide more safety to children online, (*see* Exhibit 1, at 1), and protect children from reasonably foreseeable severe or material harm or discrimination. *See* Com. Law § 14-4804(b)(2) (listing potential serious harms for covered entities to consider when performing risk analysis). Moreover, the government's interest is both unrelated and explicitly contrary to the suppression of free expression. *See* Com. Law §§ 14-4803(5), 14-4810(3)-(4). Even if the law incidentally impacts speech, the law is clear that it is not intended to censor speech or restrict access to any content. *Id.* The Kids Code also furthers the government's interest in protecting children because, absent Maryland's law, companies may over-collect and sell children's personal data or engage in practices that harm children, such as causing them to be addicted to their products,[21] making it easier for malicious actors to contact children,[22] or targeting children with manipulative advertising.[23] But it is not over-restrictive: covered entities are

---

[21] *See* FairPlay Testimony, at 1, 13-15.

[22] *See* MCASA Testimony, at 1.

[23] *See* FairPlay Testimony, at 18-19.

permitted to process any data necessary to offer their product or service.  Com. Law § 14-4806(a)(2) (allowing profiling of children by default when necessary); *id.* 14-4806(5) (allowing precise geolocation when necessary).  The required Assessments ensure covered entities consider whether their data processing practices cause reasonably foreseeable material or severe harm or discrimination to children and, if mitigation is necessary, permit any method of mitigation the covered entity chooses.  *See id.* § 14-4804.  The Kids Code is narrowly tailored because it focuses on reasonably foreseeable severe or material harms or discrimination, regulates data processing only, and expresses that  speech and content are not intended to be impacted by the law.

The Assessment requirement does not violate the First Amendment because it does not impermissibly compel speech.  All aspects of the Kids Code survive First Amendment scrutiny because, at most, they are "content-neutral measure[s] that impose[] incidental burdens on speech," *Satellite Broadcasting*, 275 F.3d at 355 and are subject to and survive intermediate scrutiny.  Counts III and IV of NetChoice's complaint must be dismissed.

## IV.    AFFECTED ENTITIES HAVE A CLEAR UNDERSTANDING AS TO WHAT CONDUCT IS PROHIBITED.

Counts I and II fail as a matter of law because the Kids Code "provide[s] a person of ordinary intelligence fair notice of what is prohibited," and is drafted so as to not "authorize[] or encourage[] seriously discriminatory enforcement."  *F.C.C. v. Fox Television Stations Inc.*, 567 U.S. 239, 253 (2012).  Challenged phrases in a statute "should be construed in the context of that statute as a whole," *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (citation omitted), or as defined by "[d]ictionary definitions and good old-fashioned common sense," *Wag More Dogs*, 680 F.3d at 371.  "Close cases do not make a regulation vague."  *Edgar v. Haines*, 2 F.4th 298, 317 (4th Cir. 2021) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

Economic regulations or those that impose only civil penalties are subject to less strict vagueness tests, whereas regulations that impact First Amendment rights may face stricter requirements. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (citations omitted). Even so, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Miselis*, 972 F.3d at 544 (quoting *Williams*, 553 U.S. at 304); *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (because we are "[c]ondemned to the use of words," we cannot expect "mathematical certainty" in language).

Here, a person of ordinary intelligence will be able to discern who constitutes a covered entity and what behavior is prohibited. *Fox*, 567 U.S. at 239. First, "best interests of children" is not impermissibly vague: it is defined by statute and is further clarified by a reading of the law as a whole.[24] The law defines the "best interests of children" as the use of a child's personal data or design of a product that does not "[b]enefit the covered entity to the detriment of children" and does not result in enumerated reasonably foreseeable material or severe harms. Com. Law § 14-4801(c). While it is true that the commonly used words "benefit" and "detriment" are not defined by the law, they are not inscrutable terms, particularly when read within the context of the statute. *See Martin*, 700 F.3d at 136. The law regulates only covered entities that operate for profit, and the intent of the law is to require covered entities to prioritize children's well-being when "commercial interests and the best interests of children" conflict." Com. Law § 14-4803(4). Accordingly, "benefit" means an economic benefit.

