## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NETCHOICE, | * |
| *Plaintiff*, | * |
| v. | * |
| | *    No. 1:25-cv-00322-RDB |
| ANTHONY G. BROWN, ET AL., | * |
| *Defendants*. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Howard R. Feldman

_____
HOWARD R. FELDMAN
Federal Bar No. 05991
JESSICA M. FINBERG
Federal Bar No. 31529
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland  21202
HFeldman@oag.state.md.us
(410) 576-6445
(410) 576-6995 (facsimile)

June 20, 2025                Attorneys for Defendant

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS..................................................................................................1

    Children Are Exposed to Serious Risks When They Use the Internet ...............................1

    The Kids Code Provides Important Basic Protections.........................................................2

    Data Protection Impact Assessments Ensure that Companies Consider Children's
        Well-Being in the Design and Function of Their Products......................................3

    The Kids Code Is Meant to Protect Children Without Infringing Upon Speech .................3

    NetChoice's Complaint Is Premised on the Unsupported Assumption that the Kids
        Code Impedes Speech, Access to Speech, or Editorial Judgment ..........................4

ARGUMENT ....................................................................................................................5

I.      STANDARD OF REVIEW. ...........................................................................................5

II.     FIRST AMENDMENT PRINCIPLES. ............................................................................6

III.    NETCHOICE LACKS STANDING TO ASSERT AS-APPLIED FIRST AMENDMENT
        CHALLENGES UNDER COUNTS I, II, V, AND VI ON BEHALF OF ITS MEMBERS. ....................7

IV.   BECAUSE USERS HAVE SUFFERED NO INJURY, NETCHOICE LACKS STANDING TO
        ASSERT AND CANNOT STATE ANY CLAIMS ON USERS' BEHALF.........................................13

V.    THE COURT SHOULD REJECT NETCHOICE'S FACIAL CLAIMS FOR PRUDENTIAL
        REASONS....................................................................................................................14

VI.   NETCHOICE'S FIRST AMENDMENT CLAIMS FAIL TO STATE FACIAL CHALLENGES
        UPON WHICH RELIEF CAN BE GRANTED. ...................................................................18

VII.  THE KIDS CODE DOES NOT REGULATE PROTECTED SPEECH. ...............................................19

      A.     The Kids Code Regulates Conduct and Expressly Provides that It Is
            Inapplicable to Protected Speech. ..........................................................................19

      B.     The Specific Regulations Regarding Data Use and Product Design Are
            Constitutional Because They Regulate Conduct.....................................................21

            1.     Restrictions on Data Processing Regulate Conduct..................................21

            2.     Prohibiting the Use of Dark Patterns Does Not Restrain Speech. .............23

3.  Preventing Third Parties from Monitoring Children's Online Activity Does Not Impact Speech...........................................24

C.  At Most, the Kids Code Incidentally Burdens Speech in a Content-Neutral Manner. ...............................................................25

1.  The "Best Interest of Children" Standard Does Not Make the Kids Code Content- or Speaker-Based. ...........................................26

2.  The "Reasonably Likely to be Accessed by Children" Standard Does Not Make the Kids Code Content- or Speaker-Based. ...................27

D.  The Assessment Requirement Is Constitutional Because It Does Not Impermissibly Compel Speech. ...................................................29

E.  To the Extent the Kids Code Incidentally Burdens Speech, It Is Subject to and Survives Intermediate Scrutiny. ....................................33

VIII.  AFFECTED ENTITIES HAVE A CLEAR UNDERSTANDING AS TO WHAT CONDUCT IS PROHIBITED. ..............................................................34

IX.  THE KIDS CODE IS NOT PREEMPTED BY COPPA OR SECTION 230. ..................................39

A.  The Kids Code Is Consistent With and Not Preempted by COPPA.....................41

B.  The Kids Code Is Consistent With and Not Preempted by Section 230...............43

CONCLUSION...................................................................................................45

## STATEMENT OF FACTS

**Children Are Exposed to Serious Risks When They Use the Internet**

In considering the Maryland Age-Appropriate Design Code Act (the "Kids Code"), Md. Code Ann., Com. Law §§ 14-4801 – 14-4813 (LexisNexis Supp. 2024), the General Assembly learned that technology companies design their products and target children in ways that lead to "[c]ompulsive overuse, exposure to harmful and age-inappropriate content, cyberbullying, eating disorders, harms to mental health, and . . . sexual exploitation."[1]  Social media use has been directly linked to children's deaths, including a Maryland child who died after taking part in the "blackout" challenge on TikTok[2] and another child who took her own life after suffering relentless cyberbullying.[3]  The General Assembly received testimony that not only is regular or excessive use of online products harmful to children's mental health, but it is also linked to a decreased ability to focus, increased impulsive behaviors, and suicidal ideation and self-harm.[4]

According to testimony received by the General Assembly, children are online constantly: teenagers can spend up to eight hours a day on their phones, and even pre-schoolers average 2.5 hours of screen-based media use per day.[5]  This is by design.  Online products are optimized to be addictive, employing algorithms to keep children using the product so that advertisers can target

---

[1] Testimony of FairPlay ("FairPlay Testimony"), at 1 (Feb. 13, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1DBKSL2UBn0WlTp0yCg6jrtzNQ3P0lRTJ.pdf.  All written testimony was submitted to the General Assembly and is part of the legislative history of the Kids Code.

[2] Testimony of Minor Family (Feb. 14, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1tX_vOUdcAhi6xqlSXcj2b2HE5FeU5OzP.pdf

[3] Testimony of Christine McComas (Feb. 9, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1LXqP6-Qq6Zr2IWO5IkFi7RGBBreqBM2e.pdf

[4] Fairplay Testimony, at 7-8.

[5] *See* Testimony of Common Sense (Feb. 13, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1BJXmS7wHOAWJVuFK08CTFv5KUmM6n57C.pdf; FairPlay Testimony, at 3; *see also* House Bill 603, Exhibit 1, at 2.

them and, because of all the data that companies collect, they are able to target children based on their interests and time delivery of advertising messages to when children are most vulnerable.[6]

The General Assembly also learned that without strong privacy protections, children are targeted by malicious actors and predators.[7]  Even the most engaged and vigilant parents cannot control their children's online privacy and safety.[8]  After hearing and considering all of these facts, the General Assembly passed the Kids Code to "[e]nsur[e] robust privacy, and thus safety, protections" for children "by ensuring that those online products are designed in a manner that recognizes the distinct needs of children within different age ranges."  (*See* House Bill 603, Exhibit 1, at 2.)

**The Kids Code Provides Important Basic Protections**

The Kids Code applies to "covered entities" that (1) operate for profit; (2) collect consumers' personal data; (3) determine the "purposes and means" of processing consumers' personal data; and (4) meet certain criteria related to annual revenue or the amount of personal data that the entity processes.  Com. Law. § 14-4801(h).  The Kids Code restricts the extent to which covered entities can process children's personal data.  *Id.* § 14-4804(a)(1)–(4), (a)(8); (c). The Kids Code also restricts covered entities from processing children's precise geolocation data, from using dark patterns, and from allowing a person other than a parent or guardian to monitor a child without alerting the child and the child's parent or guardian.  *Id.* § 14-4806(a)(5)–(7), (9). Covered entities must also configure default privacy settings for children to offer a high level of privacy; provide privacy information and their policies and terms of service "concisely" and

---

[6]  FairPlay Testimony, at 13-15, 18-19.

[7]  Testimony of Maryland Coalition Against Sexual Assault ("MCASA Testimony") (Feb. 13, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1tRDd4GxDk_pNBVftHo0XuUE5MUFUKI_t.pdf

[8]  Testimony of Maryland School Psychologists' Association (Feb. 9, 2024), https://mgaleg.maryland.gov/cmte_testimony/2024/ecm/1ibjZZUh73KxTb1Igqn2ns9rYXKszB1LE.pdf.

"prominently;" and provide "prominent, accessible, and responsive tools" for managing privacy and reporting concerns. *Id.* § 14-4805(3)–(5).

### Data Protection Impact Assessments Ensure that Companies Consider Children's Well-Being in the Design and Function of Their Products

The Kids Code requires covered entities to prepare a data protection impact assessment (the "Assessment") for any online product reasonably likely to be accessed by children. *Id.* § 14-4804(a)(1). Each Assessment must identify the purpose of the product, how it uses a child's data, and assess whether the product is designed in a manner "consistent with the best interest of the children reasonably likely to access the online product." *Id.* § 14-4804(b). The Assessment considers a number of factors, including whether the product's algorithms or its data collection, management, or processing practices could lead to children being targeted by harmful contacts. *Id.* As to each of the factors, a covered entity must assess the risks to a child of physical or financial harm, psychological or emotional harm, intrusion on privacy, and discrimination. *Id.* Assessments must describe the "steps the entity has taken and will take to . . . act in a manner consistent with the best interests of children." *Id.*

Covered entities must retain and periodically review Assessments. *Id.* § 14-4805. Upon written request by the Office of the Attorney General's Consumer Protection Division (the "Division"), a covered entity must provide a list of all Assessments the entity completed and the Assessments themselves. *Id.* § 14-4807. Disclosure of Assessments to the Division does not waive any applicable privileges shielding any other disclosure, and Assessments may not be released by the Division pursuant to a Public Information Act request. *Id.* §§ 14-4807(c), 14-4811.

### The Kids Code Is Meant to Protect Children Without Infringing Upon Speech

The General Assembly codified its intent to protect children without impeding free speech and expression and provided a safe harbor for covered entities that may accidentally be in violation

of the Kids Code. Entities that "develop and provide online products" that children will likely use "shall ensure the best interest of children" in the design, development, and provision of those products, and "privacy, safety, and well-being of children" must be prioritized over "commercial interests." *Id.* § 14-4803(2)-(4). At the same time, "[n]othing in [the Kids Code] may be construed to require a covered entity to monitor or censor third-party content or otherwise impact the existing rights and freedoms of any person." *Id.* § 14-4803(5). Likewise, nothing in the Kids Code "may be construed to: [p]revent a child from deliberately or independently searching for or specifically requesting content; or [r]equire a covered entity to implement an age-gating requirement." *Id.* § 14-4810(3)-(4). Violations of the Kids Code are subject to a fine of $2,500 per affected child for each negligent violation and $7,500 per affected child for each intentional violation. *Id.* § 14-4808. However, if covered entities are substantially compliant with the Assessment requirements, the Division will notify the entity and provide an opportunity to cure any violations before initiating an enforcement action. *Id.* § 14-4809.

