# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NETCHOICE,

*Plaintiff*,

v.

ANTHONY G. BROWN, et al.

*Defendants*.

Civil Action No. 1:25-cv-00322-RDB

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Dated: July 18, 2025

Andrew C. White (Bar No. 08821)
awhite@silvermanthompson.com
Ilona Shparaga (Bar No. 21494)
ishparaga@silvermanthompson.com
SILVERMAN THOMPSON SLUTKIN &
WHITE, LLC
400 E Pratt Street, Suite 900
Baltimore, MD 21202
(410) 385-2225 (t)
(410) 547-2432 (f)

Respectfully submitted,

*Serena Orloff*

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Serena M. Orloff*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
    Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
serena@lkcfirm.com

*admitted pro hac vice*

*Attorneys for Plaintiff NetChoice*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.   Data is the backbone of vast amounts of protected online speech. ................................... 3

   A.   Online services—including NetChoice members—create, disseminate, and facilitate enormous amounts of protected speech. ................................................ 3

   B.   Online services—including NetChoice members—require user data to create, disseminate, and facilitate speech. ................................................................ 4

II.   Extensive safeguards exist to protect the safety and privacy of minors online. ................. 6

   A.   Minors and their parents have many tools to adjust their online experience and limit access to websites, content, and contacts as they see fit. ................................ 6

   B.   A comprehensive regime of state and federal law independently protects the privacy of online users, including minors. ........................................................ 6

      1.   COPPA ........................................................................................... 6

      2.   MODPA .......................................................................................... 7

   C.   A comprehensive regime of state and federal law independently prohibits harms against minors. ........................................................................................ 8

III.   Maryland's "Age-Appropriate Design Code" ............................................................ 8

IV.   This lawsuit ...................................................................................................... 14

LEGAL STANDARDS ................................................................................................... 14

ARGUMENT ................................................................................................................ 15

I.   NetChoice's claims satisfy Rule 12(b)(6). .............................................................. 15

   A.   NetChoice plausibly alleges that the Act violates the First Amendment (Counts I, II, V, and VI). ............................................................................................... 15

      1.   The Act regulates protected speech. ................................................... 16

      2.   The "best interests of children" standard is content-based (Count I). ............ 20

      3.   The "likely to be accessed by children" standard is content-based (Count II). ......... 21

      4.   The DPIA provisions compel speech and censorship (Count V). ................ 23

      5.   The data, monitoring, and dark patterns provisions regulate protected speech and effectively require age verification (Count VI) ................................... 25

      6.   The savings clause does not cure the First Amendment defects. ................. 30

      7.   The State cannot satisfy First Amendment scrutiny on the pleadings. ........... 31

      8.   NetChoice has properly pleaded facial claims. ...................................... 31

   B.   The Act relies on impermissibly vague terms and standards (Counts III and IV). ........ 33

i

1.    The "best interests" standard, applying across all of the Act's operative provisions, is vague (Count III)....................................................................................... 34

2.    The "likely to be accessed by children" coverage standard is vague (Count IV)..... 37

C.    Section 230 and COPPA preempt the Act (Counts VII and VIII)................................ 38

1.    Section 230 Preempts the Act. ................................................................................. 39

2.    COPPA Preempts the Act. ........................................................................................ 41

II.    NetChoice has standing.................................................................................................. 43

CONCLUSION...................................................................................................................... 45

CERTIFICATE OF SERVICE ............................................................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ga. v. Miller,*
  977 F. Supp. 1228 (N.D. Ga. 1997) ................................................28

*Am. Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003) ................................................29

*Arcara v. Cloud Books, Inc.,*
  478 U.S. 697 (1986) ................................................19

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................14

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ................................................2, 34, 35

*New Mexico ex rel. Balderas v. Tiny Lab Prods.,*
  457 F. Supp. 3d 1103 (D.N.M. 2020) ................................................42

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ................................................21, 30

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991) ................................................28

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................14

*Boelter v. Advance Mag. Publishers Inc.,*
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) ................................................32

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ................................................27

*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011) ................................................15, 16, 21, 29, 31

*Butler v. Michigan,*
  352 U.S. 380 (1957) ................................................18

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ................................................1, 32

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................................31

*City of Austin v. Reagan National Advertising of Austin, LLC*,
   596 U.S. 61 (2022) .................................................................................23

*Cohens v. Virginia*,
   19 U.S. 264 (1821) (Marshall, C.J.) ......................................................45

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
   No. 4:24CV438-MW/MAF, 2025 WL 1570007 (N.D. Fla. June 3, 2025) .........2, 3, 27, 44, 45

*Corbett v. Transportation Sec. Admin.*,
   19 F.4th 478 (D.C. Cir. 2021) ................................................................44

*Corcoran v. Sessions*,
   261 F. Supp. 3d 579 (D. Md. 2017) ........................................................31

*Matter of Cricket Wireless, LLC*,
   302 A.3d 1062 (Md. App. 2023) .............................................................13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ...............................................................................39

*CSX Transp., Inc. v. Easterwood*,
   507 U.S. 658 (1993) ...............................................................................39

*Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996) ...............................................................................25

*Doe v. Grindr Inc.*,
   128 F.4th 1148, 1153 (9th Cir. 2025) .....................................................40

*Erie Ins. Co. v. Amazon.com, Inc.*,
   925 F.3d 135 (4th Cir. 2019) .................................................................41

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) ...............................................................................16

*Evans v. United States*,
   105 F.4th 606 (4th Cir. 2024) ................................................................15

*Fayetteville Pub. Libr. v. Crawford Cnty*,
   684 F. Supp. 3d 879 (W.D. Ark. 2023) .............................................21, 38

*Free Speech Coal. v. Knudsen*,
   754 F. Supp. 3d 1037 (D. Mont. 2024) ..................................................32

*Free Speech Coal. v. Paxton*,
No. 23-1122, 2025 WL 1773625 (U.S. June 27, 2025) ............................16, 19, 23, 29, 30, 33

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) ........................................................................................39

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ......................................................................................33

*Grosso v. Unum Life Ins. Co. of Am.*,
No. 24-cv-1432, 2025 WL 903800 (D. Md. Mar. 25, 2025) ............................14, 15

*H.K. through Farwell v. Google LLC*,
595 F. Supp. 3d 702 (C.D. Ill. 2022) ...........................................................43

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) ........................................................................31

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) ........................................................................................37

*Interstate Cir., Inc. v. City of Dallas*,
390 U.S. 676 (1968) ..........................................................................17, 34, 36

*Jones v. Google LLC*,
73 F.4th 636 (9th Cir. 2023) .........................................................................43

*Junior Sports Mags. Inc. v. Bonta*,
No. 24-4050, 2025 WL 1863184 (9th Cir. July 7, 2025) ......................18, 20, 26

*Lasater v. Guttmann*,
194 Md. App. 431, 5 A.3d 79 (2010) ............................................................37

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) ..........................................................18, 20, 26, 40

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy*,
594 U.S. 180 (2021) ......................................................................................17

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ......................................................................................15

*Martin v. City of Struthers*,
319 U.S. 141 (1943) ......................................................................................27

*McAllister v. Clark Cnty.*,
746 F. Supp. 3d 918 (D. Nev. 2024) ......................................................32, 33

v

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995)..................................................................27

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010).................................................................24

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983).................................................................26

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).........................................4, 5, 17, 18, 31, 32, 45

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015)....................................................24

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ...................................................25

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ....................................................40

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025) ..................17, 18, 22, 25, 29, 37

*NetChoice, LLC v. Griffin*,
No. 23-cv-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025).........4, 6, 29, 44

*NetChoice, LLC v. Griffin*,
No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)................44

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)........................................6, 44

*NetChoice, LLC v. Yost*,
No. 24-cv-00047, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025)...........3, 19, 44

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964).................................................................38

*Packingham v. North Carolina*,
582 U.S. 98 (2017)..................................................................3, 17

*PFLAG, Inc. v. Trump*,
766 F. Supp. 3d 535 (D. Md. 2025).............................................31

*Pharm. Rsch. & Manufacturers of Am. v. Stolfi*,
724 F. Supp. 3d 1174 (D. Or. 2024) ...........................................25

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ................................................................................16

*Rand Constr. Corp. v. Aegis Mech. Corp.*,
    No. CV RDB-24-1467, 2025 WL 754608 (D. Md. Mar. 10, 2025) ........................................15

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................15, 20, 23

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................................3, 4

*Retail Indus. Leaders Ass'n v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ................................................................44

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ................................................................................23

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ................................................................................21

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................17, 37

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    753 F. Supp. 3d 849 (N.D. Cal. 2024) ........................................41

*Sonda v. W. Va. Oil & Gas Conservation Comm'n*,
    92 F.4th 213 (4th Cir. 2024) ................................................................3, 45

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ................................................................22, 26

*Stark v. Patreon, Inc.*,
    656 F. Supp. 3d 1018 (N.D. Cal. 2023) ........................................32

*Talley v. California*,
    362 U.S. 60 (1960) ................................................................................27

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ................................................................18, 22, 25

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................17

*United States v. Treasury Employees*,
    513 U.S. 454 (1995) ................................................................................32

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)................................................................17

*Village of Hoffman Estates v. Flipside*,
    455 U.S. 489 (1982)..........................................................33, 34

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................................20

*Winters v. New York*,
    333 U.S. 507 (1948)................................................................36

*Wyeth v. Levine*,
    555 U.S. 555 (2009)................................................................39

*Wynnewood Ref. Co., LLC v. Env't Prot. Agency*,
    77 F.4th 767 (D.C. Cir. 2023)................................................44

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024)................................................24

*Young v. Am. Mini Theaters, Inc.*,
    427 U.S. 50 (1976)................................................................17

*Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*,
    471 U.S. 626 (1985)................................................................24

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ................................2, 39, 40, 41

**Statutes, Rules & Regulations**

144 Cong. Rec. 23926 (1998) ................................................6

15 U.S.C. § 6501 ................................................................6, 43

15 U.S.C. § 6502 ..........................................................7, 41, 42

15 U.S.C. § 6504 ....................................................................42

16 C.F.R. § 312.2 ..................................................................22

16 C.F.R. § 312.3 ....................................................................7

18 U.S.C. § 1470 ....................................................................8

47 U.S.C. § 230 ................................................................39, 40

Cal. Civ. Code § 1798.99.30 ................................................22

Fed. R. Civ. P. 8 ................................................................................................14

Md. Com. Law § 13-303 ....................................................................................28

Md. Com. Law § 13-403 ....................................................................................13

Md. Com. Law § 13-405-09 ..............................................................................13

Md. Com. Law § 13-411 ....................................................................................13

Md. Com. Law § 14-3502 ..................................................................................19

Md. Com. Law § 14-3503 ..................................................................................19

Md. Com. Law § 14-4601 ....................................................................................7

Md. Com. Law § 14-4605 ....................................................................................7