---

[24] Again, California's law serves as a poor analogue, because there, the law prohibited practices that could cause "harm" to children or expose them to "potentially harmful" content. *See, e.g.*, Cal. Civ. Code § 1798.99.31(a)(1)(B). Here, the Kids Code prohibits practices that are reasonably likely to lead to "material physical or financial harm;" "severe" or "extreme psychological or emotional harm;" or "a highly offensive intrusion on children's reasonable expectation of privacy." *See, e.g.*, Com. Law §§ 14-4801(c)(2), 14-4804(b)(3)(i)(3).

Similarly, although "detriment" is not specifically defined, the Kids Code lists the kinds of adverse consequences to children that it aims to prevent.  *See* Com. Law § 14-4801(c). "Detriment," therefore, is a physical, economic, psychological, or emotional harm.  This is reinforced by the Assessment requirement that requires covered entities to assess the risks of these specific harms under specified circumstances. *See* Com. Law § 14-4804(b)(3).  NetChoice alleges that the Kids Code does not explain "how covered entities are meant to (1) weigh [benefits and detriments] against each other; and (2) account for the benefits that minors experience." (ECF 1, at ¶ 147.)  While this observation is true, the Kids Code does not require or permit any weighing of benefits to a covered entity or to a child against detriments to a child.  *See* Com. Law § 14-4801(c).  By the plain language of the law, if a child suffers material harm due to an entity's data processing practices, and those practices allowed a covered entity to earn more than it otherwise would have absent that practice, then the entity's practices violate the Kids Code.  It is irrelevant whether the child also gained some "benefit."

Furthermore, the Kids Code's use of words like "reasonably foreseeable," "severe," and "material" does not render the Kids Code impermissibly vague.  Reasonableness and reasonable foreseeability are common standards in the law.  *See Pinchback v. Armistead Homes Corp.*, 689 F. Supp. 541, 554-55 (D. Md. 1988), *vacated in part on other grounds*, 907 F.2d 1447 (4th Cir. 1990) (borrowing from tort law and applying reasonable foreseeability as an element of proximate causation in context of discrimination claim); *Sutton-Witherspoon v. S.A.F.E. Mgmt., Inc.*, 240 Md. App. 214, 239 (2019) (noting circuit court should have considered issues of material fact related to whether crowd-size conditions at an event were "reasonably foreseeable and could create a risk of the type of harm suffered by" the injured party and whether defendant took "reasonable precautions" to control the crowd).  Similarly, the terms "highly offensive" and "intrusion on a

reasonable expectation of privacy," are two necessary elements of an intrusion upon seclusion claim. *See, e.g.*, *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001); *see also* Md. Code Ann., Envir. § 15-1109 (LexisNexis 2013) (granting Department of the Environment the right to enter property where there is "no reasonable expectation of privacy" for certain purposes). And "severe" is found throughout the Maryland Code. *See, e.g.*, Md. Code Ann., Cts. & Jud. Proc. § 3-812(b)(1) (LexisNexis 2020) (aggravated circumstances that can justify not undertaking reasonable efforts to reunify children with parents include when parent inflicts "severe physical abuse" on the child); Md. Code Ann., Transp. § 21-1004(g)(1) (LexisNexis 2020) (defining "inoperable or disabled vehicle" to include a vehicle that "poses a severe safety hazard").[25]

That the law refers to "children reasonably likely to access the online product," Com. Law § 14-4806(a)(1), rather than break them down into age cohorts does not make the law vague, nor encourage covered entities to "default to the most restrictive possible understandings" of the Kids Code. (ECF 1 ¶¶ 134-35.) If very young children are "reasonably likely" to access the product, *see id.* § 14-4801(s), then the covered entity is obligated to take those children's interests into account. But entities need not consider very young children if only teenagers are likely to access the product. And to the extent that, in the context of processing personal data, the best interests of