> **NetChoice's Complaint Is Premised on the Unsupported Assumption that the Kids Code Impedes Speech, Access to Speech, or Editorial Judgment**

NetChoice alleges that it is a non-profit trade association that "promote[s] online commerce and speech" and seeks to "increase consumer access and options via the Internet." (ECF 27 ¶ 22.) Its members include social media companies that "create, curate, and disseminate" compilations of speech. (ECF 27 ¶ 25.) Members allow users to engage in speech and debate with others, post creative endeavors, or search for particular information or content. (ECF 27 ¶¶ 37-39.) Some members recommend content to users based on their preferences. (ECF 27 ¶ 50.) In making their offerings available to users, NetChoice members collect and process users' data. (ECF 1 ¶ 40.)

NetChoice alleges that many, if not most, of its members who offer online services are subject to the Kids Code. (ECF 27 ¶ 25.) Those members collect and use data from their users,

including data needed for the services to function properly, such as device data required for online products to display properly or to identify malicious actors. (ECF 27 ¶¶ 42-44.) They also collect information related to user accounts. (ECF 27 ¶¶ 45-46.) Finally, some members collect information to "personalize content available to users." (ECF 27 ¶ 47.)

"[S]ome NetChoice members" offer parental controls and options for parents to monitor their children's activities on their services. (ECF 27 ¶ 62.) NetChoice asserts that many of its members "expend vast resources" to ensure that their services are appropriate for their user communities through content moderation or prioritization of positive and age-appropriate speech and content, while others "take a more hands-off approach" on the basis that users can decide for themselves what to engage with or filter out. (ECF 27 ¶ 63.)

NetChoice's eight-count amended complaint asserts that the Kids Code violates the First Amendment, that two definitions are vague, and that the law is preempted. (*See* ECF 27.)

## ARGUMENT

### I.    STANDARD OF REVIEW.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). Although this Court is required to "take the facts in the light most favorable to the plaintiff," it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (citation omitted). Nor may this Court credit "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678.

A party asserting claims must also have standing to bring those claims before the court. *See Maryland Election Integrity, LLC v. Maryland State Bd. of Elections* 127 F.4th 534, 537-41

(4th Cir. 2025). The plaintiff has the burden of demonstrating standing for each of its claims. *Id.* at 537. On a challenge to subject-matter jurisdiction, such as this one, defendants must show that the complaint, accepted as true, fails to state sufficient facts upon which to base subject-matter jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Challenges to Article III standing are brought under Rule 12(b)(1), and challenges to prudential standing are brought under Rule 12(b)(6). *Harris v. Wells Fargo Corp. Office Headquarters*, GJH-22-00580, 2023 WL 155244, at *2 (D. Md. Jan. 11, 2023); *see also United States v. Day*, 700 F.3d 713 (4th Cir. 2012).

## II.    FIRST AMENDMENT PRINCIPLES.

The First Amendment provides that government "shall make no law . . . abridging the freedom of speech. U.S. Const., amend. I. The First Amendment does not, however, preclude government regulation simply because the law has an incidental impact on speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-06 (1986) (although "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities," not every law is subject to strict scrutiny "simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction.").

To determine if a challenged law violates the First Amendment, a court must first assess whether "conduct with a significant expressive element . . . drew the legal remedy in the first place or if the law "has the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. at 706-07. The First Amendment is not implicated by a law that does neither. *Id*. at 707.

If a court determines that a challenged law regulates expressive activity, the next question is whether the law is content-neutral or content-based. Content-neutral laws "are subject to an

intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025) (quotation marks omitted).  A content-neutral law will be sustained under intermediate scrutiny if the law "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id*. (quotation marks omitted).

## III.    NETCHOICE LACKS STANDING TO ASSERT AS-APPLIED FIRST AMENDMENT CHALLENGES UNDER COUNTS I, II, V, AND VI ON BEHALF OF ITS MEMBERS.

To establish Article III standing, a plaintiff must allege (1) an "injury in fact" (2) that is "fairly traceable" to the defendant's conduct and (3) that is "likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  A legally cognizable injury is "concrete and particularized; the threat must be actual and imminent, [and] not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  Generally, a party must assert its own rights and cannot raise claims of third parties who are not before the court.  *Warth v. Seldin*, 422 U.S 490, 499 (1975).  This rule frees courts "not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy" and "assures the court that the issues before it will be concrete and sharply presented."  *Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) (quotation marks omitted).

An association has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington Area Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  But if the participation of individual members "is essential to a proper understanding and

resolution" of the claims at issue, then the association lacks standing. *Harris v. McRae*, 448 U.S. 297, 321 (1980) (free exercise challenge to enjoin abortion funding restriction required members to show coercive effect on their individual practice of religion); *see also Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (no associational standing when court must perform "an *ad hoc* factual inquiry for *each* [member]") (emphasis in original). NetChoice's assertion of standing to bring as-applied challenges on behalf of its members under Counts I, II,[9] V, and VI (the "First Amendment Claims") of the amended complaint fails because (1) not all its members have standing to sue in their own right  and (2) the participation of all its members will be required in discovery and at trial.

NetChoice broadly alleges that its members employ algorithms to display, compile, and curate speech from the "billions" of posts users make every day to the members' online platforms, and that the use of algorithms in this fashion constitutes expressive speech. (ECF 27 ¶¶ 37, 255.) NetChoice also alleges that the Kids Code restricts its members' access to information they require to compile, curate, and deliver to users other users' billions of posts of content and, therefore, infringes upon members' rights protected by the First Amendment. (ECF 27 ¶¶ 89, 130, 209, 253.) NetChoice further alleges the Kids Code requires that its members censor their expression. (ECF 27 ¶ 9.) NetChoice also alleges that the Assessment requirements interfere with members' ability to curate and disseminate compilations of users' protected speech. (ECF 27 ¶¶ 209-10.) Notably, NetChoice does not allege that the Kids Code requires removal of content from any online platform or renders any online content wholly unavailable to any users, whether minors or adults.

---

[9] Unlike Counts I, V, and VI, the amended complaint does not expressly state that Count II asserts an as-applied challenge on behalf of NetChoice's members. The standing argument set forth herein, therefore, pertains to Count II to the extent NetChoice does, in fact, seek to state an as-applied challenge pursuant to that count.

In *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), the Supreme Court explained that social media platforms receive First Amendment protection, but only to the extent they "create expressive products." 603 U.S. at 716. Social media platforms which exercise editorial discretion when compiling and curating their users' speech engage in activity entitled to First Amendment protection. *Id*. at 731. However, because not all compilers of others' speech "express a message of their own, not all compilations are protected by the First Amendment." *Id*. at 781 (Alito, J., concurring). Rather, "the First Amendment protects only those compilations that are inherently expressive in their own right, meaning that they select and present speech created by other persons in order to spread the compiler's own message." *Id*. (quotation marks and brackets omitted).

The "key" to social media platforms' "scheme is prioritization of content, achieved through the use of algorithms. Of the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do." *Moody*, 603 U.S. at 734. The selection and ranking of content in feeds "is most often based on a user's expressed interests and past activities." *Id*. at 734-35. Customized feeds may also be based on a platform's community standards or guidelines, which "detail the messages and videos that the platforms disfavor." *Id*. at 735. A customized feed generated by an algorithm may constitute protected speech if the algorithm was written to implement expressive choices by humans. As such, in *Moody*, the Court narrowly determined that First Amendment protection extends to feeds generated by an algorithm which implements guidelines reflecting a platform's editorial choices about which content is favored or disfavored. *Id*. at 738-40; *see also NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1220 (N.D. Cal. 2024), *appeal docketed*, Nos. 24-7879 and 25-146 (9th Cir. Jan.

2, 2025) ("The First Amendment questions in *Moody* involved restrictions on content moderation policies that embodied human value judgments about the types of messages to be disfavored.").[10]

First Amendment protections do not, however, knee-jerk extend to all content available on or disseminated by social media platforms.  As noted above, compilations that are not "'inherently expressive' in their own right" are not entitled to First Amendment protection.  *Moody*, 603 U.S. at 781 (Alito, J., concurring); *see also id*. at 792 (Alito, J., concurring) (observing that "not all platforms [may] curate all third-party content in an inherently expressive way.").  For example, "[w]hen it comes to feeds that recommend posts based solely on prior user activity, there is no apparent message being conveyed."  *Bonta*, 761 F. Supp. 3d at 1221;[11] *see also Moody*, 603 U.S. at 746 (Barrett, J., concurring) (the First Amendment may not protect social media platforms' use of artificial intelligence or algorithms which "just present[] automatically to each user whatever the algorithm thinks the user will like"); *id*. at 787-88, 790-91 (Alito, J., concurring) (suggesting that the First Amendment does not extend to "passive receptacles," such as platforms which "*carry* messages instead of *curating* them to create an independent speech product," or to platforms which "engage in little or no content moderation at all," which use algorithms that are not expressive in their operation, or which outsource curation to other parties) (emphasis in original).

In sum, *Moody* "stands only for the proposition that restrictions on a private speaker's ability to compile and organize third-party speech implicate speech rights only if those restrictions

---

[10] In *Bonta*, the court explained that the content moderation policies at issue in *Moody*, and the algorithms which embodied them, were entitled to First Amendment protection because they were comparable to "traditional forms of editorial discretion."  761 F. Supp. 3d at 1220.

[11] In *Bonta*, the court held that a statutory restriction on social media platforms' use of personalized information when compiling feeds does not infringe on protected speech because the restriction did "not prevent social media platforms from carrying out content moderation like that discussed in *Moody*."  *Bonta*, 761 F. Supp. 3d at 1221.  The court observed: "[I]t is difficult to say that restricting use of personalized feeds would alter the overall speech environment on any social media platform in any appreciable way.  In addition, it is also challenging to identify how personalization, as opposed to content moderation, might send any message."  *Id*. at 1222.

impair the speaker's own expression." *Bonta*, 761 F. Supp. 3d at 1219. Any assertion by NetChoice that all compilations constitute speech (*e.g*, ECF 27 ¶ 255) protected by the First Amendment misconstrues—and is not supported by—*Moody*. "Consequently, even post-*Moody*, courts must inquire into whether an act of compiling and organizing third-party speech is expressive before they can determine whether that act receives First Amendment protection." *Bonta*, 761 F. Supp. 3d at 1219.