Md. Com. Law § 14-4607 ....................................................................................7

Md. Com. Law § 14-4608 ................................................................................7, 19

Md. Com. Law § 14-4610 ................................................................................7, 19

Md. Com. Law § 14-4801 ................................9, 10, 11, 12, 18, 21, 22, 26, 28, 34, 36, 37, 38, 42

Md. Com. Law § 14-4804 ................................................12, 13, 23, 24, 25, 40

Md. Com. Law § 14-4803 ................................................................................10, 30

Md. Com. Law § 14-4806 ................................................11, 12, 26, 28, 29

Md. Com. Law § 14-4808 ..................................................................................13

Md. Com. Law § 14-3501 ....................................................................................8

Md. Com. Law § 14-3701 ....................................................................................8

Md. Crim. Law § 3-324 ........................................................................................8

Md. Crim. Law § 3-325 ........................................................................................8

Md. Crim. Law § 3-602 ........................................................................................8

Md. Crim. Law § 3-607 ........................................................................................8

Md. Crim. Law § 3-802 ........................................................................................8

Md. Crim. Law § 3-803 ........................................................................................8

Md. Crim. Law § 3-805 ...............................................................................8

Md. Crim. Law § 3-901-03 ..........................................................................8

Md. Crim. Law § 11-203 ..............................................................................8

Md. Crim. Law § 11-207 ..............................................................................8

Md. Crim. Law § 11-209 ..............................................................................8

Md. Sen. Bill 541 (2024) .............................................................................7

Pub. L. 106-554, Title XVII (2000) ..............................................................8

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ..............................................................................39

**Other Authorities**

Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb. ...............................................................34

Children's Online Privacy Protection Rule, 64 Fed. Reg. 59,888 (Nov. 3, 1999)..................42, 43

Erin Digitale, *Age That Kids Acquire Mobile Phones Not Linked to Well-Being, Says Stanford Medicine Study*, Stanford Medicine News Center (Nov. 21, 2022), https://tinyurl.com/5es8cy3e...............................................35

*Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998).....................................35

Katharine Miller, *"Can't Unsubscribe? Blame Dark Patterns,"* Stanford University Institute for Human-Centered Artificial Intelligence (Dec. 13, 2021), https://tinyurl.com/3em4ckzw ...............................................28

Restatement (Second) of Torts § 652B (1977) ...........................................36

Restatement (Third) of Torts § 7(a) (2010) ................................................36

Statement of Christine McComas to the Hon. C.T. Wilson, House Economic Matters Committee re: HB 603 (Feb. 9, 2024), https://tinyurl.com/3294eh46 ...............................17

Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum ...............................35

Written Testimony of Josh Galin, Executive Director, Fairplay, Before the House Economic Matters Committee (Feb. 13, 2024), https://tinyurl.com/mr3mzsan ...............17

# INTRODUCTION

Maryland's Age-Appropriate Design Code is a speech code for the internet, plain and simple. It brands itself a privacy and "design" measure, but the Act's text—and the State's own brief—leave no doubt that its purpose is to stamp out "harmful and age-inappropriate content." Mot. at 1. Good intentions do not save bad laws. This Act curtails the First and Fifth Amendments and collides head-on with preemptive federal law. District courts confronting comparable speech codes have enjoined them. Appellate courts too. This Court can—and should—do the same. But for now, the only question is whether NetChoice has plausibly alleged its theories and Article III standing. It has.

*First*, NetChoice's Amended Complaint properly—and at least plausibly—alleges both facial and as-applied First Amendment violations. The Act operates as a prior restraint on speech, limiting websites' ability to create, disseminate, and facilitate online speech unless that speech satisfies an amorphous "best interests of children" standard defined by whether content might "result in" various types of psychological, emotional, and other harms. That mandate directly targets protected expression, requires websites to consider and restrict their offerings based on content, and fails any form of heightened scrutiny. Separately, the Act impermissibly *compels* speech (in the form of "data protection impact assessments") about how websites are promoting children's "best interests." The Act also broadly regulates how websites can use data to deliver speech, their website "design," "[s]ubliminal messages," and features like "autoplay" and "friending" that are directly tethered to—and are intended to restrict—expressive activity. The Supreme Court has repeatedly invalidated similar laws that sought to restrict speech at "different points in the speech process," *Citizens United v. FEC*, 558 U.S. 310, 336 (2010), just as it has invalidated laws that broadly burden First Amendment freedoms in the name of protecting minors. This Act does both.

*Second*, the law's vague terms violate the First and Fifth Amendments because they provide websites with no clarity as to what the Act requires of them. As history and current debate reflects, different opinions abound as to what content, mediums, and expressive features are in the "best interests" of children. The Act's solution to this problem—defining "best interests" by reference to content and features that might "foreseeably" "result in" psychological or other broad categories of harm—does not solve it. Restricting speech based on its potential impact on a diverse universe of third parties—each with their own sensitivities and sensibilities—leaves services guessing as to what designs, algorithms, or features may subject them to liability. So, to avoid severe penalties, regulated entities will "steer far wider of" any online activity Maryland might be able to restrict consistent with the First Amendment than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

*Third*, two federal laws preempt the Act. The Act conflicts with Section 230 of the Communications Decency Act, which immunizes websites' decisions about what, if any, third-party content "to publish, withdraw, postpone or alter." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). And the Act is inconsistent with the treatment of children's data under the Children's Online Privacy Protection Act, and is therefore preempted by COPPA as well. Congress wrote and designed both laws to protect the internet as a vibrant medium of expression free from a patchwork of state speech policing.

*Fourth*, NetChoice has standing on behalf of both its members and their users to bring these claims. Contrary to the State's assertions, all NetChoice members need not have standing in their own right (one is enough), and all members need not participate in the lawsuit: "the Supreme Court itself has recognized that associations are often better positioned to answer the kind of industry-wide factual questions that . . . could be implicated here." *Computer & Commc'ns Indus. Ass'n v.*

*Uthmeier*, No. 4:24CV438-MW/MAF, 2025 WL 1570007, at \*9 (N.D. Fla. June 3, 2025). NetChoice similarly has standing "to assert the rights of [its] members' users" because the Act "directly burdens" those users' rights to "access speech" that members disseminate. *Id.* The State's fallback invitation to reject NetChoice's facial claims for "prudential reasons" likewise fails. Federal courts have an "unflagging obligation" to address the matters presented to them within their jurisdiction. *Sonda v. W. Va. Oil & Gas Conservation Comm'n*, 92 F.4th 213, 219 (4th Cir. 2024). The Court should deny the State's Motion.

**BACKGROUND**

I.    **Data is the backbone of vast amounts of protected online speech.**

    A.    **Online services—including NetChoice members—create, disseminate, and facilitate enormous amounts of protected speech.**

The "vast democratic forums of the Internet" are home to immense amounts of First Amendment activity. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citing *Reno v. ACLU*, 521 U.S. 844, 868 (1997)). This includes "not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue" such as "chat rooms" and "newsgroups." *Reno*, 521 U.S. at 870.

NetChoice's members facilitate, curate, and disseminate much of this speech. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. "And on Twitter [now X], users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. More generally, these and other "social media" websites, permit users worldwide to engage in massive amounts of expressive activity generating "billions of 'posts' every day" on wide-ranging topics from "vacation photos" to "travel documentaries" to "writing, artwork, and innermost thoughts." *NetChoice, LLC v. Yost*, No. 24-cv-00047, 2025 WL 1137485, at \*2 (S.D. Ohio Apr. 16, 2025);

3

*see also NetChoice, LLC v. Griffin (Griffin II)*, No. 23-cv-5105, 2025 WL 978607, at *3 (W.D. Ark. Mar. 31, 2025). Social media services both facilitate third party expression (such as of users and content creators) and also "engage[] in expression" themselves through their "display" and "compiling and curating" of protected content (text, audio, images, and video) "created by others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 728, 731, 740 (2024).

Beyond social media exists a wide array of other digital services that also create and disseminate immense amounts of protected speech. Many of these are NetChoice members as well. Search services engage in protected expression by allowing their users to find information across the internet. *See* Am. Compl. ¶ 38 (citing cases). Video streaming services like Prime Video, Hulu, and Netflix offer on-demand movies, television shows, news, and other content. Audio streaming services, like Spotify, Apple Music, Amazon Music, Audible, and Wondery, offer on-demand music, podcasts, news, and e-books. Wordpress provides hosting services that allow individual content creators, like bloggers and businesses, to host and maintain their own websites. Language learning platforms like Duolingo offer languages courses. Online news services (like nytimes.com and foxnews.com) and sports services (like ESPN) offer up-to-the-minute current events and sports and create forums for discourse among readers. Online journals (like Science.org), online databases (like pubmed), and digital libraries (like JSTOR) provide access to scientific, historical, economic, and medical research. These are just a few examples; the Internet is "as diverse as human thought." *Reno*, 521 U.S. at 870 (citation omitted); *see* Am. Compl. ¶ 39.

**B.      Online services—including NetChoice members—require user data to create, disseminate, and facilitate speech.**

Online services could not create, facilitate, or disseminate this speech without collecting, processing, and using "personal data," as the Act defines it. Online user data is akin both to the ink and paper necessary to publish newspapers and the subscriber addresses necessary to distribute

4

them. Am. Compl. ¶¶ 40-52. At the most basic level, data is necessary merely to provide functional online services and content. This includes data reflecting a user's IP address, device type, operating system, screen resolution, browser type, language preferences, and time zone to determine where content should be disseminated and how to present it. Without data, websites could not direct content to an end recipient, detect malicious actors, and ensure functional services. *Id.* ¶¶ 42-44.

Websites also use data to tailor content and services for their users. For example, many websites collect data—such as usernames and contact information—to enable customers and clients to create accounts through which they can adjust privacy and security settings, create networks of known contacts, and otherwise personalize their experience. Websites also often process data about user engagement to deliver more relevant content. As the Supreme Court observed in *Moody*, when a logged-in user accesses YouTube and Facebook, she "does not see everything—even everything from the people she follows—in reverse-chronological order." 603 U.S. at 719. The websites will have "removed some content entirely; ranked or otherwise prioritized what remains; and sometimes added warnings or labels." *Id.* In fact, of "the billions of posts or videos" that could wind up on a user's customized feed or recommendations list, "only the tiniest fraction do." *Id.* at 734. This "selection and ranking" of content relies on "algorithms" and is based both "on a user's expressed interests and past activities" as well as "more general features of the communication or its creator," *id.* at 734-35, all conveyed through user data. Curation allows users to engage with content they may find most useful and from people they "follow" or "subscribe" to, as well as "recommended" content, alerts about developing events, and advertisements that make services viable. Without curation, users would be lost in a "deluge" of content. *Id.* at 719.