---

[25] NetChoice asserts that it is "unclear" what the "necessary link" is between a website's design or information use and physical harm. (ECF 1 ¶¶ 153.) The plain language of the statute describes proximate causation. *See* Com. Law § 14-4801(c) (defining "best interests of children" to mean using personal data only in a way that does not result in reasonably foreseeable harms to children). If, however, NetChoice is suggesting that poor data processing practices could not lead to physical harm to children, it is wrong. To give one example from testimony received by the General Assembly, predators victimize children through "financial sextortion, a crime in which kids are targeted to share explicit photos and then threatened by offenders that they will share the images" unless they pay the blackmailer money. MCASA Testimony, at 2 (citing information from the National Center for Missing and Exploited Children). This can and has resulted in "panicked children taking their own lives." *Id.* It would, therefore, be a violation of the Kids Code if it is reasonably foreseeable that a website's design or information use enables predators to more easily target and victimize children. *See* Com. Law §§ 14-4801(c)(2)(i), 14-4806(a)(1).

younger children differ than from that of older children, an entity may differentiate how data is processed for different users or by different functions of their product or service.

NetChoice's contention that many entities would not know whether they are a "covered entity" (ECF 1 ¶¶ 176-85) is based on hypothetical concerns.[26]  In reviewing research or evidence related to the composition of their products' audience, covered entities are able to determine if a "significant number of children" "routinely" access their product, Com. Law § 14-4801(s)(2), or if a "significant amount" of their audience is children, *id.* § 14-4801(s)(5).  A law is not impermissibly vague simply because the exact contours of what constitutes a "significant" number of children remains undefined.  *Cf. Edgar*, 2 F.4th at 317.  Next, "routinely" means "as a matter of regular occurrence"[27] which, when taken together with a "significant number of children" provides covered entities an adequate basis to determine whether they must comply with the law. Finally, any ambiguity in the Kids Code is mitigated by its notice and opportunity-to-cure provision, Com. Law § 14-4809.  This allows covered entities that make a good faith effort to comply with the law to cure any deficiencies before facing penalties.  *Cf. Hoffman*, 455 U.S. at 499 (scienter requirement mitigates vagueness concerns).  Counts I and II must be dismissed.

## V.    THE KIDS CODE IS NOT PREEMPTED BY COPPA OR SECTION 230.

NetChoice's preemption claims in Counts V and VI fail as a matter of law because the Kids Code is not inconsistent with COPPA or Section 230 and, therefore, is not preempted.  State law may be preempted when Congress expressly preempts a state law, *Just Puppies, Inc. v. Brown*,

---

[26] NetChoice notes that even if a website has "*zero* minor users, if it is 'substantially similar' to a website that *does* have a 'significant number' of minors, it must comply with this Act."  (ECF 1 ¶ 184.)  NetChoice seems to dislike this provision as opposed to misunderstand it.  In any event, NetChoice offers no allegation that such a website exists, nor posits why such a website would not expect minors to use the website in the future.  The Court need not consider mere "speculation about possible vagueness in hypothetical situations."  *See Wag More Dogs*, 680 F.3d at 371 (quoting *Hill*, 530 U.S. at 733).

[27] *Routinely*, Merriam-Webster, https://www.merriam-webster.com/dictionary/routinely (last visited Mar. 24, 2025).

123 F.4th 652, 661 (4th Cir. 2024), or when federal law and state law "conflict," *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018)). State law is also preempted if it "stands as an obstacle to the accomplishment and exercise of the full purposes and objectives" that Congress intended. *Virginia Uranium, Inc. v. Warren*, 848 F.3d 590, 594 (4th Cir. 2017). But courts must not "seek out conflicts between state and federal regulation where none clearly exist." *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005) (citations, brackets, and internal quotation marks omitted). When it is "ambiguous" whether a federal statute preempts state law, courts should presume that there is no preemption. *See Pharmaceutical Rsch. & Mfrs. Of Am. v. Walsh*, 538 U.S. 644, 680 n.4 (Thomas, J., concurring). Neither COPPA nor Section 230 preempt the Kids Code, and the Kids Code does not pose any obstacle to the purposes and objectives of either law. *See Bonta*, 2025 WL 807961, at *30-31 (finding NetChoice unlikely to succeed on argument that COPPA or Section 230 preempt the California age-appropriate design code)

### A.    The Kids Code Is Consistent With and Not Preempted by COPPA.

COPPA sets certain baseline privacy regulations for operators of websites and online services "directed to children" under the age of 13 or "any operator that has actual knowledge that it is collecting personal information from a child" under the age of 13. 15 U.S.C. §§ 6501(1), 6502(a), (b). COPPA may be enforced by the FTC or by state attorneys general who provide notice to the FTC when they take an enforcement action. *Id.* § 6504(a). It also prohibits state or local governments from "impos[ing] any liability . . . in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under [COPPA.]" *Id.* § 6502.