If the First Amendment Claims were brought individually by NetChoice's members, to establish standing, each member would have to plead and prove that they suffered an injury in fact. For each member, this determination would require deep factual inquiries into how their social media feeds work in order to assess whether the feeds are the product of expressive, editorial discretion to which First Amendment protection applies. Similar determinations would be required with respect to every other application of every member subject to the Kids Code to determine whether, like messaging applications, they constitute "'passive receptacles' of third-party speech that receive no First Amendment protection." *Moody*, 603 U.S. at 787-88 (Alito, J., concurring). In its amended complaint, NetChoice concedes that not all of its members, when they compile and disseminate third party content, exercise editorial discretion because they simply allow "users (and parents) [to] decide for themselves what they wish to engage with and what filters to adopt." (ECF 27 ¶ 63.) Feeds compiled by entities which do not exercise editorial discretion are not protected by the First Amendment and such entities, therefore, will not suffer any redressable injury from regulation of their compilations. NetChoice otherwise offers only broad, conclusory assertions that at least some members "curate and disseminate compilations of protected speech on their services, [that] are protected by the First Amendment." (*e.g.*, ECF 27 ¶ 255.) Such conclusory allegations are plainly insufficient to show that any individual member "ha[s] standing to sue in

their own right." *See Hunt*, 432 U.S. at 343; *Maryland Highways Contractors Ass'n, Inc. v. State*, 933 F.2d 1246, 1252 (4th Cir. 1991) (association lacked standing when it could not show its members suffered any injury).

Moreover, any determination that the Kids Code has restricted protected speech of an individual member will require individual inquiry not suitable for a lawsuit to which those members are not parties. On this point, *Bonta* is instructive. In the context of ruling on a motion for preliminary injunction, the court determined that NetChoice lacked associational standing to assert as-applied challenges to restrictions on personalized feeds because such challenges would require "deep factual inquiries into how a particular social media feed works . . . . [E]ach separate as-applied challenge on behalf of each separate NetChoice member requires its own 'ad hoc factual inquiry.'" 761 F. Supp. 3d at 1230 (citation omitted); *see also Warth*, 422 U.S. at 515-16 (association lacked standing when "both the fact and extent of [members'] injury would require individualized proof"). Adjudication of such claims, the court concluded, would require NetChoice's members to participate in the litigation, at least "for the purpose of conducting discovery into how each of those members' feeds work." *Bonta*, 761 F. Supp. 3d at 1231.[12]

Likewise, here, without discovery from each of NetChoice's members, it will be unknown whether each of the applications members employ to disseminate content, including their feeds, are subject to First Amendment protection. Deep factual inquiries into such matters will require

---

[12] *See also Parent/Pro. Advoc. League v. City of Springfield*, 943 F.3d 13, 35 (1st Cir. 2019) (organizations lacked associational standing to sue on behalf of students because "adjudication of the claims here would turn on facts specific to each student, including unique features of each student's unique disability, needs, services, and placement."); *Rent Stabilization Ass'n*, 5 F.3d at 597 (association lacked standing to bring as-applied takings claims because it was not possible "to discern the identity of the aggrieved parties without delving into individual circumstances."); *Hanover County Unit of the NAACP v. Hanover County*, 461 F. Supp. 3d 280, 289-90 (E.D. Va. 2020) (dismissing association's First Amendment claim because the claim required individualized proof from members).

the members' participation in discovery and at trial. Accordingly, this court should dismiss the as-applied challenges to the Kids Code asserted by NetChoice in Counts I, II, V, and VI.

## IV. BECAUSE USERS HAVE SUFFERED NO INJURY, NETCHOICE LACKS STANDING TO ASSERT AND CANNOT STATE ANY CLAIMS ON USERS' BEHALF.

For the simple reason that the First Amendment does not infringe upon any potential users' First Amendment rights, this court should also dismiss the challenges, whether as-applied or facial, to the Kids Code asserted by NetChoice in Counts I through VI of the amended complaint, to the extent such claims are based on asserted harm to users. (ECF 27 ¶ 114 (asserting that each count of the amended complaint "raises the rights of both NetChoice members and" their users).) The Kids Code mandates that it shall not be interpreted or construed to "[p]revent or preclude a child from deliberately or independently searching for or specifically requesting content." Com. Law § 14-4810(3). Further, the Kids Code does not require removal of any content from any online platform, and it is not intended "to require a covered entity to monitor or censor third-party content or otherwise impact the existing rights and freedoms of any person." *Id*. § 14-4803(5).

Again, *Bonta* is instructive. Like the Kids Code, the California law in question did "not require removal of any posts, and users may still access all posts by searching through the social media platforms." 761 F. Supp. 3d at 1224. The state's regulation of personalized feeds did not render any content inaccessible "simply because someone needs to proactively search for it." *Id*. Thus, for purposes of ruling on a preliminary injunction motion, the court held that NetChoice failed to establish that users' First Amendment rights were infringed by the law. *Id*. at 1223-24. The fact that content may not appear in users' personalized feeds does not render the content inaccessible. Counts I through VI of the amended complaint should be dismissed to the extent such claims raise the rights of the users of NetChoice's members' platforms and applications.

V.    **THE COURT SHOULD REJECT NETCHOICE'S FACIAL CLAIMS FOR PRUDENTIAL REASONS.**

"For a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Moody*, 603 U.S. at 723.  First, "'[c]laims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement." *Id.* (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008)).  Second, facial challenges "run contrary to the fundamental principle of judicial restraint" by requiring courts to anticipate questions of constitutional law or to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Washington State Grange*, 552 U.S. at 450 (quotation marks omitted).

Third, "'facial challenges threaten to short circuit the democratic process' by preventing duly elected laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723 (quoting *Washington State Grange*, 552 U.S. at 451).  By preventing states and state courts from determining a statute's scope, and from "applying [their] own statute[s] in a constitutional manner," facial challenges "distort the relationship between the Federal Government and the States." *Id.* at 758-60 (Thomas, J., concurring) (also observing that "[f]acial challenges disrupt the adversarial system and increase the risk of judicial error" by "ask[ing] courts to resolve potentially thorny constitutional questions with little factual background and briefing by a party who may not be affected by the outcome."); *id.* at 777-78 (Alito, J., concurring).  As such, "[e]ven in the First Amendment context, facial challenges are disfavored" and, therefore, they are "hard to win." *Id*. at 723, 744; *see also id*. at 748 (Jackson, J., concurring) ("[A]s all Members of the Court acknowledge, plaintiffs bringing a facial challenge must clear a high bar.").

To prevail on a First Amendment facial challenge, a plaintiff must establish that the challenged "law's unconstitutional applications are substantial compared to its constitutional ones.

To make that judgment, a court must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *Moody*, 603 U.S. at 718; *see also id*. at 723 (a plaintiff must show that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.") (quotation marks and brackets omitted). The need for a plaintiff "to carry its burden on [these] issues is the price of its decision to challenge [a law] as a whole." *Id*. at 744.

To undertake a "proper facial analysis" of the Kids Code, this Court will first be required to assess the full scope of the law by comprehensively determining "[w]hat activities, by what actors," are prohibited or otherwise regulated by the law. *Id*. at 724. Next, the court "must explore the [Kids Code's] full range of applications," "decide which of the [law's] applications violate the First Amendment, and . . . measure them against" the applications which do not violate the First Amendment. *Id*. at 725-26.[13] After completing the required analysis, a court may strike down a challenged law "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id*. at 724; *see also id*. at 744 ("[N]either parties nor courts can disregard the requisite inquiry into how a law works in all of its applications.").

As with any challenged law, a comprehensive analysis of the Kids Code, and each its many parts, "is bound to be fact intensive, and it will surely vary from function to function and platform to platform." *Moody*, 603 U.S. at 747 (Barrett, J., concurring). This fact intensive inquiry will require the Court to "carefully parse not only what entities are regulated, but how the regulated

---

[13] Referring to the analysis a facial challenge requires of social media platforms' feeds, Justice Barrett expressed: "Analyzing how the First Amendment bears on those functions is complicated enough without simultaneously analyzing how it bears on a platform's other functions—*e.g.,* Facebook Messenger and Google Search—much less to distinct platforms . . . . In fact, dealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task." *Moody*, 603 U.S. at 745 (Barrett, J., concurring). Thus, Justice Barrett cautioned that facial challenges to the laws at issue, like the Kids Code, "likely forces a court to bite off more than it can chew." *Id*. at 747 (Barrett., J., concurring).

activities actually function before deciding if the activity in question constitutes expression and therefore comes within the First Amendment's ambit." *Id.* at 749 (Jackson, J., concurring).[14]

Collectively, the Justices' opinions in *Moody* make clear that applying First Amendment principles "in one fell swoop to the entire social-media universe" is a highly complicated, if not impossible, exercise. *Moody*, 603 U.S. at 748 (Barrett, J., concurring). Yet, in connection with NetChoice's facial First Amendment Claims, with respect to parties not before it, *Moody* mandates that this Court undertake that very kind of onerous entity-by-entity, platform-by-platform, and function-by-function analysis that is required to assess whether, initially, the First Amendment protects content generated by all parties subject to the Kids Code. *Moody* also mandates that the court determine the full scope of the Kids Code and the full range of its applications.

In contrast with the onerous, disfavored exercise that must be undertaken in connection with a facial challenge, an as-applied challenge to the Kids Code by a party claiming that the law actually infringes on its free speech would enable the court to narrowly "home in on whether and how specific functions [operated by the party bringing an as-applied challenge]—like feeds versus direct messaging—are inherently expressive and answer platform- and function-specific questions that might bear on the First Amendment analysis" as it pertains to that party. *Moody*, 603 U.S. at 747-78 (Barrett, J., concurring); *see also id.* at 795-96 (Alito, J., concurring) (suggesting that courts "proceed with caution" in resolving questions concerning the "application of a constitutional

---

[14] Further complicating matters, the analysis of each feed compiled and disseminated by each online platform will not always lead to a straightforward conclusion that the feed does or does not implement humans' expressive choices. In *Bonta*, the court observed that a feed might recommend posts based on both users' activity (non-expressive) and the platform's content moderation policy (expressive) and indicated that a restriction applied to a "mixed" feed might be permissible as an incidental burden on speech. *Bonta*, 761 F. Supp. 3d at 1223 (citing *Sorrell*, 564 U.S. at 567). In parsing how feeds generated by social media platforms actually function and, ultimately, in determining whether they are entitled to First Amendment protection, a court may need to assign relative weights to the expressive and non-expressive factors to the algorithms employed to generate such feeds. *Id.*

requirement to new technology," and noting that "[s]uch questions should be resolved in the context of an as-applied challenge.").