**II.    Extensive safeguards exist to protect the safety and privacy of minors online.**

**A.    Minors and their parents have many tools to adjust their online experience and limit access to websites, content, and contacts as they see fit.**

As courts have recognized, parents have many tools to moderate and oversee how (if at all) their children use the internet. *See NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1127 (D. Utah 2024); *Griffin II*, 2025 WL 978607, at *3-5. Parents decide whether and when to let their minor children use devices in the first place and when those devices can access the internet. Many devices have features that allow parents to limit time spent on the device, filter online content, and control privacy settings and applications. Am. Compl. ¶ 63. Cellular and broadband internet providers, wireless routers, and browsers also offer tools and settings to block particular websites, filter content, and monitor internet usage. *Id.* ¶¶ 57-59. Widely available browser extensions reinforce these tools. *Id.* ¶ 58. Many websites and apps—including those operated by NetChoice's members—also provide parents with similar options and controls, such as Google's SafeSearch filter and screen time management. *Id.* ¶¶ 60-62.

**B.    A comprehensive regime of state and federal law independently protects the privacy of online users, including minors.**

**1.    COPPA**

The Children's Online Privacy Protection Act (COPPA) is a comprehensive federal privacy law that, along with its regulations, has long "limit[ed] the collection of personal information from children without parental consent." 144 Cong. Rec. 23926 (1998). COPPA defines a child as anyone under 13 and applies to websites that are "directed to children" or have "actual knowledge" they are collecting personal information from a child. 15 U.S.C. § 6501(1), (4)(10); *id.* § 6502. These websites must provide notice of information collection, use, and disclosure practices; obtain parental consent before collecting, using, or disclosing a child's personal information; provide parents "reasonable means" to review and refuse consent to the use of a child's personal

information; and not condition a child's participation in certain activities on excessive disclosure of personal information. 16 C.F.R. § 312.3(a)-(d). COPPA preempts "inconsistent" state rules. 15 U.S.C. § 6502(d).

### 2. MODPA

Effective October 1, 2025, Maryland residents also are protected by a stringent and comprehensive state data privacy regime known as the Maryland Online Data Privacy Act (MODPA). *See* Am. Compl. ¶¶ 5, 65; Md. Sen. Bill 541 (2024). MODPA regulates data "controllers," meaning any person that "determines the purpose and means of processing personal data." Md. Com. Law § 14-4601(K). Among other things, MODPA restricts controllers from: (i) collecting, processing, sharing, or selling "sensitive data"; (ii) collecting, processing, or transferring *any* personal data in "a manner that unlawfully discriminates"; (iii) collecting or processing any personal data of known minors for targeted advertising or sale; and (iv) collecting or processing data beyond what is "necessary and proportionate" to provide a service or achieve the disclosed purpose of the processing. § 14-4607. MODPA also requires controllers to implement "reasonable administrative, technical, and physical data security practices to protect the confidentiality, integrity, and accessibility of personal data" and to regularly conduct "data protection assessments" assessing whether data processing poses risks of deceptive treatment, disparate impacts, and financial and physical injuries (among other things). §§ 14-4608, 14-4610. MODPA also empowers Maryland consumers (and parents and guardians on behalf of their children) to determine whether and what type of personal data is being processed, to whom it has been disclosed, and for what purpose; to delete their data; and to opt out of targeted advertising, "solely automated decisions," and other data processing. § 14-4605(B).

### C. A comprehensive regime of state and federal law independently prohibits harms against minors.

In addition to these pre- and co-existing data privacy protections, a number of federal and state laws protect the physical, financial, and emotional wellbeing of Maryland minors. These include laws that protect minors from sexual abuse, exploitation, bullying, hazing, stalking, unfair and deceptive practices, misleading online content, online surveillance, pornography, extortion and threats, online privacy harms, and pornography. Am. Compl. ¶ 64; *see, e.g.*, Md. Com. Law § 14-3701 *et seq.* (online child safety); *id.* § 14-3501 *et seq.* (personal information protection act); *id.* § 13-301 *et seq.* (deceptive trade practices); Md. Crim. Law § 3-324 (sexual solicitation of minors); *id.* § 3-325 (using personally identifying information to solicit sex crime); *id.* § 3-602 (sexual abuse of a minor); *id.* § 3-607 (hazing); *id.* § 3-802 (stalking); *id.* § 3-803 (harassment); *id.* § 3-805 (misuse of email); *id.* §§ 3-901-03 (crimes against privacy); *id.* § 11-203 (sale or display of obscene item to minor); *id.* §§ 11-207-209 (online child pornography); Pub. L. 106-554, Title XVII (2000) (children's internet protection), 18 U.S.C. § 1470 (transfer of obscene materials to minors); *id.* § 1591 (child sex trafficking); *id.* § 1801 (video voyeurism); *id.* § 2251-52 (sexual exploitation).

## III. Maryland's "Age-Appropriate Design Code"

On April 6, 2024—the same day the General Assembly enacted MODPA—the General Assembly also enacted the Maryland Age-Appropriate Design Code Act. The Act is modeled on a similar "Age Appropriate Design Code" enacted and enjoined (now twice) by a California District Court. Maryland enacted its version of the AADC while the California court's first injunction was pending appeal before the Ninth Circuit. Maryland removed certain language from its AADC that had been pivotal to that court's analysis, including express references to regulating harmful

"content." But Maryland left intact the central and unconstitutional flaw that suffuses both laws: the guise of regulating data "privacy" and website "design" to require websites to self-censor.

**Central coverage provisions.** The Act's speech regulations apply to websites that meet the definition of "covered entity," are not exempt, and are as the Act defines it "reasonably likely to be accessed by children," *i.e.*, Maryland residents younger than 18. § 14-4801(e), (s).

A "covered entity" is any for-profit entity doing business in the State that collects personal data; determines how and why it is processed; and satisfies one of the following criteria: (i) has annual gross revenues exceeding $25 million; (ii) annually buys, receives, sells, or shares the personal data of 50,000 or more users; or (iii) derives at least half of its annual revenues from the sale of personal data. § 14-4801(h)(1). "Personal data" is non-public "information that is linked or reasonably able to be linked to an identified or identifiable individual." § 14-4801(n).

A covered entity is only subject to the Act if it offers an online service, product, or feature that is "reasonably likely to be accessed by children," meaning :

(1) The online service, product, or feature is directed to children as defined in COPPA;

(2) The online service, product, or feature is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children;

(3) The online service, product, or feature is substantially similar or the same as an online service, product, or feature that satisfies item (2) above;

(4) The online service, product, or feature has advertisements marketed to children;

(5) The covered entity's internal research findings determine that a significant amount of the online service, product, or feature's audience is composed of children; or

(6) The covered entity knows or should have known that a user is a child.

§ 14-4801(s).

**"Best interests of children" requirements.** The Act's operative speech restrictions rely on the subjective and indeterminate "best interests of children" standard. § 14-4801(c). The General Assembly codified its "intent" that covered websites "shall ensure the best interests of children when designing, developing, and providing" their services and features that "children are reasonably likely to access," and if websites "process children's data in any capacity," they "shall do so in a manner consistent with the best interests of children." § 14-4803(2)-(3). The Act also commands that if "a conflict arises between commercial interests and the best interests of children, covered entities . . . shall prioritize the privacy, safety, and well-being of children." § 14-4803(4). This mandatory language appears to require websites to act in the "best interests of children" and "prioritize [their] privacy, safety, and well-being" across all activities and data processing.

The Act defines the "best interests of children" to mean that "a covered entity's use of the personal data of children or the design of an online product" does not: (1) "[b]enefit the covered entity to the detriment of children"; *and* does not (2) "[r]esult in":

(i)     Reasonably foreseeable and material physical or financial harm to children;

(ii)    Severe and reasonably foreseeable psychological or emotional harm to children;

(iii)   A highly offensive intrusion on children's reasonable expectation of privacy; or

(iv)    Discrimination against children based on race, color, religion, national origin, disability, gender identity, sex, or sexual orientation.

§ 14-4801(c).

None of these terms is defined, and to the extent they resemble terms used in other legal frameworks, it is not clear what they mean as applied to data "processing" and "design."

**Data restrictions.** The Act also creates a set of default presumptions against online services' ability to receive, use, and handle—or even *delete*—user data (what the Act calls

"processing" and "profiling") unless their data processing and "design" are consistent with the "best interests of children." For example, regulated websites may not "process" the "personal data of a child in a way that is inconsistent with the best interests of children" and unless "reasonably necessary to provide" a service with which a "child is actively and knowingly engaged," § 14-4806(a)(1), (3). "Process" means "to perform an operation or set of operations by manual or auto-mated means," including "collecting, using, storing, disclosing, analyzing, deleting, or modifying personal data." § 14-4801(p).

The Act also restricts "profiling" "a child" "by default," unless the website can demonstrate "appropriate safeguards in place to ensure that profiling is consistent with the best interests of children" *and* that profiling is either "necessary to provide the requested online product" *or* there is "a compelling reason that profiling is in the best interests of children." § 14-4806(a)(2). "Profile" is defined to encompass multiple ways that covered entities might personalize content. Specifi-cally, it is "automated processing . . . that uses personal data to evaluate, analyze, or predict certain aspects relating to an individual, including an individual's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements." § 14-4801(q).

**Monitoring.** The Act also prohibits "[a]llow[ing] a person other than a child's parent or guardian to monitor the child's online activity without first notifying the child and the child's parent or guardian." § 14-4806(a)(9). The term "monitor" is not defined but appears to extend to a range of commonplace online expressive activities, such as "friending" a contact to see that user's updates or "following" a content creator or influencer to view new posts.

**Dark patterns.** Finally, the Act prohibits covered entities from using so-called "dark pat-terns" to: "[c]ause a child to provide personal data beyond what is reasonably expected"; "[c]ir-cumvent privacy protections"; or "[t]ake any action that the covered entity knows, or has reason

to know, is not in the best interests of children who access or are reasonably likely to access the online product." § 14-4806(a)(7). A "'[d]ark pattern' means a user interface designed or manipulated with the purpose of subverting or impairing user autonomy, decision making, or choice." § 14-4801(i). The term has been interpreted to encompass a range of commonplace features that simplify the user experience, such as "autoplay" and "newsfeed" functions. *See* Am. Compl. ¶ 93.

**Data Protection Impact Assessments.** Beginning April 1, 2026, covered entities must prepare a Data Protection Impact Assessment (DPIA) for every online service and feature they offer that is "reasonably likely to be accessed by children." § 14-4804(a)(1). A DPIA is a "systematic survey to assess compliance with the duty to act in the best interests of children." § 14-4801(j). A DPIA must identify the "purpose" of the online service and how it uses children's data; determine whether it "is designed in a manner consistent with the best interests of children reasonably likely to access" it; and describe "steps that the covered entity has taken and will take to comply with the duty to act in a manner consistent with the best interests of children." § 14-4804(b).