NetChoice asserts that the Kids Code is inconsistent with COPPA because (1) as to children under the age of 13, the Kids Code regulates products likely to be used by children rather than only

28

those actually known to be used by children (ECF 1 ¶¶ 265-68); (2) the Kids Code has a parallel enforcement scheme (ECF 1 ¶¶ 269-71); and (3) the Kids Code regulates how the data of children aged 13-17 is processed, whereas COPPA only applies to data of children under age 13 (ECF 1 ¶ 272).  The first and third contentions are essentially the same: the Kids Code regulates more entities than COPPA and protects more children.  But a state law is not preempted for imposing the same or supplemental protections.  *Jones v. Google LLC*, 73 F.4th 636, 642-43 (9th Cir. 2023); *see also GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 439-40 (2020) (noting that when interpreting a statute, "a matter not covered is to be treated as not covered" (citation omitted)).  That COPPA prohibits states from imposing liability for "inconsistent" "treatment" of activities regulated under COPPA does not imply "clear congressional intent to create an *exclusive* remedial scheme for enforcement of COPPA requirements."  *Jones*, 73 F.4th at 643.

In *Jones*, the Ninth Circuit considered COPPA's preemptive effects on state law claims arising out of conduct that also violated COPPA.  There, the court held that "a state law damages remedy for conduct already proscribed by federal regulations is not preempted."  *Id.* at 643-44 (citations omitted); *see also id.* at 643 (citing FTC amicus brief arguing that "state law claims . . . which are brought as fully stand-alone causes of action under state law . . . but involve conduct that also violates COPPA are generally consistent with COPPA and not preempted").  The court also reasoned that a construction that did *not* allow state laws that imposed the same or supplemental obligations as COPPA would "effectively read the word 'inconsistent' out of COPPA's preemption provision" and "preempt all state law claims protecting children's online privacy."  *Id.* at 642.  Here, both COPPA and the Kids Code both serve to protect the privacy of children's personal data; accordingly, the Kids Code is not preempted.

**B.      The Kids Code Is Consistent With and Not Preempted by Section 230.**

Section 230 protects interactive computer service providers from legal responsibility for information created and developed by third parties. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 & n.4 (4th Cir. 2009) (website immune from defamation suit based on third-party posts). But Section 230 "does not provide blanket protection from claims" that rely in any way on publishing information. *Henderson v. Source for Public Data, L.P.*, 53 F.4th 110, 123 (4th Cir. 2022). For instance, in *Erie Ins. Co. v. Amazon.com, Inc.*, the Fourth Circuit held that Section 230 did not immunize Amazon in a products liability claim, even though the publication of an advertisement for the product was a necessary but-for cause of harm. 925 F.3d 135, 139-40 (4th Cir. 2019). There, the claim was not based on the content of speech that Amazon published, but instead on Amazon's sale of a defective product. *Id.*

Just as with COPPA, Congress explicitly codified into the statute that "[n]othing in [Section 230] shall be construed to prevent any State from enforcing any state law that is consistent with this section." 47 U.S.C. § 230(e)(3). The General Assembly was similarly explicit that the Kids Code cannot be used to impose liability inconsistent with Section 230. Com. Law § 14-4810(2). But, as already discussed, even without that provision, the Kids Code does not impose liability for the content of *any* speech. Just because some or all of NetChoice's members publish third party speech as part of some or all of their services does not mean that Section 230 immunizes them from the Kids Code. *Cf. Erie Ins. Co.*, 925 F.3d at 139-40.

## CONCLUSION

The motion to dismiss should be granted.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Howard R. Feldman

_____

HOWARD R. FELDMAN
Federal Bar No. 05991
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland  21202
HFeldman@oag.state.md.us
(410) 576-6445
(410) 576-6995  (facsimile)

March 28, 2025                                    Attorneys for Defendant