*Washington State Grange* involved a facial challenge by political parties to Washington State's blanket primary system. 552 U.S. at 444-49. The state law required that candidates be identified on the ballot by the party of their own choosing, that voters may vote for any candidate and that the top two vote getters advance to the general election regardless of their self-designated party preference. *Id*. at 447-48. The political parties contended that the state law violated their First Amendment associational rights "by usurping [their] right to nominate [their] own candidates and by forcing [them] to associate with candidates [they did] not endorse." *Id*. at 448. Because the political parties' facial challenge turned "on the possibility that voters will be confused as to the meaning of [candidates'] party-preference designation," the Supreme Court determined that factual determinations about voter confusion "must await an as-applied challenge." *Id*. at 454-58; *see also United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012) (rejecting First Amendment facial challenge and cautioning that such challenges often rest on speculation, raise the "risk of premature interpretation of statutes on the basis of factually barebones records," and are "contrary to principles of judicial restraint" (quotation marks omitted)); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 300-01 (4th Cir. 2009) (cautioning against facial challenges and observing that "as-applied challenges are the basic building blocks of constitutional adjudication" (brackets and quotation marks omitted)).

The above-discussed authorities strongly counsel this court against resolving NetChoice's facial First Amendment Claims and support the dismissal of such claims in favor of as-applied challenges that may be brought by parties who claim injury from being subject to the Kids Code

and in which the requisite factual determinations can be made. Accordingly, this Court should dismiss the facial challenges asserted in Counts I, II, V, and VI of the amended complaint.

## VI. NETCHOICE'S FIRST AMENDMENT CLAIMS FAIL TO STATE FACIAL CHALLENGES UPON WHICH RELIEF CAN BE GRANTED.

Based upon allegations of harm to NetChoice's members and the members' users, Counts I, II, V, and VI, the First Amendment Claims, assert facial challenges to the Kids Code. As to NetChoice's members, the amended complaint asserts that the Kids Code infringes upon the speech expressed in the feeds the members compile and disseminate to their users. (*E.g.,* ECF 27 ¶¶ 89, 130, 209, 253.)

As discussed above, to prevail on its facial challenges to the Kids Code based on violations of its members' rights to compile and publish feeds,[15] NetChoice must plead and prove that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723. As to the personalized feeds compiled and generated by NetChoice's members and other operators of social media platforms, at a minimum, *Moody* mandates that NetChoice "show that most feeds contain expressive elements." *Bonta*, 761 F. Supp. 3d at 1221 n.4. But the required analysis must also extend beyond feeds to all of their other applications, functions, and activities regulated by the Kids Code, including those that do not embody any human's expressive, editorial choices, such as messaging and chat applications. Thus, to meet the high bar the Supreme Court has established for facial challenges, NetChoice must identify each of the online platforms that fall within the Kids Code's reach and disclose "the nature of the content moderation they practice." *Moody*, 603 U.S. at 787 (Alito, J., concurring). But rather than alleging the facts which, if proven true, would allow for such a conclusion to be reached,

---

[15] NetChoice's separate allegations in Count V, that the Assessment requirement compels speech in violation of the First Amendment is separately discussed below.

NetChoice simply parrots back *Moody*'s test and alleges that it is met. (*E.g.*, ECF 27 ¶¶ 129, 139, 244-45.)

NetChoice's amended complaint falls short of meeting its burden to address all applications of the Kids Code as a whole and how feeds and other functions assertedly subject to the law work. Although NetChoice concedes that not all of its members engage in protected expression (ECF 27 ¶ 63), in a conclusory fashion, it nonetheless alleges that all of its members' compilations of content are protected by the First Amendment. (ECF 27 ¶ 255.) NetChoice does not allege any facts as to how the law actually interacts with its members, or even which of its members would be impacted by the alleged impermissible effects of the law. Because the amended complaint does not allege the full range of activities conducted by the full range of actors regulated by the Kids Code then, if proven true, the allegations in the amended complaint would fall far short of establishing the facts necessary for this Court to conclude that feeds and other functions subject to the law are protected by the First Amendment in the first instance. Likewise, if proven true, the allegations in the amended complaint would not establish that a substantial number of the law's applications are unconstitutional when judged in relation to the law's legitimate sweep. Thus, as to the facial First Amendment Claims based on violations of NetChoice's members' rights to compile and publish feeds, the amended complaint fails to state plausible claims for relief.

VII. **THE KIDS CODE DOES NOT REGULATE PROTECTED SPEECH.**

A. **The Kids Code Regulates Conduct and Expressly Provides that It Is Inapplicable to Protected Speech.**

All of NetChoice's First Amendment claims fail because the Kids Code does not regulate protected speech. Rather, the Kids Code is a consumer protection law that regulates the conduct of companies that engage in commercial endeavors. Specifically, it prohibits covered entities from collecting and using data from children in a way that could lead to reasonably foreseeable, severe

or material harm to children; it restricts collection of data from children; and it and requires entities to review the design and data practices of their products to ensure that those products are not going to seriously harm children. Com. Law §§ 14-4804, 14-4806. To make clear its intent about how the Kids Code is to be applied, the General Assembly expressed that the law does not require entities to "monitor or censor third-party content" or impact First Amendment rights. *Id.* §§ 14-4803(5). The General Assembly also instructed that the law may not "be interpreted or construed to: [p]revent or preclude a child from deliberately or independently searching for or specifically requesting content; or [r]equire a covered entity to implement an age-gating requirement." *Id.* § 14-4810(3)–(4).[16]

Because the law regulates conduct and not content, to read First Amendment implications into the Act would be contrary to basic principles of statutory interpretation. *Sabisch v. Moyer*, 466 Md. 327, 350 (2019) ("[T]he General Assembly is presumed to have meant what it said and said what it meant."); *Arcara*, 478 U.S. at 707. Courts may not "add []or delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute" or "construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State*, 378 Md. 378, 387 (2003). There is no provision of the Kids Code that requires covered entities to monitor, alter, or censor speech, nor any provision that allows the Division to punish an entity for the content of their own or any third party's speech. *See* Com. Law §§ 14-4801 – 14-4813. NetChoice's assertion that the Kids Code requires covered entities to opine on harms to children that arise from content (*e.g.*, ECF 27 ¶¶ 107, 221, 243) or impacts its members ability to make protected editorial decisions regarding curated feeds (*e.g.*, ECF 27 ¶¶ 255-58), reads into the law

---

[16] This Court may properly consider the General Assembly's stated intentions in assessing whether the Kids Code is a content- or speaker-based regulation. *See Bonta*, 716 F. Supp. 3d at 1225-26.

language that the General Assembly did not include and ignores the General Assembly's expressions of intent.

NetChoice's apparent conclusion that, because at least some of its members disseminate protected speech or engage in at least some protected speech themselves, any regulation on those members' activities is subject to strict scrutiny, is contrary to First Amendment jurisprudence. The Supreme Court has held that speech-disseminating entities such as the press and booksellers cannot "claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities." *Arcara*, 478 U.S. at 705 (finding that a one-year closure of a bookstore that knowingly allowed illegal sexual activity on its premises did not impermissibly burden the store's First Amendment bookselling activities); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 581 (1983) (collecting cases and noting that "[c]learly, the First Amendment does not prohibit all regulation of the press"). NetChoice's First Amendment Claims fail because the Kids Code regulates conduct, not speech. Accordingly, Claims I, II, V, and VI must be dismissed.

### B. The Specific Regulations Regarding Data Use and Product Design Are Constitutional Because They Regulate Conduct.

The Kids Code's provisions related to data processing, manipulating users through dark patterns, and monitoring children's online activities permissibly regulate conduct, not speech.

### 1. Restrictions on Data Processing Regulate Conduct.

The core purpose of the Kids Code is to prevent the overcollection of children's personal data and to protect children from harmful data practices by covered entities. NetChoice takes issue with three of these provisions in particular: (1) the law's prohibition on "process[ing] the personal data of a child in a way that is inconsistent with the best interests of children reasonably likely to access the online product;" (2) its requirement that a covered entity not "profile a child by default"

unless it is "necessary to provide the requested online product" and the entity implements "appropriate safeguards" to "ensure that profiling is consistent with the best interests of children;" and (3) its prohibition on "process[ing] personal data of a child that is not reasonably necessary to provide an online product that the child is actively and knowingly engaged with."  (ECF 27 ¶ 45 (quoting Com. Law §§ 14-4806(a)(1)–(3).)  All three of these provisions regulate the conduct of companies and none impose an impermissible restriction on protected speech.

By restricting the extent to which companies can process children's data, the Kids Code ensures that companies do not profit off of practices that expose children to foreseeable risks of harm.  NetChoice alleges that "[s]peech on the Internet requires" entities to process children's data.  (ECF 27 ¶ 254).  But it does not follow that restrictions on processing children's data regulate the speech that an online service provider can create or publish.   For instance, a journalist may need to gather information to write an article, but regulations that could impact how that information is gathered does not impact what the journalist is allowed to say.   Simply because an entity primarily engages in activities that involve speech does not mean that laws of general applicability to conduct cannot be applied to them without offending the First Amendment.  *See Arcara*, at 478 U.S. at 705. [17]

Furthermore, the Kids Code does not prevent processing children's data or profiling children: it only sets reasonable limits on covered entities' ability to do so in order to ensure children's safety.  For instance, covered entities may profile children when the child opts in to

---

[17] NetChoice's emphasis on its contentions that protected speech requires data processing elides the fact that vast amounts of data processing that occurs online can have no connection to speech at all.  For instance, these provisions of the Kids Code prohibit an online gaming app from collecting data about the child even when the app is not being actively used on the child's device.  *See* Com. Law § 14-4806(a)(3).  It is unclear how that course of conduct would constitute or even relate to protected speech.

profiling or if the covered entity must profile a child in order to provide its product. *See* Com.
Law § 14-4806(a)(2). The provisions NetChoice challenges do not regulate protected speech.