To assess whether their services are "designed in a manner consistent with the best interests of children," covered entities must address the four categories of harm specified in the second prong of the "best interests of children standard," [1] in relation to the following topics:

    (i)    Whether their "data management or processing practices":

        a.  "could lead to children experiencing or being targeted by contacts that would result in" harm;

        b.  "could permit children to participate in or be subject to conduct that would result in" harm; or

---

[1] These are: (i) "reasonably foreseeable and material physical or financial" harm; (ii) "reasonably foreseeable and extreme psychological or emotional" harm; (iii) "highly offensive intrusion on children's reasonable expectation" of privacy; and (iv)"[d]iscrimination against children based on race, color, religion, national origin, disability, gender identity, sex, or sexual orientation."

> c. "are reasonably expected to allow children becoming party to or exploited by a contract through the online product that would result in" harm;

(ii) Whether they use "system design features to increase, sustain, or extend the use of the online product, including the automatic playing of media, rewards for time spent, and notifications that would result in" harm;

(iii) "Whether, how, and for what purpose" they collect or process "personal data of children and whether those practices would result in" harm;

(iv) "Whether and how data collected to understand the experimental impact" of the service or feature "reveals data management or design practices that would result in" harm; and

(v) Whether the websites "algorithms" would "result in" harm.

> § 14-4804(b)(3).

Covered entities also must address "[a]ny other factor" that "may indicate that the online product is designed in a manner that is inconsistent with the best interests of children." § 14-4804(b)(3)(viii). Then, they must describe the "steps" they "ha[ve] taken and will take to comply with the duty to act in a manner consistent with the best interests of children." § 14-4804(b)(4).

**Enforcement.** Violations of the Act are "subject to" Maryland's Consumer Protection Act. § 14-4808(a). Maryland's Consumer Protection Act allows the Attorney General to investigate violations and seek injunctive and monetary relief, in addition to other fees and costs. §§ 13-405 to 409. It also allows for criminal penalties, § 13-411, and authorizes civil penalties of up to $2,500 per affected child for negligent violations and $7,500 per affected child for intentional violations. § 14-4808(b). Civil enforcement is pursued through administrative proceedings, where the State acts as both prosecutor and judge. *See* § 13-403. Judicial review is deferential. *See Matter of Cricket Wireless, LLC*, 302 A.3d 1062, 1075 (Md. App. 2023).

## IV.   This lawsuit

NetChoice filed this lawsuit on February 3, 2025, and filed an Amended Complaint on April 25, 2025. NetChoice challenges the "best interests of children" and "likely to be accessed" standards as content-based restrictions on speech under the First Amendment (Counts I and II); challenges those same standards as impermissibly vague under the Fifth Amendment (Counts III and IV); challenges the DPIA requirements as unlawfully compelling speech in violation of the First Amendment (Count V); challenges the data, monitoring, and dark patterns restrictions as imposing content-based restrictions in violation of the First Amendment (Count VI); challenges the data collection restrictions as preempted by COPPA (Count VII); and challenges the Act's "best interests of children" requirements to the extent they are preempted by Section 230 of the Communications Decency Act of 1996 (Count VIII).

On June 20, 2025, the State moved to dismiss. ECF No. 35. The State challenges the legal sufficiency of each count under Rule 12(b)(6) and NetChoice's standing under Rule 12(b)(1). The State also contends that the Court should dismiss certain claims for "prudential" reasons.

## LEGAL STANDARDS

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes dismissal of a complaint that fails to assert sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The purpose of the Rule is "to test the sufficiency" of the allegations, "not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Grosso v. Unum Life Ins. Co. of Am.*, No. 24-cv-1432, 2025 WL 903800, at *4 (D. Md. Mar. 25, 2025) (citation omitted). A complaint need not include "detailed factual allegations," *Ashcroft*, 556 U.S. at 678; it must only

"set forth enough factual matter (taken as true) to suggest a cognizable cause of action, even if actual proof of those facts is improbable and recovery is very remote and unlikely." *Grosso*, 2025 WL 903800, at \*5 (citations omitted and cleaned up).

Rule 12(b)(1) requires dismissal if a court lacks "authority to hear the matter brought by a complaint." *Rand Constr. Corp. v. Aegis Mech. Corp.*, No. CV RDB-24-1467, 2025 WL 754608, at \*4 (D. Md. Mar. 10, 2025). Such a motion "may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting that the jurisdictional allegations of the complaint [are] not true." *Id.* (citations omitted). Where, as here, the defendant makes a facial challenge, "the district court assesses jurisdiction under the same standard as one brought under Rule 12(b)(6)." *Evans v. United States*, 105 F.4th 606, 615 (4th Cir. 2024). That is, "the district court accepts all allegations as true and determines whether those allegations are sufficient to invoke jurisdiction." *Id.*

## ARGUMENT

### I.     NetChoice's claims satisfy Rule 12(b)(6).

#### A.     NetChoice plausibly alleges that the Act violates the First Amendment (Counts I, II, V, and VI).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech," and the Fourteenth Amendment incorporates that protection against the States. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). "The most basic" principle of the First Amendment is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling state interest[]." *Reed v. Town of*

15

*Gilbert*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)). Content neutral laws that burden expression are subject to intermediate scrutiny and must advance "important governmental interests unrelated to the suppression of free speech and [] not burden substantially more speech than necessary to further those interests." *Free Speech Coal. v. Paxton (FSC)*, No. 23-1122, 2025 WL 1773625, at *5 (U.S. June 27, 2025) (citation omitted).

The First Amendment's protections apply to minors—just as to adults—and "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citation omitted). Protected speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795.

## 1. The Act regulates protected speech.

The State's core argument is that the Act "regulates conduct, not speech," Mot. at 21; *see also id.* at 20, 22, 24, 25, 27, 30, yet its brief demonstrates otherwise. The Act seeks to prevent "exposure to harmful and age-inappropriate content," "advertising messages," "videos," "social media," and other "screen-based media" that the State believes to be "harmful to children's mental health." Mot. at 1. The General Assembly cited similar concerns about "social media use" in its preamble to the Act, *see* Ex. 1 at 2, and legislative history cited in the State's brief makes clear that the "harms" and "risks" the Act targets are those attributed to online *speech*. These include "child-targeted marketing,"  "age inappropriate content," "negative content," "provocative or risqué content," "inappropriate advertising," and "influencer marketing"—all attributed predominantly to "social media" and "algorithms" that did not assess "whether the content or overall online

experience is beneficial to the user."[2] Other testimony cited by the State derides "malicious" "tweets" and "algorithms . . . push-feeding dangerous and psychologically damaging content."[3]

This is all protected speech. The First Amendment protects "social media" and "advertising" and videos." *Moody*, 603 U.S. at 737-38; *Packingham*, 582 U.S. at 105 (noting the "wide array of protected First Amendment activity" on "social media"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760-61 (1976) ("advertising" is protected speech); *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 682 (1968) ("motion pictures" are protected); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1186 (N.D. Cal. 2025) (*Bonta III*) ("children's online access to video games, video streaming services, social media, and educational content" is protected by the First Amendment). Indeed, the "vast majority" of websites likely to be accessed by children "involve expressive content." *Bonta III*, 770 F. Supp. 3d at 1185.

NetChoice members work hard to ensure that minors do not encounter harmful speech on their services, but the notion that the State may oversee those activities is "startling and dangerous." *United States v. Stevens*, 559 U.S. 460, 470 (2010). The First Amendment applies to speech regardless of the State's view of its "social worth," *Stanley,* 394 U.S. at 564, or whether it is in children's best interests. The First Amendment protects, among other things, speech that causes "anguish," *Snyder v. Phelps*, 562 U.S. 443, 451, 461 (2011); speech that is "offensive" or "disagreeable," *Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 594 U.S. 180, 205 (2021) (Alito, J., concurring); speech that "invites dispute," *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 63-

---

[2] Written Testimony of Josh Galin, Executive Director, Fairplay, Before the House Economic Matters Committee (Feb. 13, 2024), https://tinyurl.com/mr3mzsan (Fairplay Statement).

[3] Statement of Christine McComas to the Hon. C.T. Wilson, House Economic Matters Committee re: HB 603 (Feb. 9, 2024), https://tinyurl.com/3294eh46.

64 (1976); and speech that is "highly offensive" or "unwanted," *United States v. Playboy Ent. Grp., Inc.,* 529 U.S. 803, 811 (2000); *see also Butler v. Michigan*, 352 U.S. 380, 381 (1957).

The Act's use of terms that sound in product "design," "safety," and data "privacy," § 14-4801(c), does not hide that its object is speech. *See* Mot. at 27. In *M.P. by & through Pinckney v. Meta Platforms Inc.*, the Fourth Circuit recently rejected a similar attempt to frame liability for speech-related harms in terms of "safety" and website "design." 127 F.4th 516, 520-23 (4th Cir. 2025). In fact, the theories in *Pinckney* were nearly identical to the theories of liability the Act codifies. The plaintiff there sought to hold Meta liable under state product liability theories based on allegedly "unreasonably dangerous" and "defective" website design, *id.* at 522-23, and an "algorithm" that led users to "racist and hate-driven content." *Id.* at 526. The Fourth Circuit acknowledged public concerns about algorithms arranging content, but nevertheless saw these claims for what they were: an effort "to hold Facebook liable for disseminating 'improper content.'" *Id.* at 525.

The Supreme Court too has recognized that the First Amendment protects website "design" and the use of "data" to deliver online speech. For example, "expressive choices" about "organizing," "select[ing]," and "presenting" content to viewers—and the use of "algorithms" "based on user's expressed interests" to deliver that content—are protected, as are the "distinctive expressive product[s]" that result from those choices. *Moody*, 603 U.S. at 731-32, 734, 738, 740, 744. And despite California's attempt to frame its similar AADC as targeting "online products," "privacy," and "data management," the California District Court recognized that the law "regulate[d] protected speech." *Bonta III*, 770 F. Supp. 3d at 1186. Other courts have rejected similar state efforts to disguise speech restrictions as "privacy," "safety," and "conduct" regulations. *See Junior Sports Mags. Inc. v. Bonta*, No. 24-4050, 2025 WL 1863184, at *2 (9th Cir. July 7, 2025) (rejecting state's

attempt to "frame" law as privacy regulation where "the so-called privacy concerns" only related to "the use of certain information for the purpose of marketing or advertising firearm-related products to minors" (cleaned up)); *Yost*, 2025 WL 1137485, at *16 (law restricting minors' access to "a plethora of protected speech cannot be reduced to a regulation of commercial conduct" (cleaned up)).