**2.    Prohibiting the Use of Dark Patterns Does Not Restrain Speech.**

Prohibition of dark patterns is a consumer protection regulation that prohibits manipulative
conduct and does not impact protected speech. The Kids Code defines a "dark pattern" as a "user
interface designed or manipulated with the purpose of subverting or impairing user autonomy,
decision making, or choice." Com. Law § 14-4801(i)(1); *see also id.* § 14-4801(i)(2) (also
including any practice the FTC identifies as a dark pattern). Use of "dark patterns" to cause a child
to "provide personal data beyond what is reasonably expected to provide for the online product;"
to "[c]ircumvent privacy protections;" or to "[t]ake any action the entity knows, or has reason to
know, is not in the best interest of children" who are reasonably likely to access the product is
prohibited. *Id.* § 14-4806(7). In other words, it is not merely a prohibition on speech that is "too
persuasive," (ECF 27 ¶ 263), but a prohibition on manipulative practices.

Dark patterns are not speech: for instance, NetChoice notes that features such as
YouTube's "autoplay" feature, which "endlessly" serves a user more content by auto-playing a
new video as soon as the first one ends could be considered a dark pattern. (ECF 27 ¶ 263 n.2.)
This kind of feature could be a way to manipulate users into overusing a product by losing track
of how much time is spent on the product. This kind of feature also applies regardless of the
content of the videos played, the identity of the speaker, or the identity of the user. Accordingly,
an "autoplay" feature is not likely to be speech at all. But even if a dark pattern might incidentally
involve speech, it need not be afforded the same protection as non-manipulative speech.

Dark patterns are analogous to subliminal messaging, because they are meant to cause or
encourage certain behavior without the user's conscious knowledge. *See* Com. Law § 14-
4801(i)(1). Subliminal messages are themselves akin to false or misleading commercial speech.

*See Waller v. Osbourne*, 763 F. Supp. 1144, 1148 (M.D. Ga. 1991), *aff'd,* 958 F.2d 1084 (11th Cir.

1992) (explaining that "the presence of a subliminal message, whose surreptitious nature makes it

more akin to false and misleading commercial speech and other forms of speech extremely limited

in their social value, would relegate the [media] containing such to a class worthy of little, if any,

[F]irst [A]mendment constitutional protection."); *see also Central Hudson Gas & Elec. Corp. v.

Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) ("The government may ban forms of

communication more likely to deceive the public than to inform it.") (citations omitted).  And

subliminal messages that "manipulate or affect, or [are] intended to manipulate or affect, the

behavior of the recipient" are afforded less protection than perceptible images.  *See Gilmer v.

Buena Vista Home Video, Inc.*, 939 F. Supp. 665, 669 (W.D. Ark. 1996).  Similarly, companies

employing dark patterns do so to earn additional profits by manipulating users and causing users

to engage in behavior the user might not otherwise intend to do had they been afforded free choice.

Accordingly, even dark patterns that could constitute speech should be afforded lesser, if any,

protection from the First Amendment.

### 3.    Preventing Third Parties from Monitoring Children's Online Activity Does Not Impact Speech.

By prohibiting "a person other than a child's parent or guardian" from "monitor[ing] the

child's online activity without first notifying the child and the child's parent or guardian," Com.

Law § 14-4806(9), the Kids Code regulates conduct.  NetChoice claims that this provision

precludes websites from allowing activities "such as 'friending' and 'following' other users."

(ECF 27 ¶ 262.)  NetChoice does not, however, explain how "friending" or "following" others

constitutes protected speech.  *Cf. Bonta*, 761 F. Supp. 3d at 1228 (it is "far from obvious" that

restricting a minor's ability to view the number of "likes" a post receives, when the underlying

likes themselves are still viewable, has First Amendment implications). Furthermore, NetChoice does not explain how "friending" or "following" constitutes "monitoring."

Regardless, the Kids Code does permit monitoring, so long as the child and his or her parent are notified. So even if "friending" or "following" constitute "monitoring," those activities are permitted by the Kids Code so long as the child and their parent are able to see that a third party has friended or followed the child. This requirement could be met by requiring approval of a friend requests or a notification that a third party is now following the child's account. Even if "friending" and "following" were protected speech activity, the Kids Code does not actually prohibit those functions. The Kids Code's restrictions on the manner in which data may be used, its prohibition on dark patterns, and its prohibition on monitoring all past constitutional muster. As a matter of law Count VI must be dismissed.

### C.    At Most, the Kids Code Incidentally Burdens Speech in a Content-Neutral Manner.

In any event, even if the Kids Code incidentally burdens some protected speech through its regulation of conduct, NetChoice's First Amendment claims still fail because the Kids Code is still not unconstitutional. The Kids Code is content-neutral and therefore subject to intermediate scrutiny. *TikTok*, 145 S. Ct. at 67, 69; *Satellite Broad. & Comm'ns Assoc. v. FCC*, 275 F.3d 337, 353, 355 (4th Cir. 2001) (intermediate scrutiny applied to content-neutral incidental burdens on speech of satellite carriers and cable operators under rule that may impact ability to "exercise editorial discretion over the menu of channels they offer to their subscribers").

The "principal inquiry" as to whether a law is content-neutral "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys" even if there is "an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Wag More Dogs*, 680 F.3d at 366. A regulation is content-

neutral if "(1) the regulation is not a regulation of speech, but rather a regulation of the places where some speech may occur; (2) the regulation was not adopted because of disagreement with the message [the speech] conveys; or (3) the government's interests in the regulation are unrelated to the content of the [affected] speech." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 432-33 (4th Cir. 2007) (quotation marks omitted; other alterations in original)). The Kids Code's regulations and Assessment requirement apply to foreseeably harmful data processing practices without regard to the content of any message. For instance, the law prohibits an application from using manipulative methods to prolong children's use of products or exploit them, even if that application disseminates speech the State agrees with. *See Covenant Media*, 493 F.3d at 432-33 (regulation is content neutral if not adopted due to disagreement with message of speech or if governmental interests are unrelated to content of speech).

### 1.    The "Best Interest of Children" Standard Does Not Make the Kids Code Content- or Speaker-Based.

Count I must be dismissed because the Kids Code's "best interest of children" standard does not violate the First Amendment. As discussed, no part of the Kids Code requires a covered entity to review, monitor, evaluate, censor, or age-gate speech or content on its products or services. Com. Law §§ 14-4803(5); 14-4810(3). NetChoice claims that entities must "examine their content and the speakers on their services" in order to evaluate whether their online services and features could result in the significant harms the Kids Code seeks to prevent. (ECF 27 ¶ 120.) Contrary to the language of the law and absent any allegations regarding an actual application of the law, NetChoice concludes that the Kids Code restricts speech "because of its message, its ideas, its subject matter or its content." (ECF 27 ¶ 124.) But as discussed, this ignores the plan statutory language.

The "best interest of children" standard applies to covered entities' data processing practices, not to speech. It is the term used in the law to encompass practices that will not foreseeably cause significant harm to children. For instance, if a covered entity's insecure data management or design practices permit malicious actors to easily hack into the camera on a child's laptop or tablet to spy on the child, then the entity would not be in compliance with the Kids Code, and no speech is impacted. *See* Com. Law § 14-4804(3)(vi) (requiring, as part of the Assessment requirement, that entities assess whether their data management or design practices could foreseeably lead to a highly offensive intrusion on a child's privacy). Similarly, if a product collects more sensitive information from children than is necessary to supply the product and manages that data in an insecure way, that would also be a violation of the Kids Code, *see id.* § 14-4804(3)(i), because that practice—which has nothing to do with speech—is not consistent with the best interests of children. It is a standard that does not inherently relate to speech. Count I must be dismissed.

## 2. The "Reasonably Likely to be Accessed by Children" Standard Does Not Make the Kids Code Content- or Speaker-Based.

The Kids Code is not transformed into a content- or speaker-based regulation because it applies only to products and services "reasonably likely to be accessed by children." First, determining whether a product or service is reasonably likely to be accessed by children does not require a consideration of content or speaker. But even if it did, that does not inherently make it a content- or speaker-based regulation. Second, the Kids Code is generally applicable: it does not apply only to conduct with significant expressive content, single out entities that are engaged in expressive activity, or single out entities based on the specific content or speaker of that expressive activity. Third, because the Kids Code does not seek to censor, infringe upon, or punish creation

or dissemination of protected speech, the law does not "focus[] on the impact that speech has on its listeners."  (ECF 27 ¶ 138 (quotation marks omitted).)

The "reasonably likely to be accessed by children" standard ensures that the Kids Code applies "to only the platforms that have a chance of attracting the children the Act seeks to protect." *See NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 556 (S.D. Ohio 2024).  The standard is used only to distinguish covered entities from non-covered entities. *See id.* ("Websites that children might access' is not a topic or subject matter.").  Covered entities that engage in expressive speech surely present "subject matter as diverse as human thought." *Id.* (quotation marks omitted).  Products and services covered by the Kids Code's regulations may not have been designed for or to appeal to children or contain subject matter intended for children.  They also may not relate to expressive activities.  For instance, a navigation app would likely fall within the ambit of the Kids Code because it is reasonably likely to be accessed by children even if it is not designed to appeal to children.

Determining whether a product or service is "reasonably likely to be accessed by children" does not require an entity to consider the content of its product or service.  *See* Com. Law § 14-4801(s) (among other potential factors, a product falls within this definition if "based on competent and reliable evidence regarding audience competition" or "the covered entity's internal research findings," the product is determined to be "routinely accessed by a significant number of children").  But even if it did, it does so only to the extent of determining which online products, services, and features are likely to be accessed by children such that the Kids Code would apply.  Looking at the content of speech only for the purpose of determining whether a regulation applies does not trigger First Amendment concerns when the underlying regulation is agnostic as to the actual content.  *See, e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69

(2022) ("[A]bsent a content-based purpose or justification," a distinction based on whether a sign advertises something on the same premises or whether it directs consumers to an offsite location "is content neutral and does not warrant the application of strict scrutiny"). Here, even if a covered entity or the Division had to look at the content of a website to determine whether the Kids Code should apply, that does change the fact that the Kids Code is content-neutral.