In light of these decisions, the State's contention that the Act "regulates conduct, not speech" is not credible—much less does it overcome the liberal plausibility standard applicable here. The State struggles to offer a non-speech application of the Act, and the two examples it does offer—data breaches and insecure data management, Mot. at 27—are covered by other laws, including MODPA. *See* Md. Com. Law § 14-3502(b) (requiring businesses "to protect against unauthorized access to or use of personal information"); *id.* § 14-3503(a) (requiring businesses to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information" maintained); § 14-4608(A)(3) (requiring data processors to "[e]stablish, implement, and maintain reasonable . . . data security practices to protect the confidentiality, integrity, and accessibility of personal data"); *id.* § 14-4610 (addressing "processing activities that present a heightened risk of harm"). MODPA's bona fide data privacy and security obligations are "a far cry from the [Act's] vague and onerous requirement that covered businesses" rearrange their offerings based on the potential for "detriment to children." *Bonta II*, 113 F.4th at 1120.

For the same reason, the State's invocation of *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), Mot. at 21, is misplaced. *Arcara* held that a state could sanction a bookstore for on-premise prostitution that "manifest[ed] absolutely no element of protected expression," 478 U.S. at 705. But here, it was "conduct with a significant expressive element that drew the legal remedy in the

19

first place," so the State must satisfy First Amendment scrutiny. *Id.* at 706; *see also FSC*, 2025 WL 1773625, at *5 (government's interest in regulating conduct must be "*unrelated to the suppression of free speech*" (emphasis added)). The State "may not selectively burden otherwise-lawful speech in the name of protecting privacy." *Junior Sports Mags. Inc.*, 2025 WL 1863184, at *6.

## 2. The "best interests of children" standard is content-based (Count I).

The Act not only regulates speech, it does so based on content. Laws are content-based if they draw distinctions based "on the message a speaker conveys." *Reed*, 576 U.S. at 163. Some content distinctions "are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose," yet both are distinctions based on "message" and subject to strict scrutiny. *Id.* Even "facially content neutral" laws are content-based if they "cannot be justified without reference to the content of the regulated speech" or were adopted "'because of disagreement with the message the speech conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (cleaned up).

The "best interests of children" standard is content based. As the Fourth Circuit recognized in *Pinckney*, websites cannot assess whether their "designs" are "dangerous" without evaluating "*content.*" *Pinckney*, 127 F.4th at 525 (emphasis added). Likewise, websites cannot determine whether their data processing will expose minors to "harmful" or "age-inappropriate content," Mot. at 1, or foreseeably result in broad categories of "harm," without examining content. To take the State's own examples, a covered website cannot know whether its data practices or design might "lead to . . . eating disorders" or other "harms to mental health," *id.*, without evaluating the subject matter of the content it publishes. Videos and posts about extreme dieting presumably will not be in the "best interests of children," whereas posts that promote healthful eating or body positivity presumably will. Because the only way to know is to make judgments about content, the

"restrictions in the [Act] . . . depend entirely on the communicative content of the" website. *Reed*, 576 U.S. at 164; *see also, e.g.*, *Fayetteville Pub. Libr. v. Crawford Cnty*, 684 F. Supp. 3d 879, 906 (W.D. Ark. 2023) ("[I]t is difficult, if not impossible, to assess a challenged book's 'appropriate-ness' without considering its content, message, and/or viewpoint.").

The State argues that First Amendment scrutiny is not required because the Act "does not require removal" of any specific content from any website. Mot. at 13. But even if content need not be removed altogether, laws that "deputize private actors into determining whether material is suitable for kids" require strict scrutiny. *Bonta II*, 113 F.4th at 1118. This Act does so by requiring websites to prevent minors from viewing content that is not in their "best interests." In this way, the Act effectively *does* require removal (or at least suppression) of certain content from any part of the website that can be accessed by minors. That is unconstitutional. *See Brown*, 564 U.S. at 795 (efforts to "protect the young from ideas or images that a legislative body thinks unsuitable for them" are content-based); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 59, 70 (1963) (invali-dating regime "directly and designedly" intended to stop circulation of certain books); *Se. Promo-tions, Ltd. v. Conrad*, 420 U.S. 546, 548 (1975) (invalidating scheme that restricted theater pro-ductions based on whether they were "in the best interest of the community").

### 3. The "likely to be accessed by children" standard is content-based (Count II).

The "likely to be accessed by children" standard also is content-based. This standard de-fines the universe of regulated entities by whether their offerings have content "substantially sim-ilar to" another website routinely accessed by children or "advertisements marketed to children"; are "directed to children" as defined by COPPA; are such that the website "knows or should have known" that a user is a child; or are "routinely accessed" by an "audience compos[ed]" of a sig-nificant number of children. § 14-4801(s). The first two criteria— whether websites have content

"substantially similar to" another website or "advertisements marketed to children"—expressly demand consideration of the content of other websites and advertisements. They are content-based. The second two criteria are proxies for content: the simplest way to evaluate if a website is "directed to children" or should know its users are children is by reference to content. This is so intuitive that both California's parallel AADC and the FTC's parallel regulation under COPPA say so explicitly, requiring consideration of "design elements" "known to be of interest to children," such as "games, cartoons, music, and celebrities who appeal to children." *Bonta*, 770 F. Supp. 3d at 1187 (citing Cal. Civ. Code § 1798.99.30(b)(4)); *see also* 16 C.F.R. § 312.2 (whether a website is "directed to children" depends on "subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content," etc.). The content-based nature of the inquiry is not altered by Maryland's choice to cross-reference the FTC's content-based regulation, § 14-4801(s)(1), rather than mention content itself.

The Act's remaining criteria do not mention content, but they define the regulated universe by reference to the "audience" of speech, § 14-4801(s)(2), (5), thereby focusing on the "impact that speech has on its listeners." *Playboy Ent. Grp., Inc.*, 529 U.S. at 811. The State denies this and offers examples of "ridesharing apps," "navigation apps," and "online stores" as purported evidence that websites might have minor users without implicating protected expression. But one would not refer to the users of those apps as an "audience," *cf.* § 14-4801(s)(2), (5). Likewise, none of the minor-specific harms the State cites as motivating the Act are relevant to those apps. Ridesharing and navigation apps—to the extent minors are using them—are not causing "eating disorders," "cyberbullying," or "compulsive overuse." Mot. at 1 (cleaned up). Where the "overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the law "is not justified without reference to the content of the regulated speech." *Playboy*

*Ent. Grp., Inc.*, 529 U.S. at 811 (cleaned up); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011) (regulation to counteract an "influence" on specific "listeners" is "incompatible with the First Amendment").

The State's reliance on *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), Mot. at 29, is likewise misplaced. Unlike the "location-based" regulation in that case, the Act here is not "agnostic as to content." 596 U.S. at 69. In the State's own words, this Act regulates "harmful and age-inappropriate" speech, Mot. at 1, and it therefore "cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin*, 596 U.S. at 74 (quoting *Reed*, 576 U.S. at 163); *see also FSC*, 2025 WL 1773625, at *11 ("A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either on its face *or in its justification*." (emphasis added, citation omitted, cleaned up)). "[D]etermin[ing] whether a particular business's online offerings are likely to be accessed by children unavoidably requires an evaluation of content." *Bonta III*, 2025 WL 807961, at *9. This Count is plausible.

### 4.    The DPIA provisions compel speech and censorship (Count V).

The Act's DPIA requirements, § 14-4804, also violate the First Amendment because they compel speech and interfere with protected editorial discretion.

"It is well-established that the First Amendment protects 'the right to refrain from speaking at all.'" *Bonta II*, 113 F.4th at 1117 (citation omitted). A law "mandating speech that a speaker would not otherwise make" is a "content-based regulation of speech" subject to strict scrutiny because it "alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). That is true "even when the compelled speech need only be disclosed to the government." *Bonta II*, 113 F.4th at 1118.

The DPIA requirement "clearly compels speech by requiring covered businesses to opine on potential harm to children." *Id.* at 1117. Websites must opine on whether their services: could "lead to children experiencing or being targeted by contacts" that would result in harm; "could permit children to participate in or be subject to conduct that would result in" harm; use "design features" that might "sustain, or extend the use of" the website; and use data processing or "algorithms" that might "result in" amorphous categories of harm. § 14-4804(b)(3). In other words, companies must "recast [their] content-moderation," child safety, and data management "practices in language prescribed by the State, implicitly opining on whether and how certain controversial" practices around the selection and display "of content should be moderated," *X Corp. v. Bonta,* 116 F.4th 888, 901 (9th Cir. 2024). Worse, the requirement will compel companies who determine that their algorithms or design could foreseeably result in specified harms to "condemn" themselves by announcing that they are not "in the best interests of children"—which is even "more constitutionally offensive." *Nat'l Ass'n of Mfrs. v. SEC,* 800 F.3d 518, 530 (D.C. Cir. 2015).

The State cites *Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 629, 650-53 (1985) to argue that "[c]ompelled speech enjoys less protection," Mot. at 31, but *Zauderer's* narrow "exception" is only available "in certain contexts" and "does not apply here." *NIFLA*, 585 U.S. at 768. To qualify, compelled speech must be "commercial," "purely factual and uncontroversial," not "unjustified or unduly burdensome," *id.*, and "reasonably related to the State's interest in preventing deception of consumers." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010). DPIAs do not qualify. They do not "propose a commercial transaction," they are not made to the public, and the topic they address—children's "best interests"—is inherently subjective, abstract, and "highly controversial." *Bonta II*, 113 F.4th at 1119-20.

The State asserts that DPIAs do not require websites "to state or adopt any particular message." Mot. at 31. Not so: if websites determine that specified harms are foreseeable, they must announce themselves to be not "in the best interests of children," which is "controversial from the subjective standpoint of the speakers." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1278 (9th Cir. 2023). Regardless, even if the State "does not dictate the content of the disclosed information, it does pose the questions the . . . companies must answer." *Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, 724 F. Supp. 3d 1174, 1200 (D. Or. 2024). That is enough.

Separately, the "DPIA report requirement invites First Amendment scrutiny because it deputizes covered businesses into serving as censors for the State." *Bonta*, 113 F.4th at 1118. As discussed above, the First Amendment prohibits prior restraints on speech, including state action designed to deputize private actors to serve as censors by proxy. *See supra* at [ ]; *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 754-56 (1996). The DPIA provisions add to this unlawful censorship regime by requiring covered entities to describe "steps" they "*ha[ve] taken and will take* to comply with the duty to act in a manner consistent with the best interests of children." § 14-4804(b)(4) (emphasis added). So strict scrutiny is "warranted because the DPIA report requirement . . . deputizes private actors into censoring speech based on its content[.]" *Bonta II*, 113 F.4th at 1121 (citing *Playboy Ent. Grp. Inc.*, 529 U.S. at 806).