Second, the Kids Code applies to any product or service that is reasonably likely to be accessed by children, not just those products or services that engage in expressive activity. *See Arcara*, 478 U.S. at 706-07 (heightened scrutiny reasonable only when a law regulating nonexpressive conduct actually applies to an activity with significant expressive content or "has the inevitable effect of singling out those engaged in expressive activity"). For instance, in addition to many of NetChoice's members, the Kids Code applies to navigation apps, ridesharing apps, online stores, and many other products and services. Additionally, the Kids Code applies to all features of products and services of covered entities, not just expressive features. Therefore, the law's definition of covered entities is not based in content or the identity of a speaker.

Finally, as discussed, the Kids Code seeks to protect children from harmful data privacy or processing practices and explicitly does not censor speech. Therefore, the content of any protected speech found on a covered entity's product or service is irrelevant to the application of the law. No part of the Kids Code requires entities to review, monitor, or censor content. Accordingly, the fact that the Kids Code applies to products or services "reasonably likely to be accessed by children" does not make the law content- or speaker-based. Count II must be dismissed.

### D. The Assessment Requirement Is Constitutional Because It Does Not Impermissibly Compel Speech.

Count V of the amended complaint must be dismissed because the Assessment requirement does not offend First Amendment protections or impermissibly compel speech. The government

29

may not force a speaker to "alter its own message" or to publish a viewpoint it opposes. *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986). Compelled speech violations arise when "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006). A First Amendment protection against compelled speech applies when the government requires a speaker to "disseminate a particular political or ideological message." *United States v. Sindel*, 53 F.3d 874, 877-78 (8th Cir. 1995) (requiring reporting of cash transactions in excess of $10,000 to the IRS does not impermissibly compel speech because it does not require public dissemination of a message with which the filer disagreed).

The Assessment requirement does not violate the First Amendment because it requires conduct and does not dictate what a covered must say when undertaking the required evaluation of its data processing practices. Assessments require that covered entities measure their risks, engage in thoughtful data processing practices, and maintain records of their analyses. *See* Com. Law §§ 14-4804, 14-4805.[18] If necessary, covered entities must also describe how they will mitigate risks that their Assessment uncovers.[19] *See* Com. Law § 14-4804(b)(4). In other words,

---

[18] The requirement to complete an Assessment is comparable to the data protection and privacy assessments required under many other state laws. *E.g.*, Me. Rev. Stat. Ann. tit. 10 § 1348(1)(A) (analysis of harm required after data breach); Mo. Rev. Stat. § 407.1500.2(5) (after data breach, company must either notify affected consumers or company must put in writing its determination that there is no risk of harm to consumers' whose data was compromised); Colo. Rev. Stat. Ann. § 6-1-1309 (data protection impact assessment required as part of data protection law); Fla. Stat. Ann., § 501.713 (same).

[19] Because the Assessment requirement does not ask covered entities to evaluate whether children are exposed to harmful content, it is unclear why NetChoice alleges that mitigation of data processing risks would necessarily include censorship or age-gating. (*See* ECF 27 ¶¶ 223-28.) In any event, a company is free to choose its desired mitigation method, which may include parental controls that some NetChoice members already employ. (ECF 27 ¶¶ 62-63.) Notably, the fact that some members may already employ safeguards like parental controls is another reason why NetChoice is not an appropriate party to bring as-applied challenges to the Assessment requirement, because individual inquiry about the method and extent of safeguards members may already have in place would be required to determine whether any entity faces potential enforcement action by the Division. *See* § III.

the Assessments only require that entities must make their own factual conclusions about their products or services.

To the extent that the writing requirement constitutes compelled speech, the speech deserves less than strict scrutiny protection. Compelled speech enjoys less protection when it is uncontroversial and factual and when it does not require the speaker to publicly adopt a position that it does not agree with. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (in an advertising context, factual and uncontroversial required disclosure does not intrude upon First Amendment rights as severely as prohibition on speech); *Sindel*, 53 F.3d at 877-78; *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101, 1104, 1108-09 (D.C. Cir. 2011) (no First Amendment concern that company is unable to control investor information after it disclosed that information only to the S.E.C. because required disclosure was not "a veiled attempt to suppress unpopular ideas or information or manipulate the public debate," but was instead part of important regulatory scheme); *S.E.C. v. AT&T, Inc.*, 626 F. Supp. 3d 703 (S.D.N.Y. 2022) (requirement that a company publicly disclose material information once selectively disclosed not subject to strict scrutiny because it does not require a company to say a message it did not already adopt).

The Assessment requirement, to the extent it compels speech, does not do so in an impermissible way because the compelled speech is less protected. Assessments only require that entities must make their own factual conclusions about their products or services and show their work. The Assessments do not require a covered entity to state or adopt any particular message beyond its own fact-based conclusions, *cf. Zauderer*, 471 U.S. at 651; does not require any moral or political judgment, *cf. National Ass'n of Mfrs. v. S.E.C.*, 800 F.3d 518, 530 (D.C. Cir. 2015); does not require a company adopt any position with which it disagrees, *cf. Pacific Gas & Elec. Co.*, 475 U.S. at 10-11, 16; and does not even require the covered entity to make a public statement,

*see Sindel*, 53 F.3d at 878.  And, contrary to NetChoice's assertions, the Assessment requirement does not require a company to "disparage their services" (ECF 27 ¶ 107) or "publicly condemn itself" (ECF 27 ¶ 222).  If a covered entity reviews its data processing practices and determines that it does not create a foreseeable risk of harm to minors, then the Assessment would indicate that.  If a covered entity finds that one of its practices *could* lead to a foreseeable risk of serious harm to minors, then it is not "disparagement"[20] for the entity to acknowledge that fact and or to propose a plan to remedy the potential harm.

Finally, while the Ninth Circuit held that the assessment requirement under California's Age-Appropriate Design Code Act unconstitutionally compelled speech, this finding was premised on a strict scrutiny standard on the basis that California's law required that businesses "measure and disclose . . . the risk that children will be exposed to disfavored speech." *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120-21 (9th Cir. 2024).[21]  The court noted that its decision would not threaten other assessment schemes, and acknowledged that risk assessments, like Maryland's, that do not focus on children's exposure to "harmful or potentially harmful" content can be constitutional.  *Id*.  Count V must be dismissed because the Assessment requirement does not impermissibly compel speech.

---

[20] *Disparage* is defined by *Black's Law Dictionary* as "1. To speak slightingly of; to criticize (someone or something) in a way showing that one considers the subject of discussion neither good nor important.  2. To degrade in estimation by disrespectful or sneering treatment."  Black's Law Dictionary (12th ed. 2024).

[21] The Ninth Circuit focused on the fact that, under California's Assessment requirement, entities must consider and mitigate the harmful effects of content or proxies for content on children.  *See Bonta*, 113 F.4th at 1118-22 (discussing Cal. Civ. Code § 1798.99.31(a)(1)(B)).  The court noted that its ruling should not "threaten[] other [Assessment] schemes throughout the nation" because "[t]he problem here is that the risk that businesses must measure and disclose to the government is the risk that children will be exposed to disfavored speech online."  *Id.* at 1121.  The Ninth Circuit's holding should have little bearing on the constitutionality of Maryland's Assessment requirement, because Maryland's law requires no consideration of content on covered entities' platforms and products.

E. **To the Extent the Kids Code Incidentally Burdens Speech, It Is Subject to and Survives Intermediate Scrutiny.**

As discussed, the Kids Code is, at most, subject to and survives intermediate scrutiny. A law that incidentally burdens speech and is content-neutral is constitutional when "the regulation materially advances an important or substantial interest" by redressing or preventing real harms. *Satellite Broad.*, 275 F.3d at 356. If it does serve a substantial government interest, a court must ask whether the regulation is narrowly tailored, which means that it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* "In other words, the regulation may not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward*, 491 U.S. at 799).

The Kids Code furthers one of the most compelling government interests: the protection of "the physical and psychological wellbeing of children." *See United States v. Malloy*, 568 F.3d 166, 175 (4th Cir. 2009); *see also* ECF 27 ¶ 124 (agreeing that "protecting minors is a compelling interest"). Indeed, while the Kids Code is not a regulation of speech, the "protection of children clearly constitutes a 'public welfare' interest" that could "justify[] regulation of speech in certain circumstances." *United States v. Matthews*, 209 F.3d 338, 342 (4th Cir. 2000) (collecting cases). Furthermore, regulation of privacy rights is well-within the State's legitimate authority. *ACA Connects – Am.'s Commc'ns. Assoc. v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020). The General Assembly passed the Kids Code to provide more safety to children online, (*see* Exhibit 1, at 1), and protect children from reasonably foreseeable severe or material harm or discrimination. *See* Com. Law § 14-4804(b)(2) (listing potential serious harms for covered entities to consider).

Moreover, the government's interest is both unrelated and explicitly contrary to the suppression of free expression. *See* Com. Law §§ 14-4803(5), 14-4810(3)–(4). Even if the law incidentally impacts speech, the law is clear that it is not intended to censor speech or restrict

access to any content.  *Id.*  The Kids Code also furthers the government's interest in protecting children by restricting companies from engaging in specified data processing practices, including overcollection of personal information and practices which could foreseeably lead to harm to children.  But the law is not over-restrictive: covered entities are permitted to process any data necessary to offer their product or service.  Com. Law § 14-4806(a)(2) (allowing profiling of children by default when necessary); *id.* 14-4806(5) (allowing precise geolocation when necessary).  The required Assessments ensure covered entities consider whether their data processing practices cause reasonably foreseeable material or severe harm or discrimination to children and, if mitigation is necessary, permit any method of mitigation the covered entity chooses. *See id.* § 14-4804.  The Kids Code is narrowly tailored because it focuses on reasonably foreseeable severe or material harms or discrimination, regulates data processing only, and forbids the law from being constructed in a way that would require or encourage censorship.  *See id.* §§ 14-4803(5), 14-4810(3)–(4).