5.     **The data, monitoring, and dark patterns provisions regulate protected speech and effectively require age verification (Count VI)**

*Data restrictions.* The Act's data restrictions also regulate speech. *See* Am. Compl. ¶¶ 40-52, 254-58. Websites require user data to facilitate, curate, and disseminate content, Am. Compl. ¶¶ 40-52. Data is "like the ink and paper necessary to publish newspapers," the "subscriber addresses necessary to distribute" them, and a necessary "building block in the further creation of [online] speech." *Id.* ¶ 41. Yet, the Act restricts this essential prerequisite to speech by prohibiting

websites from collecting, using, storing, analyzing, evaluating, deleting, or modifying it, § 14-4801(p)(2), (q), unless those activities are "necessary" and in children's "best interests." § 14-4806(a)(1); § 14-4806(a)(2); *see Junior Sports Magazines*, 2025 WL 1863184, at *2 (law prohibiting use of minors' personal information "for the purpose of marketing or advertising" restricted speech). The State denies none of this, nor could it at this stage of the lawsuit.

Instead, the State simply repeats the discredited refrain that the data provisions regulate "conduct" to "ensure children's safety" so "that companies do not profit off of practices that expose children to foreseeable risks of harm." Mot. at 22. *Pinckney* rejected nearly identical arguments, recognizing that the real object is "to hold [websites] liable for disseminating 'improper content.'" 127 F.4th at 525. So too here, where the State has not even attempted to articulate how the use of "data" standing alone— without reference to downstream content or communications—threatens "children's safety" or exposes children to "foreseeable" "harm." Just as a state could not restrain the press by taxing paper and ink, *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 577-79 (1983), Maryland may not restrain online speech by regulating data "'to advance its own side of a debate." *Sorrell*, 564 U.S. at 580. That is likely why Defendants themselves have acknowledged the plausibility of this reading and cautioned that: "to the extent the Maryland Act's prohibitions impact a covered entity's collection, use, creation, or disclosure of information or burden only certain types of information or speech, . . . a court may consider the provisions to regulate protected speech." Am. Compl. Ex. B at 4 (citing *Sorrell*, 564 U.S. at 570).

*Monitoring restrictions.* The Act's restriction on allowing other users to "monitor [a] child's online activity," § 14-4806(a)(9), also burdens commonplace activities, such as "friending" and "following" other minors, friends, colleagues, and family members. Mot. at 24.

The State denies that "friending" or "following" other users "constitutes protected speech," Mot. at 24, but it is wrong: "implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up), and to "receive" and "read" the speech of others. *Griswold*, 381 U.S. at 482; *see also Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (the "right to distribute literature" also "necessarily" entails "the right to receive it"). Friending and following other users—including friends, family, content providers, influencers, and groups—is an expressive choice by the listener to receive content from selected speakers or groups. By contrast, "burdening" that freedom requires heightened scrutiny. Am. Compl. ¶ 262; *Boy Scouts of Am.*, 530 U.S. at 648; *cf.*, *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24CV438-MW/MAF, 2025 WL 1570007, at *12 n.18 (N.D. Fla. June 3, 2025) (a "compelling argument can be made that the creation of a social media account is itself expressive association").

The State's alternate argument that the Act "does permit monitoring, so long as the child and his or her parent are notified," Mot. at 25, does not cure the First Amendment defect. The government need not prohibit speech outright to violate First Amendment scrutiny; "burdens" are sufficient. *Boy Scouts of Am.*, 530 U.S. at 648. By requiring an "obvious signal" to a minor's "parent or guardian" each time the user is friended or followed, the Act burdens users' rights to both expressive association and anonymous speech. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ("[The] decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."); *Talley v. California*, 362 U.S. 60, 64 (1960) ("Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.");

*Carr*, 2025 WL 1768621, at *15 (enjoining provision that burdened "anonymous speech online"); *ACLU of Ga. v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997) (enjoining law that restrained anonymous speech). Such a burden is plausible, at a minimum.

*Dark patterns.* The Act's restrictions on so-called "dark patterns" (i.e., persuasive "user interfaces"), §§ 14-4801(i), 14-4806(a)(7), likewise violate the First Amendment. Again, the State does not deny that these restrictions regulate benign and widely used features such as "autoplay" and "newsfeed" functions that use algorithms to recommend personalized content—features designed to simplify and improve the expressive experience.[4] *See* § 14-4801(i). But the State contends that they are permissible because "[d]ark patterns are analogous to subliminal messaging"— which the State equates to "misleading" speech—because "they are meant to cause or encourage certain behavior without the user's conscious knowledge." Mot. at 23. The State cites no authority for these assertions and there is none: encouragement "without a [listener's] conscious knowledge," *id.*, is not the same as misleading speech, which Maryland already prohibits. Md. Com. Law § 13-303. Regulation "because of the fear that the expression will prove persuasive is inherently related to the suppression of free expression." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 585 (1991) (Souter, J., concurring).

That is particularly true here where the definition of "dark patterns" *also* requires websites to perform the vague and content-based "best interests" analysis. § 14-4806(7)(iii). As discussed *infra* at [ ], the uncertainty and subjectivity inherent in the "dark patterns" prohibitions will cause

---

[4] *See, e.g.*, Katharine Miller, *"Can't Unsubscribe? Blame Dark Patterns," Stanford University Institute for Human-Centered Artificial Intelligence* (Dec. 13, 2021), https://tinyurl.com/3em4ckzw (explaining that the "[a]utoplay" feature on YouTube by which "an algorithm automatically plays the next video and will endlessly serve you more and more content" is recognized as "a dark pattern").

websites to sweep too broadly, and chill editorial decisions to select, promote, and moderate content to audiences. This includes a news site recommending articles, a social media platform recommending posts, a music- or video-streaming service promoting customized playlists and movies based on prior listening or viewing history, a video-sharing platform promoting popular videos, and an independent blogger pushing out new-post alerts to followers. Am. Compl. ¶ 264.

*Effective age verification requirement.* All the foregoing restrictions, § 14-4806(a)(1)-(3), (7), & (9), also trigger First Amendment scrutiny because they effectively require websites to either know when their users are children or limit expressive activities for all users. That is because these provisions only apply when a user *is* a child. *See* § 14-4806(a)(1)-(3), (7), (9). The State argues that the Act expressly disclaims an "age-gating" requirement, but it fails to explain how websites can otherwise comply with these requirements without restricting speech for all users. This forced choice is "mistaken" and requires strict scrutiny. *Brown*, 564 U.S. at 794; *see also, e.g.*, *FSC*, 2025 WL 1773625, at *11 ("age verification is a burden on the exercise of th[e] right" to access protected speech); *Carr*, 2025 WL 1768621, at *13 (age verification would "impose an invasive burden on all Georgians' online speech by requiring their submission of personal information to access" speech); *Griffin*, 2025 WL 978607, at *8 ("Age-verification schemes . . . 'are not only an additional hassle,' but 'they also require that website visitors forgo the anonymity otherwise available on the internet.'" (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *Bonta III*, 770 F. Supp. 3d at 1203 (invalidating AADC requirement to estimate age because "[e]very covered business will be forced to choose between intruding into user

privacy, thereby chilling publication of and access to protected speech, or publishing only child-appropriate content, thereby restricting access to protected speech for users of all ages").[5]

### 6. The savings clause does not cure the First Amendment defects.

The Maryland General Assembly appears to have understood all these defects, as it enacted a savings provision conveying its "Intent" that "[n]othing in this subtitle may be construed to require a covered entity to monitor or censor third-party content or otherwise impact the existing rights and freedoms of any person." § 14-4803(5). According to the State, the "General Assembly is presumed to have meant what it said and said what it meant," so the "law regulates conduct and not content." Mot. at 20.

This glib assurance lends no relief to regulated websites. The General Assembly "is presumed to have meant what it said" in *all* the Act's provisions. The clear and overwhelming thrust of those provisions is to require websites to redesign their expressive offerings so minors consume less bad speech. In fact, in the same "Legislative Intent" provision, the State reiterates that websites must operate "in a manner consistent with the best interests of children," "ensure the best interests of children when designing, developing, and providing" their services, and if a "conflict arises between commercial interests and the best interests of children," prioritize children. § 14-4603. The natural reading of these provisions is to require services to childproof their expressive offerings, and the State's brief confirms that is how the State reads them. So, "[i]t would be naïve to credit the State's assertions" of legislative intent when the Act's substantive provisions "plainly serve as instruments of [speech] regulation." *Bantam Books, Inc.*, 372 U.S. at 68-69.

---

[5] In *FSC*, the Supreme Court upheld—under intermediate scrutiny—age-verification requirements for adults to access pornographic speech that is protected as to them but not as to minors. 2025 WL 1773625, at *11. By contrast here, the Act's content-based standards apply to speech protected for everyone, so strict scrutiny is required and "fatal in fact." *Id.* at *12.

"More fundamentally," the Court should "reject the [State's] attempt to immunize the [Act] from review through a savings clause" that "would nullify the 'clear and specific' substantive provisions of the" Act. *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021). Courts have "repeatedly rejected the argument that simply including 'consistent with applicable law' or a similar boilerplate phrase inoculates an otherwise unconstitutional [law] from judicial review." *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 562 (D. Md. 2025). If such a "purely theoretical savings clause, with no method or standard for invoking it," required dismissal at the pleadings stage, "judicial review [would be] a meaningless exercise." *HIAS, Inc.*, 985 F.3d at 325; *see also, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (savings clause did not "override" conflicting text of Executive Order where there was "more than a mere possibility that some agency might make a legally suspect decision" implementing the law (cleaned up)).

### 7. The State cannot satisfy First Amendment scrutiny on the pleadings.

For all the reasons above, the Act is presumptively unconstitutional and the State must satisfy heightened scrutiny. The State points to its interest in protecting children, Mot. at 33-34, but the State's "legitimate power to protect children" from harm, "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. In any event, NetChoice has plausibly alleged a First Amendment claim. That is all that is required. *See Corcoran v. Sessions*, 261 F. Supp. 3d 579, 599 (D. Md. 2017) (finding application of scrutiny "premature" at the pleading stage (citing cases)).

### 8. NetChoice has properly pleaded facial claims.

Finally, the State misreads *Moody*, 603 U.S. at 723, as supporting dismissal of NetChoice's facial claims because the Amended Complaint purportedly does not "address all applications of the [Act] as a whole" and the full "range of activities" and regulated "actors." Mot. at 18-19. *Moody*

addressed the standard to "win"—not to plead—facial relief, 603 U.S. at 723. As the Supreme Court has long recognized, that facial standard "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 331 (2010) (citing *United States v. Treasury Employees*, 513 U.S. 454, 477-78 (1995)). *Moody* did not change that, and the case remains pending on remand from the Supreme Court. That makes sense: requiring a plaintiff to plead "all applications," "activities," and "actors" touched by a law would not be "short and plain" as Rule 8 requires, and it would unfairly immunize unconstitutional laws from review so long as they regulate *so much speech* that their applications cannot concisely be alleged. So, as other courts have now recognized, *Moody's* "level of detail [is] not required" at the pleading stage. *McAllister v. Clark Cnty.*, 746 F. Supp. 3d 918, 940 (D. Nev. 2024); *see also, e.g.*, *Free Speech Coal. v. Knudsen*, 754 F. Supp. 3d 1037, 1050 (D. Mont. 2024) (denying motion to dismiss because *Moody*'s standard goes to the "remedy" not "what must be pleaded"); *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1039 (N.D. Cal. 2023) (similar); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 603 (S.D.N.Y. 2016) (motion to dismiss overbreadth claims was "premature" because courts do not assess a law's "plainly legitimate sweep" or "conceivably impermissible applications" on a motion to dismiss).