Because the Kids Code, to the extent it regulates speech or expression at all, is content-neutral and only incidentally burdens speech, it is subject to, at most, intermediate scrutiny.  The Kids Code passes intermediate scrutiny.  For all the reasons discussed, all of NetChoice's First Amendment Claims fail as a matter of law and must be dismissed.

VIII.    **AFFECTED ENTITIES HAVE A CLEAR UNDERSTANDING AS TO WHAT CONDUCT IS PROHIBITED.**

Counts III and IV fail because the Kids Code "provide[s] a person of ordinary intelligence fair notice of what is prohibited," and is drafted so as to not "authorize[] or encourage[] seriously discriminatory enforcement."  *F.C.C. v. Fox Television Stations Inc.*, 567 U.S. 239, 253 (2012).  Challenged phrases in a statute "should be construed in the context of that statute as a whole," *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (citation omitted), or as defined by "[d]ictionary

34

definitions and good old-fashioned common sense," *Wag More Dogs*, 680 F.3d at 371. "Close cases do not make a regulation vague." *Edgar v. Haines*, 2 F.4th 298, 317 (4th Cir. 2021). Courts generally "do not doubt the constitutionality of laws that call for the application of a qualitative standard" to real-world conduct simply because it might requires "estimating rightly . . . some matter of degree." *Bonta*, 761 F. Supp. 3d at 1231 (quotation marks omitted). Nor should a regulation be struck down based on "hypothetical scenarios that bear no resemblance" to the actual conduct being engaged in or to historical pattern of enforcement. *Martin*, 700 F.3d at 137.

Economic regulations or those that impose only civil penalties are subject to less strict vagueness tests, whereas regulations that impact First Amendment rights may face stricter requirements. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (citations omitted). Even so, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (because we are "[c]ondemned to the use of words," we cannot expect "mathematical certainty" in language).

Here, a person of ordinary intelligence will be able to discern who constitutes a covered entity and what behavior is prohibited. *Fox*, 567 U.S. at 239. First, "best interests of children" is not impermissibly vague: it is defined by statute and is further clarified by a reading of the law as a whole. The law defines the "best interests of children" as the use of a child's personal data or design of a product that does not "[b]enefit the covered entity to the detriment of children" and does not result in enumerated reasonably foreseeable material or severe harms. Com. Law § 14-4801(c). While it is true that the commonly used words "benefit" and "detriment" are not defined by the law, they are not inscrutable terms, particularly when read within the context of the statute. *See Martin*, 700 F.3d at 136. The law regulates only covered entities that operate for profit, and

the intent of the law is to require covered entities to prioritize children's well-being when "commercial interests and the best interests of children conflict." Com. Law § 14-4803(4). Accordingly, "benefit" means an economic benefit.

Similarly, although "detriment" is not specifically defined, the Kids Code lists the kinds of adverse consequences to children that it aims to prevent. *See* Com. Law § 14-4801(c). "Detriment," therefore, is a physical, economic, psychological, or emotional harm. This is reinforced by the Assessment requirement that requires covered entities to assess the risks of these specific harms under specified circumstances. *See* Com. Law § 14-4804(b)(3). NetChoice alleges that the Kids Code does not explain "how covered entities are meant to (1) weigh [benefits and detriments] against each other; and (2) account for the benefits that minors experience." (ECF 27 ¶ 164.) While this observation is true, the Kids Code does not require or permit any weighing of benefits to a covered entity or to a child against detriments to a child. *See* Com. Law § 14-4801(c). By the plain language of the law, if a child suffers material harm due to an entity's data processing practices, and those practices allowed a covered entity to earn more than it otherwise would have absent that practice, then the entity's practices violate the Kids Code. It is irrelevant whether the child also gained some "benefit."

Furthermore, the Kids Code's use of words like "reasonably foreseeable," "severe," and "material" does not render the Kids Code impermissibly vague. Standards based on "reasonableness,"[22] such a duty to prevent reasonably foreseeable harms, are commonplace in the

_____

[22] Using "reasonableness" as a standard is well-grounded in legal jurisprudence. In addition to being ubiquitous in common law, the word is found in state and federal statutes and rules of procedure. *E.g.*, Fed. R. Civ. P. 11 (among other uses, noting that a court can award "reasonable" expenses and attorney fees to a party that prevails on a motion for sanctions; 21 U.S.C. § 360*l*(a)(1)(A) (permitting FDA Secretary to order postmarket surveillance for devices when device failure "would be reasonably likely to have serious adverse health consequences"); Md. Code Ann., Envir. § 6-821 (LexisNexis 2013) (requiring property owners give "reasonable advance notice" and make "reasonable efforts" and cover "reasonable expenses" to ensure at-risk tenants are not present when performing repairs that may disturb lead-based paint and requiring tenants allow access to owner at "reasonable times"). The term is also regularly used in the Uniform Commercial Code, the Model Penal Code, and the Restatements. *See* George P.

law. *See, e.g.*, *Pinchback v. Armistead Homes Corp.*, 689 F. Supp. 541, 554-55 (D. Md. 1988), *vacated in part on other grounds*, 907 F.2d 1447 (4th Cir. 1990) (borrowing from tort law and applying reasonable foreseeability as an element of proximate causation in context of discrimination claim); *Sutton-Witherspoon v. S.A.F.E. Mgmt., Inc.*, 240 Md. App. 214, 239 (2019) (noting circuit court should have considered issues of material fact related to whether crowd-size conditions at an event were "reasonably foreseeable and could create a risk of the type of harm suffered by" the injured party and whether defendant took "reasonable precautions" to control the crowd). Similarly, the terms "highly offensive" and "intrusion on a reasonable expectation of privacy," are two necessary elements of an intrusion upon seclusion claim. *See, e.g.*, *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001). And "severe" is found throughout the Maryland Code. *See, e.g.*, Md. Code Ann., Cts. & Jud. Proc. § 3-812(b)(1) (LexisNexis 2020) (aggravated circumstances that can justify not undertaking reasonable efforts to reunify children with parents include when parent inflicts "severe physical abuse" on the child); Md. Code Ann., Transp. § 21-1004(g)(1) (LexisNexis 2020) (defining "inoperable or disabled vehicle" to include a vehicle that "poses a severe safety hazard").[23]

That the law refers to "children reasonably likely to access the online product," Com. Law § 14-4806(a)(1), rather than break them down into age cohorts does not make the law vague, nor

---

Fletcher, *The Right and the Reasonable*, 98 Harvard L.R. 949, 949 n.1 (1985) (noting that between them, these three sets of model codes and rules "couple the adjective 'reasonable' and the adverb 'reasonably' with over 100 different words").

[23] NetChoice asserts that it is "unclear" what the "necessary link" is between a website's design or information use and physical harm. (ECF 27 ¶ 171.) The plain language of the statute describes proximate causation. *See* Com. Law § 14-4801(c) (defining "best interests of children" to mean using personal data only in a way that does not result in reasonably foreseeable harms to children). Predators victimize children through "financial sextortion, a crime in which kids are targeted to share explicit photos and then threatened by offenders that they will share the images" unless they pay the blackmailer money. MCASA Testimony, at 2. This can and has resulted in "panicked children taking their own lives." *Id.* Liability may ultimately result if a fact-finder determines that kind of harm is reasonably foreseeable as a result of a covered entity's failure to comply with the Kids Code.

encourage covered entities to "default[] to the most restrictive possible understandings" of the Kids Code. (ECF 27 ¶¶ 152-53.) Entities must only consider the children that are "reasonably likely" to access the product, *see id.* § 14-4801(s), and need not consider children who are younger (or older) than those likely to access the product. Furthermore, entities are also free to differentiate how data is processed for different users or by different functions of their product or service.

NetChoice's contention that many entities would not know whether they are a "covered entity" (ECF 1 ¶¶ 199-203) is based on hypothetical concerns.[24] In reviewing research or evidence related to the composition of their products' audience, covered entities are able to determine if a "significant number of children" "routinely" access their product, Com. Law § 14-4801(s)(2), or if a "significant amount" of their audience is children, *id.* § 14-4801(s)(5). A law is not impermissibly vague simply because the exact contours of what constitutes a "significant" number of children remains undefined. *See Bonta*, 761 F. Supp. 3d at 1231 ("[Q]ualitative words of degree like 'significant' are common in our statutes [and] an unavoidable part of the law.") "Routinely" means "as a matter of regular occurrence"[25] which, when taken together with a "significant number of children" provides covered entities an adequate basis to determine whether they must comply with the law.

NetChoice also complains that application of the Kids Code when a covered entity knew or "should have known" that a user was a child is too indeterminate because it requires a "retrospective evaluation" that could allow for penalties if a single child used a product and the

---

[24] NetChoice alleges that even if a website has "*zero* minor users, if it is 'substantially similar' to a website that *does* have a 'significant number' of minors, it must comply with this Act" even if it does not know about the substantially similar website. (ECF 27 ¶ 202.) NetChoice seems to dislike this provision as opposed to misunderstand it. In any event, NetChoice offers no allegation that such a website exists, nor posits why such a website would not expect minors to use the website in the future. This Court need not consider mere "speculation about possible vagueness in hypothetical situations." *See Wag More Dogs*, 680 F.3d at 371.

[25] *Routinely*, Merriam-Webster, https://www.merriam-webster.com/dictionary/routinely (last visited June 20, 2025).

company had information somewhere that revealed that the user was a child.  (ECF 27 ¶ 203.)

This is not an indeterminate standard.  And a "knows or should have known" standard is common

in the law.  *See, e.g.*, *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167-68 (2004) (discussing

the discovery rule, where the statute of limitations begins to accrue when a plaintiff "knows or

should know of the potential claim"); (to establish liability in negligence case related to lead

poisoning, plaintiff must show the "landlord knew or had reason to know of a condition on the

premises posing an unreasonable risk of physical harm to persons in the premises").  Looking into

the past to determine whether facts were known to the entity, or should have been known to the

entity, is hardly unreasonable and certainly is not vague.

Finally, any ambiguity in the Kids Code is mitigated by its notice and opportunity-to-cure

provision, Com. Law § 14-4809.  This allows covered entities that make a good faith effort to

comply with the law to cure any deficiencies before facing penalties.  *Cf. Hoffman Estates*, 455

U.S. at 499 (scienter requirement mitigates vagueness concerns).  Counts III and IV must be

dismissed.