In any event, *Moody* did not change the standard even to win a facial claim. It simply reiterated a plaintiff's burden to prove, at the merits stage, that a "substantial number" of a law's applications are unconstitutional "judged in relation to [its] plainly legitimate sweep." *Id.* at 723. Addressing the full range of regulated activities and actors was important in *Moody* because the parties had "confined their battle to [a single] terrain"—content moderation by "giant social media platforms.'" *Id.* at 724. Here, by contrast, NetChoice has alleged how the Act's content-based standards restrict enormous amounts of protected speech by a vast spectrum of regulated speakers

and publishers. *See* Am. Compl. ¶¶ 36-39 (discussing "traditional print and news services," billions of "audio, video, and still images" posted to social media daily, "interactive, real-time dialogue" such as "chat rooms" and "newsgroups," podcasts, streaming services, countless individual blogs, sports services, online academic journals and databases, digital libraries of "scientific, historical, economic, and medical research" and more). NetChoice has further alleged—and the State has confirmed—that the Act's very purpose is to suppress "harmful and age-inappropriate" across all these media, Mot. at 1; *see, e.g.*, Am. Compl. ¶¶ 1-2, meaning it requires strict scrutiny in all applications. *FSC*, 2025 WL 1773625, at *11 ("A law can . . . trigger strict scrutiny, either on its face *or in its justification*." (emphasis added)). So NetChoice has "pled sufficient facts to put the [State] on notice" of its assertion that the Act "reaches a substantial amount of constitutional activity." *McAllister*, 746 F. Supp. 3d at 940. That is all that is required.

### B. The Act relies on impermissibly vague terms and standards (Counts III and IV).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws offend at least two baseline values: first, that persons should have a "reasonable opportunity to know what is prohibited" so they can "steer between lawful and unlawful conduct," and second, that "laws must provide explicit standards for those who apply them" to prevent "arbitrary and discriminatory" enforcement. *Id.* (footnotes omitted).

The "degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 498 (1982). A vague law that "abuts upon sensitive areas of basic First Amendment freedoms, may force the entities regulated "to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked."

*Baggett*, 377 U.S. at 372 (citation omitted). So, laws impacting protected expression demand a "more stringent" test. *Village of Hoffman Estates,* 455 U.S. at 499. "It is [ ] essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit*, 390 U.S. at 689.

### 1. The "best interests" standard, applying across all of the Act's operative provisions, is vague (Count III).

The "best interests of children" standard requires websites to prove a negative couched in vague and subjective terms: that their communicative and expressive services will not benefit the entity "to the detriment of children" or "result in" ill-defined downstream harms. § 14-4801(c). The State's Motion asks the court to rewrite this test with qualifiers found nowhere in the law, Mot. at 35-36, and the standard remains vague even with those qualifiers.

The first prong of the test requires that data use and website design not "[b]enefit the covered entity to the detriment of children." § 14-4801(c)(1). This standard is ambiguous as to both the terms "benefit" and "detriment" and how they must relate to one another. What level of detriment and benefit? From whose perspective? And who decides? The General Assembly did not use the qualifiers it used in the second prong of the standard (material, severe, foreseeable, etc.), indicating that any type and degree of "detriment" or "benefit" counts. Yet these terms are highly subjective, context-dependent, and personalized. As historical examples reflect, people inevitably have different opinions about what content is detrimental for minors. Some believe that Mark Twain's *Adventures of Huckleberry Finn* is a detriment because it contains racial epithets; others think it is a uniquely beneficial piece of literature. *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000),

https://tinyurl.com/ye2xwphb. Some think *Saving Private Ryan* is too violent for minors (a detriment); others think it imparts valuable lessons (a benefit). *See Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr. Some think smartphones are detrimental and addictive. *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum. Others disagree. *See* Erin Digitale, *Age That Kids Acquire Mobile Phones Not Linked to Well-Being, Says Stanford Medicine Study*, Stanford Medicine News Center (Nov. 21, 2022), https://tinyurl.com/5es8cy3e.

Opinions likewise differ greatly when it comes to whether and to what extent online services and features detriment or benefit minors. Indeed, the same feature could be either a benefit or a detriment (or both) depending on characteristics unique to a minor. Access to social media might be a benefit to a teen recovering from surgery and eager to connect with friends from a hospital bed but a detriment to a teen attempting to focus on schoolwork or exercise. Access to online diet and fitness information might be a benefit to a teen attempting to eat more healthfully but a detriment to one recovering from an eating disorder. And access to online news media might benefit teens attempting to learn about their world but traumatize those who have been personally touched by reported events. The list is endless. Defining the prohibition in terms of what impact speech might have on a diverse universe of listeners—with different backgrounds, education levels, and sensitivities—leaves websites guessing as to what is required of them. It will force covered websites "to steer far wider of" any features Maryland might permissibly restrict than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372.

For the same reasons, the second prong of the standard—which asks whether websites' data practices and designs might foreseeably "result in" the same categories of harm,

discrimination, or "highly offensive" privacy intrusions, § 14-4801(c)(2)—is unworkable too. This prong again defines the boundaries of the regulation by reference to the anticipated impact of speech on a diverse audience, so that "individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law." *Interstate Circuit*, 390 U.S. at 688 (invalidating standard that evaluated whether film was "likely to incite or encourage" harmful behaviors "on the part of young persons"); *see also Winters v. New York*, 333 U.S. 507, 518-19 (1948) (invalidating law that prohibited "news or stories" that might "become vehicles for inciting" criminal activity).

That the Act uses "standard[s] . . . common in the law" like "reasonably foreseeable" and "highly offensive," Mot. at 36-38, does not cure the ambiguity. As the State concedes, vagueness is evaluated in "context," Mot. at 34, and context makes all the difference here. The concept of foreseeable harm in the tort context is typically tethered to behaviors in the *physical* world. *See* Restatement (Third) of Torts § 7(a) (2010) ("An Actor ordinarily has a duty to exercise reasonable care when the actor's *conduct* creates a risk of *physical* harm." (emphasis added)). And liability for "highly offensive" privacy intrusions is traditionally limited to "an *intentional* interference" by invading "a private *place*." Restatement (Second) of Torts § 652B (1977) (emphasis added). The State's cited cases similarly concern regulations that did not involve protected speech. Mot. at 36-37.

By contrast, the Act here transposes these concepts onto protected expression—a context in which they have no historical application or clear meaning—and drops the mens rea require-ment. In fact, courts have repeatedly rejected efforts to transplant terms used in other contexts to speech. In *Snyder v. Phelps*, 562 U.S. at 458 the Supreme Court held that the term "outrageous"—a term commonly used to define intentional torts, *e.g.*, *Lasater v. Guttmann*, 194 Md. App. 431,

36

450, 5 A.3d 79, 90 (2010)—was too "malleable" a standard to impose liability for speech. Likewise, in *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988), the Court held that "'[o]utrageousness' in the area of political and social discourse *has an inherent subjectiveness about it* which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression" or "adverse emotional impact." *Id.* at 55 (emphasis added); *see also Bonta III*, 770 F. Supp. 3d at 1206 (the "best interests" standard in family law "proceedings provide[d] *no useful guidance* as to how a covered business should understand what the 'best interests' of children generally means as used in the CAADCA"). The same is true here.

2. **The "likely to be accessed by children" coverage standard is vague (Count IV).**

The Act's coverage standard also fails to provide the requisite guidance. Defining the scope of regulated entities by reference to whether they are "routinely accessed by a significant number of children," § 14-4801(s)(2), leaves websites guessing as to whether they are covered. "Significant number" could refer to the total number of minors, or the percentage of minors relative to all users, or something else. And what amounts to "significant" in either event is unclear. For example, the Vermont Legislature passed a similar law (vetoed by the governor) that defined "significant number of children" as "composed of at least *two percent of minor consumers* two through under 18 years of age," Vt. S.289 § 1 (2024) (emphasis added), although many would not consider two percent to be "significant." The same problem arises with "routine": is it sufficient that a website is accessed consistently and with regularity, even if infrequently? Or must the access also occur at some frequency? And need the routine access occur by the same children? Or will any critical mass do? Again, the Act does not say. Nor is the vagueness removed by "reviewing research or evidence related to the composition of [website's] audience," Mot. at 38, because websites still need to know how to parse that evidence against the standard. *Cf. Fayetteville Pub. Libr.*, 684 F.

Supp. 3d at 907 (finding the phrase "accessible to minors" vague and susceptible to arbitrary application because it left "libraries to guess what *level* of security meets the law's requirements" (emphasis added)).

Further, even if a website believes it does not meet the routine/significant criterion, it must compare itself to nearly every other website online to determine whether it "is *substantially similar or the same as* an online product" that does meet it. § 14-4801(s)(3). In other words, even if a website has *zero* minor users, if it is "substantially similar" to a website that *does* have a "significant number" of minors, it must comply with this Act. And the website must do so even if it *does not know* the other (substantially similar) feature meets the "significant number of children" standard. The State fails to explain how this standard provides fair notice.

Likewise, whether a website "should" know that "a user is a child," § 14-4801(s)(6), is indeterminate. This consideration inherently will require retrospective evaluation that could penalize websites any time they have *even a single minor* access the service if they had information somewhere indicating the minor's status. This expansive catch-all effectively negates the "routine" and "significant" qualifiers elsewhere in the definition. The State has no answer except the refrain that the "should have known" standard "is common in the law." Mot. at 39. But again, that provides no "talismanic immunity" from a vagueness challenge where terms must be evaluated in context and "by standards that satisfy the First Amendment." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). As a case in point, the "should" know standard is not common in privacy law as demonstrated by COPPA, which uses an actual knowledge standard. *See infra* at [ ].

## C.     Section 230 and COPPA preempt the Act (Counts VII and VIII)

Aside from its constitutional defects, the Act is preempted by Section 230 and COPPA as to certain categories of applications. The Supremacy Clause of the Constitution establishes that

federal law is "the supreme law of the land," U.S. Const. art. VI, cl. 2, empowering Congress "to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "Preemption may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). For express preemption, the legislative text "necessarily contains the best evidence of Congress' preemptive intent," *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), and courts also examine the "structure and purpose of the statute as a whole." *Lohr*, 518 U.S. at 486 (1996). Conflict preemption arises if, among other things, "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of federal law." *Anderson*, 508 F.3d at 191-92 (cleaned up). The "purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

### 1.      Section 230 Preempts the Act.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Congress enacted this provision in recognition of the "staggering" amount of information communicated by online services, the "obvious chilling effect" of even the "specter of tort liability in an area of such prolific speech," and the infeasibility of screening "millions of postings for possible problems." *Zeran,* 129 F.3d at 331. Accordingly, Congress also enacted a preemption provision stating that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). This provision "establishes broad immunity from any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 n.4 (4th Cir. 2009).