## IX.    THE KIDS CODE IS NOT PREEMPTED BY COPPA OR SECTION 230.

NetChoice's preemption claims in Counts VII and VIII fail because the Kids Code is not

inconsistent with the Children's Online Privacy Protection Act ("COPPA") or Section 230 of the

Communications Decency Act, 47 U.S.C. § 230 ("Section 230") and, therefore, is not preempted.

The Constitution provides that the laws of the United States "shall be the supreme Law of the

Land."  U.S. Const. art. VI, cl. 2.  State law may be preempted under the Supremacy Clause when

(1) Congress has clearly expressed is intention to preempt state law ("express preemption"); (2)

Congress has indicated its clear intent, through comprehensive legislation, to occupy an entire field

("field preemption"); or (3) a federal law conflicts with state law ("conflict preemption").  *See*

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) .

Any assessment of whether the Kids Code is preempted by federal law "starts with the basic assumption that Congress did not intend to displace state law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453-54 (4th Cir. 2005) (quotation marks omitted).  The assumption disfavoring preemption is particularly strong when, as is the case with COPPA, Congress legislates in a field that the States, as "independent sovereigns," have "traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted).  Consistent with an assumption that Congress does not intend to displace state law, "[w]hen the text of an express pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (quotation marks omitted).

States, as "independent sovereigns in our federal system . . . do not need Congress's permission to exercise their historic police powers." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024); *see also Northern Va. Hemp*, 125 F.4th at 492 ("[U]nder the federalism principles baked into the Constitution, states are separate sovereigns.  So, we apply the Supremacy Clause with 'the basic assumption that Congress did not intend to displace state law.'").

The area of health and safety is one such field that is "primarily" and "historically" a matter of local concern.  *Hillsborough County*, 471 U.S. at 719; *see also Medtronic*, 518 U.S. at 475 (explaining that "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" and holding that state law was not preempted by federal law regulating medical devices) (quotation marks omitted); *Northern Va. Hemp*, 125 F.4th at 492 ("[S]tates have long possessed primary responsibility in our federal system for protecting the health and safety of their citizens"); *Pinney*, 402 F.3d at 457.  The presumption against preemption "of a state statute designed to foster public health . . . has special

force" when, as here, the federal and state "governments are pursuing 'common purposes.'"[26] *Pharmaceutical Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (citations omitted).

Importantly, courts must not "seek out conflicts between state and federal regulation where none clearly exists." *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005) (citations, brackets, and internal quotation marks omitted). Accordingly, "[i]f a federal statute is ambiguous with respect to whether it pre-empts state law, then the presumption against pre-emption should ordinarily prevent a court from concluding that the state law is pre-empted." *Walsh*, 538 U.S. at 680 n.4 (Thomas, J., concurring).

### A.    The Kids Code Is Consistent With and Not Preempted by COPPA.

COPPA sets certain baseline privacy regulations for operators of websites and online services "directed to children" under the age of 13 or "any operator that has actual knowledge that it is collecting personal information from a child" under the age of 13. 15 U.S.C. §§ 6501(1), 6502(a), (b). It also prohibits state or local governments from "impos[ing] any liability . . . in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under [COPPA.]" *Id.* § 6502(d).

NetChoice asserts that COPPA preempts the Kids Code based on express and obstacle-conflict preemption. Specifically, NetChoice asserts that the Kids Code is inconsistent with COPPA because (1) as to children under the age of 13, the Kids Code regulates online products likely to be used by children rather than only those actually known to be used by children (ECF 27 ¶¶ 275-278); (2) the Kids Code has a parallel enforcement scheme for children under age 13 (ECF 27 ¶¶ 279-281); and (3) the Kids Code regulates how the data of children under age 18 is

---

[26] COPPA and the Kids Code were both enacted to promote and protect the welfare of children who use online platforms. *See* Com. Law § 14-4803; *Shanahan v. IXL Learning Inc.*, No. 24-CV-02724-RFL, 2024 WL 4658276, at *3 (N.D. Cal. Nov. 1, 2024).

processed, whereas COPPA only applies to data of children under age 13 (ECF 27 ¶ 282).[27]  When, as here, a statutory preemption clause uses the term "inconsistent," the inquiries under express and conflict preemption "effectively collapse into one" inquiry: whether "state law stands as an obstacle to the accomplishment and execution" of the federal law.  *Jones v. Google LLC*, 73 F.4th 636, 644 (9th Cir. 2023) (quotation marks and citation omitted).

In *Jones*, the Ninth Circuit considered COPPA's preemptive effects on state law claims arising out of conduct that also violated COPPA.  In rejecting Google's assertion that "all state law claims protecting children's online privacy" are preempted by COPPA and holding that COPPA did not preempt the state law claims, the Ninth Circuit explained that "inconsistent" refers to "contradictory state law requirements, or to requirements that stand as obstacles to federal objectives."  *Jones*, 73 F.4th at 642; *see also id.* at 643 (citing, with approval, FTC amicus brief explaining that "Congress did not intend to wholly foreclose state protection of children's online privacy.").   Thus, "state laws that supplement or require the same thing as federal law, do not stand as an obstacle to Congress's objectives, and so are not inconsistent."  *Id.* (quotation marks and citations omitted); *see also GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 439-40 (2020) (noting that when interpreting a statute, "a matter not covered is to be treated as not covered" (citation omitted)).  That COPPA prohibits states from imposing liability for "inconsistent" "treatment" of activities regulated under COPPA does not, the court concluded, imply "clear congressional intent to create an *exclusive* remedial scheme for enforcement of COPPA requirements."  *Jones*, 73 F.4th at 643 (emphasis in original);[28] *accord*

---

[27] NetChoice's first and third contentions are essentially the same: the Kids Code regulates more entities than COPPA and protects more children.

[28] In so concluding, the Ninth Circuit noted that Congress, in enacting COPPA, "has 'legislated in a field in which the States have traditionally occupied.'"  *Jones*, 73 F.4th at 643 (quoting *Rice*, 331 U.S. at 230 (ellipses omitted)).

*NetChoice v. Bonta*, No. 22-cv-08861-BLF, 2025 WL 807961, at *31 (N.D. Cal. Mar. 13, 2025) (holding that NetChoice was unlikely to succeed on claim that COPPA preempts the California Age-Appropriate Design Code Act); *Hartman v. Meta Platforms, Inc.*, No. 3:23-CV-02995-NJR, 2024 WL 4213302, at *13-18 (S.D. Ill. Sept. 17, 2024) (holding that COPPA does not preempt the Illinois Biometric Information Privacy Act).

Both COPPA and the Kids Code protect the privacy of children's personal information. The Kids Code does contradict COPPA, for example, by declaring legal any conduct or activity prohibited by COPPA.  Rather, the Kids Code supplements COPPA by providing privacy protections for children under age 17 in addition to those COPPA provides for children under age 13, such as the provisions which restrict data processing, profiling, geolocating, monitoring, and the use of dark patterns.  *See* Com. Law § 14-4806.  As such, the Kids Code does not stand as an obstacle to and is not inconsistent with the protections COPPA provides to children under age 13.

In enacting the Kids Code, the Maryland General Assembly legislated in an area—health and safety—that traditionally falls within the legislative power of the states.  In enacting COPPA, Congress did not express an intention to foreclose regulation by the states which supplement the protections afforded children by COPPA.  Absent a clear expression by Congress in COPPA, NetChoice's assertion that COPPA preempts state law protecting children's online privacy cannot overcome the strong presumption against preemption when the federal government regulates in an area traditionally left to the states.  Count VII of the amended complaint must be dismissed.

**B.     The Kids Code Is Consistent With and Not Preempted by Section 230.**

Section 230 protects interactive computer service providers from legal responsibility for information created and developed by third parties.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 & n.4 (4th Cir. 2009).  Section 230 "does not provide blanket protection from claims" that rely in any way on publishing information.

43

*Henderson v. Source for Public Data, L.P.*, 53 F.4th 110, 123 (4th Cir. 2022).  For instance, in *Erie Ins. Co. v. Amazon.com, Inc.*, the Fourth Circuit held that Section 230 did not immunize Amazon in a products liability claim, even though the publication of an advertisement for the product was a necessary but-for cause of harm.  925 F.3d 135, 139-40 (4th Cir. 2019).  There, the claim was not based on the content of speech that Amazon published, but instead on Amazon's sale of a defective product.  *Id.*

Section 230 provides that it shall not be "construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  Based on express preemption, NetChoice asserts that Section 230 preempts the Kids Code's "Assessment requirement, § 14-4804, and the processing and profiling restrictions, § 14-4806, to the extent that they apply to dissemination of third-party speech."  (ECF 27 ¶ 287.)  In making this assertion, NetChoice ignores that the General Assembly expressed that that the Kids Code shall not by "interpreted or construed to . . . [i]mpose liability in a manner that is inconsistent with [Section 230]."  Com. Law § 14-4810(2).  And, as discussed, even without that provision, the Kids Code does not impose liability for the content of any speech.  Just because some or all of NetChoice's members publish third party speech as part of some or all of their services does not mean that Section 230 immunizes them from the Kids Code's Assessment requirement and its restrictions on data processing and profiling.  *Cf. Erie Ins. Co.*, 925 F.3d at 139-40.  Accordingly, the preemption claim asserted in Count VIII of the amended complaint should be dismissed.

Count VIII should also be dismissed because, as the court in *NetChoice v. Bonta* observed, "[a]ny assertion of Section 230 immunity against enforcement of the [California law] will depend on the circumstances of the case.  One business's publication of content may implicate Section

230 while another business's publication of the same content may not, depending on each

business's role (or lack thereof) in creating the published content."  2025 WL 807961, at *31.  In

finding that NetChoice was not likely to succeed on the merits of its facial preemption claim, the

court determined that Section 230 should more appropriately be raised as it applies "in response

to the State's attempted enforcement of the [California law] in a particular case."  *Id*.  That same

logic warrants dismissal of Count VIII.

**CONCLUSION**

The motion to dismiss should be granted.


Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Howard R. Feldman

_____
HOWARD R. FELDMAN
Federal Bar No. 05991
JESSICA M. FINBERG
Federal Bar No. 31529
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland  21202
HFeldman@oag.state.md.us
(410) 576-6445
(410) 576-6995  (facsimile)

June 20, 2025                            Attorneys for Defendant