Section 230 preempts state liability based on (1) "the disseminating of [third party] information" and (2) the "information's improper content." *Henderson*, 53 F.4th at 123. The analysis is not "formalistic" and is intended to probe whether state-imposed liability would undermine Congress's "policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran*, 129 F.3d at 330-31.

The Act's DPIA requirements and data restrictions, undermine that policy choice to the extent they restrict third-party speech the State deems not in the "best interests of children." *See* Am. Compl. ¶¶ 16, 286-95. They also satisfy both preemption elements. They base websites' liability for using "data" on whether websites disseminate third-party content deemed to be "improper"; i.e., not in children's best interests. The same is true for the DPIA provisions that compel websites to take "steps" to ensure third-party content is "consistent with the best interests of children." §§ 14-4804(b)(3)(i), (vii), (4). *See Pinckney*, 127 F.4th at 525 (imposition of liability based on website "design" and data processing was "inextricably intertwined with Facebook's role as a publisher of third-party content"); *Doe (K.B.)*, 2025 WL 719080, at *5 (Section 230 "foreclosed" products liability claim based on Meta's alleged failure to adopt safety mechanisms where "the source of the duty is the danger" from third-party content and contacts); *Doe v. Grindr Inc.,* 128 F.4th 1148, 1153 (9th Cir. 2025) (Section 230 claims barred claim that "Grindr breached its duty not to design . . . defective products by failing to prevent a minor from being matched with predators"); *Est. of Bride*, 112 F.4th at 1179-80 (Section 230 barred claims for "design defects" and "negligence" based on the theory that website design was "unreasonably dangerous" because it facilitated "cyberbullying").

The State fails to show these claims are not—at a minimum—plausible. It argues that states

bear "responsibility in our federal system for protecting the health and safety of their citizens," Mot. at 40, but Section 230 "counteracts . . . th[is] interpretive canon." *Zeran*, 129 F.3d at 334. The State also invokes *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019), but unlike the imposition of liability on a defective *physical product* there (an igniting battery), here, Maryland seeks to impose liability on content. And finally, the State cites *Bonta III*, 2025 WL 807961, at *31, where the court declined to reach the Section 230 claim, even while recognizing the California AADC "may implicate Section 230" in certain applications. Those are the applications NetChoice alleges here. And requiring websites to defensively litigate those applications piecemeal through the Maryland administrative process "would certainly 'lessen the scope [of protection] plainly intended' by Congress," *Zeran*, 129 F.3d at 334.

## 2. COPPA Preempts the Act.

Congress enacted COPPA to "'safeguard the confidentiality, security, and integrity of . . . children's personal online information' by requiring companies that operate websites and online services marketed toward children . . . to provide certain disclosures about their data collection activities." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 875 (N.D. Cal. 2024). COPPA makes it unlawful for a website "to collect personal information from a child in a manner that violates" FTC regulations, but limits its scope to websites "that ha[ve] *actual knowledge* [they are] collecting personal information from a child." 15 U.S.C. § 6502(a), (b) (emphasis added). Through this and other limitations, COPPA attempts to balance "maintaining children's access to the Internet, preserving the interactivity of the medium, and minimizing the potential burdens of compliance on companies, parents, and children." Children's Online Privacy Protection Rule, 64 Fed. Reg. 59,888, 59,889 (Nov. 3, 1999). And to preserve the federal government's authority to maintain that balance, COPPA provides that "[n]o State or local

government may impose any liability . . . in connection with an activity or action described in this chapter that *is inconsistent with the treatment of those activities or actions under this section*." 15 U.S.C. § 6502(d) (emphasis added). The Act is "inconsistent" with COPPA in at least four ways.

*First*, the primary "activity" addressed by COPPA is the "collect[ion]" of "personal information from children." *Id.* § 6502(b)(1). Congress made the policy decision to *allow* websites to collect and use such data so long as they comply with its notice and consent provisions. The Act, by contrast, *restricts* such collection based on the "best interests" standard found nowhere in COPPA. The Act's imposition of that additional constraint on the collection and use of minors' data is "inconsistent" with Congress's policy judgment to require only notice and consent.

*Second* and relatedly, Congress chose only to restrict collection of minors' data when an "online service [] has *actual knowledge* that it is collecting personal information from a child." *Id.* § 6502(b)(1)(A). The Act here restricts data collection by *any* websites "[r]easonably likely to be accessed by children," § 14-4801(s), regardless of actual knowledge. The Act's removal of an important mens rea requirement under COPPA is again "inconsistent" with COPPA's decision to require one as a prerequisite to liability. *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1120-21 (D.N.M. 2020).

*Third*, Congress preserved authority to the FTC to define a uniform federal framework governing the collection of children's data and established that COPPA's constraints on the collection are enforced only by state Attorneys General *after* notice to the FTC. 15 U.S.C. §§ 6502(c), 6504. But the Act here imposes a parallel set of data constraints and a parallel enforcement regime that evades the FTC's supervisory authority and COPPA's limits. *E.g.*, *H.K. through Farwell v. Google LLC*, 595 F. Supp. 3d 702, 711 (C.D. Ill. 2022).

Fourth, Maryland's restrictions on data collection from teenagers (minors 13-17) is

"inconsistent" with Congress's preemptive determination to (1) regulate only interactions with minors younger than 13; and (2) to otherwise permit data collection and usage. *See* 15 U.S.C. § 6501(1).

In all four ways, the Act interferes with Congress's command to establish a uniform, national policy for data-privacy practices for minors. It also imposes liability for the same data collection activities that is "inconsistent" with Congress's measured approach under COPPA.

*Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2023) —on which the State relies, Mot. at 42—does not hold otherwise. *Jones* concerned preemption of liability for "conduct that *also violate[d]* COPPA's regulations." *Id.* at 641 (emphasis added). But here, the Act prohibits certain activities (such as data use) that COPPA permits with notice and consent is obtained. And it regulates websites that COPPA insulates from regulation because they do not know that users are minors. So contrary to the State's assertions, Mot. at 42-43, the Act "contradict[s]" COPPA's carefully delineated decisions about what activities to regulate and when to regulate them. The Act also stands as an obstacle to Congress's carefully balanced policy framework, which sought to protect data while *also* "maintaining children's access to the Internet, preserving the interactivity of the medium, and minimizing the potential burdens of compliance on companies, parents, and children." 64 Fed. Reg. at 59889.

## II. NetChoice has standing.

NetChoice has standing to bring as-applied claims on behalf of its members and to raise the interests of its members' users. *See* Mot. at 7-13.

First, NetChoice has standing to advance as-applied claims on behalf of its members, who have standing in their own right because at least some are regulated by the Act. Am. Compl. ¶ 25. That is all that is required here because a regulated entity generally "has standing to challenge a

[law] under which it is regulated." *Wynnewood Ref. Co., LLC v. Env't Prot. Agency*, 77 F.4th 767, 777 (D.C. Cir. 2023); *accord Corbett v. Transportation Sec. Admin.*, 19 F.4th 478, 483 (D.C. Cir. 2021). The State does not dispute this; instead it contests that NetChoice members "curate and disseminate compilations of protected speech." Mot. at 11. But NetChoice's complaint clearly alleges they do, *see* Am. Compl. ¶¶ 37, 40, 50, and in any event, such curation is not a prerequisite of standing.

The State's other associational standing arguments are misplaced too. "[A]ll" NetChoice members need not have standing in their own right, Mot. at 8; "just one" suffices. *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007). Likewise, litigation of the as-applied claims does not require participation of "all" members. Mot. at 8. "The questions this Court must answer—whether the [Act] implicates the First Amendment, whether it is content based or content neutral, and whether it is narrowly tailored to further a significant government interest—can all be answered without reference to the intricacies of each individual platform's operation[.]" *Computer & Commc'ns Indus. Ass'n*, 2025 WL 1570007, at *9. In fact, "the Supreme Court itself has recognized that associations are often better positioned to answer the kind of industry-wide factual questions that . . . could be implicated here. *Id.* (citation omitted); *accord Reyes*, 748 F. Supp. 3d at 1118-19; *Fitch*, 2025 WL 1709668, at *5; *Griffin II*, 2025 WL 978607, at *6.

Second, NetChoice has standing to assert the rights of its members' users, as numerous courts have now held. *See Yost,* 2025 WL 1137485, at *13 (finding NetChoice had standing on behalf of minor users who "are denied a forum in which to assert their own rights"); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *10 (W.D. Ark. Aug. 31, 2023) (same); *Computer & Commc'ns Indus. Ass'n,* 2025 WL 1570007, at *9 (same). The State's only argument otherwise is that the Act does not restrict speech, Mot. at 13, which is wrong for all the reasons set

forth above, and in any event, goes to the merits, not standing.

Finally, the State's request to "reject" NetChoice's claims for "prudential" reasons, Mot. at 14-15, should itself be rejected. "The generally applicable rule is that a federal court, whose jurisdiction has been invoked" has a "strict duty" to "exercise that jurisdiction and address the matter before it." *Sonda,* 92 F.4th at 219 (citation omitted); *Cohens v. Virginia,* 19 U.S. 264, 404 (1821) (Marshall, C.J.). The State again invokes *Moody*, but "*Moody* simply clarified that applying the standard for a facial challenge will be fact-intensive in some circumstances." *Computer & Commc'ns Indus. Ass'n*, 2025 WL 1570007, at *9. It established no authority to dismiss a case on "prudential" grounds.

## CONCLUSION

The State's Motion should be denied.

Dated: July 18, 2025

Respectfully submitted,

*/s/  Serena Orloff*
Steven P. Lehotsky*
Scott A. Keller*
Serena M. Orloff*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
    Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
serena@lkcfirm.com
jeremy@lkcfirm.com

*admitted pro hac vice*

*/s/ Andrew C. White*
Andrew C. White (Bar No. 08821)
awhite@silvermanthompson.com
Ilona Shparaga (Bar No. 21494)
ishparaga@silvermanthompson.com
SILVERMAN THOMPSON SLUTKIN &
WHITE, LLC
400 E Pratt Street, Suite 900
Baltimore, MD 21202
(410) 385-2225 (t)
(410) 547-2432 (f)

*Attorneys for Plaintiff NetChoice*

**CERTIFICATE OF SERVICE**

I certify that, on July 18, 2025, the foregoing was served by CM/ECF on all registered CMF users.

*Serena Orloff*
Serena M. Orloff