**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NETCHOICE,

     *Plaintiff*,

     v.

ANTHONY G. BROWN, *et al.*,

     *Defendants*.

Civil Action No. 1:25-cv-00322-RDB

**MEMORANDUM IN SUPPORT OF PLAINTIFF NETCHOICE'S
MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

Plaintiff NetChoice submits this Memorandum in support of its Motion for Leave to File a Second Amended Complaint adding a new cause of action (Count IX) under the Commerce Clause of the United States Constitution. The Act at issue in this lawsuit broadly regulates commercial online services that are likely to be accessed by minors. But as the Fourth Circuit has recognized, "[g]iven the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet [activities] . . . can be construed to have only a local effect" so as to comport with the Commerce Clause. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004). The proposed Second Amended Complaint therefore states a theory of relief that falls squarely within this Circuit's controlling precedent. The amendment  is neither prejudicial to Defendants nor made in bad faith. NetChoice respectfully requests the Court grant leave to file it.

**I.      The Maryland Age-Appropriate Design Code Act**

Maryland's Age-Appropriate Design Code Act ("Act") took effect on October 1, 2024. Md. Code Ann., Com. Law §§ 14-4801 *et seq.* The Act applies to "covered entities" that operate online services "children are reasonably likely to access," including a number of NetChoice

members' websites.[1] The Act requires such websites to "prioritize the privacy, safety, and well-being of children" over "commercial interests" and "ensure the best interests of children when designing, developing, and providing" their services. § 14-4803(2), (4).

"Child[ren]" are any "consumer[s]" under 18. § 14-4801(e). So websites are regulated if they are "reasonably likely to be accessed" by any minor, including older teens on the cusp of adulthood. "Best interests of children" means that the website's "design" and "use of the personal data of children": (1) does not "[b]enefit the covered entity to the detriment of children"; and (2) does not "result in" (a) foreseeable physical, financial, psychological, or emotional harm to children; (b) highly offensive intrusions to children's privacy; or (c) discrimination against children on the basis of a protected classification. § 14-4801(c).

Although some of the Act's provisions purport to regulate the "use of personal data" and "privacy," the Act is not a true data privacy law. The same day the Act was passed, the Maryland Legislature enacted a *separate*, comprehensive data privacy law known as "MODPA" that is one of the most stringent in the nation. *See* S.B. 541, 2024 Gen. Assemb., Reg. Sess. (Md. 2024); Proposed Second Am. Compl. ("SAC") ¶¶ 5, 66.  Maryland's simultaneous adoption of MODPA as an independent privacy regime renders this Act superfluous to serve any interest the State has in regulating data privacy of minors.

The goal of this Act—in the Legislature's words—is to "prevent the use of children's personal data to offer *elements* that the covered entity" should know are "materially detrimental to . . . children." ECF 35-2, at 2 (Preamble, emphasis added). To that end, the Act requires websites

---

[1] Entities are "covered" if they operate for profit, satisfy certain size thresholds, operate in Maryland, and "determines the purposes and means" of processing consumers' personal data. § 14-4801(h)(1). For ease of reference, this Motion refers to covered entities simply as "websites" or "online services."

to change the way they "design" their services, § 14-4801(c), so as to ensure the "[b]est interests of children" as Maryland defines it. As the Ninth Circuit has recognized in relation to California's similar law, this type of language "deputizes covered businesses into serving as censors for the State," because it "require[s] consideration of content or proxies for content." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024). In fact, websites cannot deliver content to their users unless they "use" and "process" data. SAC ¶¶ 7, 41-53. So prohibiting websites from using data unless their service promotes the "best interests of children" necessarily requires websites to consider the content, information, and communications available through their services and ensure that such communicative "elements" are not "detrimental" to children. ECF 35-2, at 2 (Preamble). Defendants here have conceded that the Act is intended to require websites to "design" their services to prevent "exposure to harmful and age-inappropriate content." ECF 35-1, at 1.

To advance these objectives, the Act compels covered websites to issue so-called "Data Protection Impact Assessments" where they must opine on whether their services are "designed in a manner consistent with the best interests of children." § 14-4804(b)(3). Covered websites also must provide "prominent, accessible, and responsive tools" for parents to exercise minors' rights, and they must not (among other things) "process" the "personal data of a child in a way that is inconsistent with the best interests of child"; use "dark patterns" that might cause users to take actions "not in the best interests of children"; or use "automated processing" to predict the minor's "interests" or "preferences" (so-called "profiling") unless it is in "the best interests of children." §§ 14-4801(q), 14-4805(5), 14-4806(a)(1)-(2), (7).

The Act does not cover: the "sale, delivery, or use of a physical product sold by an online retailer," § 14-4801(m)(2)(ii); data collected by health and medical providers, health plans, healthcare clearinghouses, researchers, or entities engaged in financial activities, § 14-4802(1)(i);

3

or government entities and non-profit organizations. § 14-4801(h)(1)(i).

## II.    Procedural Background

NetChoice filed this case in February 2025 and filed an Amended Complaint in April 2025. That complaint advances eight claims: (1) that the "best interests of children" standard, § 14-4801(c), is a restriction on speech that violates the First Amendment to the United States Constitution; (2) that the "best interests of children" standard  is void for vagueness under the First and Fourteenth Amendments; (3) that the "likely to be accessed by children" standard, § 14-4801(s) violates the First Amendment; (4) that the "likely to be accessed by children" standard is void for vagueness; (5) that the Data Protection Impact Assessment requirements, § 14-4804, violate the First Amendment by compelling speech; (6) that the Act's restrictions on data, "dark patterns," and "monitoring" violate the First Amendment by restricting speech and expressive association; (7) that the Act is preempted by the federal Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501 *et seq.*; and (8) that Section 230 of the federal Communications Decency Act, 47 U.S.C. § 230, preempts the Act as applied to websites that disseminate third-party content. *See* NetChoice Am. Compl., ECF 27, ¶¶ 123-285.

Maryland moved to dismiss NetChoice's Amended Complaint, ECF 35, which the Court fully denied on November 24, 2025. ECF 58. On January 5, 2026, Defendants filed an Answer to NetChoice's Amended Complaint summarily denying, disclaiming knowledge, or asserting a "legal conclusion" as to all but two allegations in the complaint (those admitted allegations pertaining to their positions as Maryland Attorney General and Chief of the Division of Consumer Protection). *See* ECF 63. On January 6, the Court issued an initial Scheduling Order, ECF 64, and directed the parties to confer and request any modifications by January 20, which both parties did. ECFs 66, 67. On February 2, Defendants informed NetChoice and the Court that they planned to retain outside counsel to represent them in further proceedings. At Defendants' request, the Court

entered a 45-day stay of discovery; noted that the parties' motions to modify the scheduling order remained open; and set a follow-up status conference for Monday, March 23, 2026. ECF 68.

On March 20, the stay expired and Defendants' attorneys from the Attorney General's Office advised NetChoice counsel that Defendants had retained the law firm Boies Schiller Flexner LLP ("BSF") to assist as co-counsel. On March 25, 2026, NetChoice informed Defendants that NetChoice intended to move for leave to file a Second Amended Complaint to add a Commerce Clause claim. Defendants indicated they would either oppose amendment or move to dismiss the amended claim.[2] Simultaneously with this filing, the parties are filing a joint statement addressing the schedule for discovery in this action.

## III.    Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure allows a plaintiff to amend its complaint after service of a responsive pleading either "with the opposing party's written consent or the court's leave" and provides that the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The "Fourth Circuit's policy is 'to liberally allow amendment.'" *Lavin v. Safeco Ins. Co. of Am.*, 2022 WL 17342051, at *1 (D. Md. Nov. 30, 2022) (quoting *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010)); *see Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lance v. Prince George's Cnty., Md.*, 199 F. Supp. 2d 297, 300-01 (D. Md. 2002). The district court may deny leave to amend only "when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011). These are "'the only legitimate concerns in denying

---

[2] The parties have negotiated a proposed schedule to govern this Motion as part of broader proposed changes to the initial scheduling order. The parties are submitting those proposals to the Court contemporaneously with the filing of this motion.

leave to amend, since only these truly relate to protection of the judicial system or other litigants.'" *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4th Cir. 1987) (quoting *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980)). Absent these elements, "mere delay in moving to amend is not sufficient reason to deny leave to amend." *Id.* (citation omitted) (holding district court abused its discretion by denying motion to amend complaint filed after suit had been pending for three and a half years and three months after the facts on which the amendment rested were allegedly discovered).

## IV.    Proposed Amendment

NetChoice seeks leave to add a single, legal claim to the Amended Complaint alleging that the Act violates the negative command of the U.S. Constitution's Commerce Clause, otherwise known as a dormant Commerce Clause claim. U.S. Const. art. I, § 8, cl. 3. NetChoice counsel became aware of this claim in connection with its preparation of a complaint in another case in South Carolina and accompanying fact development. NetChoice disclosed this proposed amendment before the State had served any discovery requests.

The proposed amendment satisfies Rule 15's liberal standard for amendment: it is not futile, prejudicial, or made in bad faith.

***Amendment is not futile.*** "An amendment is futile if it would fail to withstand a motion to dismiss." *Jackson v. Int'l Bus. Machines Corp.*, 2022 WL 834147, at *1 (D. Md. Mar. 21, 2022). NetChoice's proposed Commerce Clause claim easily withstands such a motion under controlling Fourth Circuit caselaw. SAC ¶¶ 297-317.

The U.S. Constitution vests Congress with the power "[t]o regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. This affirmative grant of power also includes a "negative command, known as the dormant Commerce Clause," under which States may not directly regulate out-of-state parties' out-of-state commerce, unduly burden, or discriminate

6

against interstate commerce. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). This principle reflects the Constitution's "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989). SAC ¶ 298.

Although state laws do not violate the Commerce Clause solely because they "influence" commerce outside their borders, laws that "'*directly* regulate[] transactions . . . wholly outside the State" or "involve[] individuals 'having no connection with'" the State are another matter. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375, 376 n.1 (2023) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982)); *see Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 669, 670-72 (4th Cir. 2018) (holding a Maryland law unconstitutional because it regulated "conduct that occur[red] entirely outside Maryland's borders"). State laws also violate the Commerce Clause if they impose burdens on interstate commerce—including "broader, market-wide consequences of compliance"—that are clearly excessive in relation to the putative local benefits. *See Pork Producers*, 598 U.S. at 397 (Roberts, C.J., concurring in part); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). SAC ¶ 299.

Internet communications "fall[] within the class of subjects that are protected from State regulation because they 'imperatively demand a single uniform rule.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (quoting *Cooley v. Bd. of Wardens*, 53 U.S. (12 How.) 299, 319 (1851)). Unlike physical products sold in local markets, the internet is a borderless technology, and its value lies in its low-cost ability to connect users and convey information across state lines. Thus, as many courts have recognized, regulation of online activities inherently raises interstate commerce concerns. *See, e.g.*, *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182-83

7

(S.D.N.Y.1997) (the "Internet . . . requires a cohesive national scheme of regulation" to avoid "[h]aphazard and uncoordinated state regulation [that] can only frustrate the growth of cyberspace"); *cf. United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002) ("Internet transmission, in and of itself, constitutes interstate transportation sufficient to [constitute] interstate commerce"); *United States v. MacEwan*, 445 F.3d 237, 244 (3d Cir. 2006) (similar). *See* Proposed SAC ¶¶ 300-01.

The Fourth Circuit has squarely applied this reasoning to permanently enjoin state regulation of online information deemed "harmful" to minors. *PSINet*, 362 F.3d at 239-40. The court explained that "the nature of the Internet" makes a purely in-state internet regulation "nearly impossible." *Id.* at 240; *see also Se. Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 777, 787-88 (D.S.C. 2005) (quoting *Dean*, 342 F.3d at 103) (enjoining state law that prohibited the online dissemination of "harmful material to minors" because "'[g]iven the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material . . . can be construed to have only a local effect'").

The Maryland Act here similarly violates the Commerce Clause. It cannot be construed to have only local effect, and it imposes excessive burdens on a global medium of commerce, for at least three reasons.

*First*, although some of the Act's provisions purport to target compliance to online services accessed by "resident[s] of the State," § 14-4801(g)(1), the same services accessible to Maryland residents are also accessible to residents of *every other* state. It is impossible for websites to limit the Act's effects to Maryland residents. *See* Proposed SAC ¶ 304.

To even attempt such a limit, a website must first be able to separate Maryland residents from other users, but there is no reliable method to do so. Proposed SAC ¶ 305. Self-reporting of

location (to say nothing of legal residency) is notoriously imperfect. Users enter false information and move across state lines without informing websites. *Id.* Many users do not grant permission to collect precise geolocation information, and even precise geolocation would not necessarily confirm a user's state of *residency* because people travel, attend college in other states, and otherwise temporarily relocate. *Id.* IP addresses do not speak to residency either, and even as to location, they are imperfect, particularly around the borders of a State. *Id.* Moreover, many users deploy virtual private networks to mask their true IP addresses. *Id.* So a website that attempts to geolocate users for purposes of compliance—a burdensome undertaking that alienates many users—still assumes enforcement risk.

*Second*, requiring that websites verify residency information necessarily affects users in other States. Websites cannot confine these efforts to Maryland residents because they do not know which users fall in that category to begin with. Proposed SAC ¶ 306. And the Act prohibits processing "precise geolocation" information from minors by default unless they "provid[e] an obvious signal to the child." § 14-4806(6). So to even attempt to confirm whether a minor is in Maryland, websites must provide "obvious" signals to users in other States, many of whom might not wish to share such information and might be protected by laws in their own State from being compelled to do so. *E.g.*, Cal. Civ. Code § 1798.121(a) (defining consumers' "right to limit use" of their sensitive personal information, such as geolocation data); Proposed SAC ¶ 306.

Because of the broad reach of this Act, the requirement to collect residency data from all users is just as true for casual online browsing (such as search services or browsing an online bookstore) as it is for account-based services (such as many "social media" websites). Proposed SAC ¶ 307. And across these services, if the user does not agree to share residency information with the website—perhaps due to privacy concerns or mere annoyance at the impediment to

access—the website would have only two options: deny the user access to the service *altogether* or apply Maryland's requirements to that user, whether or not the user is a Maryland resident. *Id.*

Attempting to block users in Maryland does not avoid these problems. As noted above, geolocation methodologies are imperfect and any effort to block Maryland users would necessarily reach users outside of Maryland, while also allowing some users in Maryland (or who are Maryland residents) to continue using the service. Proposed SAC ¶ 308.

Nor could websites ensure compliance by simply adopting rules that prohibit *minors* in Maryland from using the service. A website might not have *any* Maryland minor users—and might even prohibit Maryland minors from using the service—but under the Act's definition of "reasonably likely to be accessed by children," the website might still be regulated under the Act if it is "directed to children" under COPPA's nationwide standard, § 14-4801(s), (s)(1); displays advertisements "marketed to" users under 18, § 14-4801(s)(4); is "substantially similar" to *another* online service routinely accessed by children in Maryland, § 14-4801(s)(3); or if a significant number of minors ignore its rules and use the website anyhow, § 14-4801(s)(2). And the moment even a single Maryland minor begins accessing the service—even if prohibited under the website's terms of service—the website could become subject to all the Act's requirements immediately if the website "should have known" (but did not know) of that fact. § 14-4801(s)(6). This "should have known" standard essentially requires websites to monitor the location and ages of *all* users—including those in other States—to ensure it will not later be held to have been negligent in not knowing that a *particular* user was a minor resident of Maryland. *See* Proposed SAC ¶ 309.

The Act thus necessarily "involve[s] individuals 'having no connection with'" the State of Maryland. *Pork Producers*, 598 U.S. at 376 n.1 (quoting *Edgar*, 457 U.S. at 641-43). It requires websites to monitor users outside of Maryland and requires those users to accept one of three

10

limitations: (1) allow *every website* "reasonably likely to be accessed by minors" (as Maryland defines it) to collect and track their residency information; (2) be blocked from accessing those websites; or (3) accept Maryland's restrictions even though they live in other States. Proposed SAC ¶ 310.

*Third and finally*, the notion that every individual State may dictate, according to that State's unique preferences, how online operators must "design[], develop[], and provid[e]" their online services, § 14-4803(2), would fundamentally change—and dramatically impair—the value of the internet as a global conduit of commerce.

Requiring websites to create state-specific "designs" of their services to comply with a patchwork of fifty different regulatory regimes would balkanize the internet and undermine the open, uniform network that has driven American innovation for decades. Proposed SAC ¶ 312. The internet's core value proposition—that a single online service can reach every user in every State without friction—would collapse under such a regime, forcing companies to either build and maintain fifty separate technical architectures and content delivery systems (even while the value of their services drops because users no longer experience a cohesive set of services nationwide) or simply exit the market. *Id.* Smaller companies and startups that lack the resources to navigate bespoke regulatory schemes in each jurisdiction, would be essentially shut out of the game, chilling the competitive entry that benefits consumers. *Id.* These harms would affect users nationwide, not just in a single State. *Id.* The Act thus imposes burdens that are clearly excessive relative to any putative local benefit.

And inconsistencies would arise whenever users from one State travel to another State. For example, Maryland's Act requires websites to "ensure the best interests of children [as Maryland defines it] when designing, developing, and providing" their services. § 14-4803(2). But Florida

11

has enacted a law that *restricts* many websites' ability to delete, regulate, or inhibit content, use algorithms to limit exposure to content, or even post "an addendum to any content" posted by another user. Fla. Stat. § 501.2041(1)(a)-(c), (e)-(f), (2)(d), (f)(1), (j). Further, Florida might define children's "best interests" differently than Maryland, in which case websites would need to tailor their algorithms to the preferences of each State. *See Ass'n for Accessible Meds.*, 887 F.3d at 669 (Commerce Clause analysis "considers not only the consequences of the statute itself, but also how the challenged statute may interact with . . . regulatory regimes of other States and what effect would arise if every State adopted similar legislation" (cleaned up)); Proposed SAC ¶ 313.

A user in Maryland accessing a website headquartered in California should not receive different information from a user in Florida—yet that is the result of multiplying state-specific mandates. And it replaces the seamless interstate network Americans have relied on for decades with a fragmented, costly, and far less useful collection of state-specific silos. Proposed SAC ¶ 314.

Congress recognized these dangers when it enacted Section 230 and COPPA, to permit the internet to "flourish[], to the benefit of all Americans, with a minimum of government regulation," 47 U.S.C. § 230(a)(4), and "*unfettered by . . . State regulation.*" *Id.* § 230(b)(2) (emphasis added).

That hands-off federal policy has worked: The internet has grown tremendously over the past few decades, fostering "a revolution of historic proportions." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017). The online services regulated by this Act have facilitated trillions of dollars in commerce, provided hundreds of millions of Americans with access to information, and helped billions of people across the globe communicate almost instantaneously. Proposed SAC ¶ 316. This Act's proscriptive mandates are fundamentally inconsistent with that cohesive national scheme and Fourth Circuit precedent. *PSINet*, 362 F.3d at 239-40. Amendment is not futile.

***Amendment is not prejudicial.*** "An amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006). That is the case here. There is no prejudice to Defendants because this Motion to Amend is filed before this Court has finalized a discovery schedule, and negotiations about discovery issues remain ongoing. Additionally, NetChoice informed Defendants about the nature of the proposed dormant Commerce Clause claim on March 25, 2026, right after Defendants' requested stay of discovery expired on its own terms, and before Defendants propounded any discovery. *See id.* (contrasting non-prejudicial amendments "before any discovery has occurred" with fact-dependent amendments "shortly before or during trial").

***Amendment is not made in bad faith.*** Bad faith arises only "when it appears that the plaintiff is using Rule 15 to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, and to present theories seriatim in an effort to avoid dismissal." *Gilead Scis., Inc. v. Meritain Health, Inc.*, 2025 WL 2917379, at *4 (D. Md. Oct. 12, 2025) (cleaned up). "Bad faith generally involves changing legal theories and the belated presentation of facts which the pleader was already aware of in an effort to delay ultimate resolution." *Id.* (cleaned up). Here, NetChoice has already survived Defendant's motion to dismiss, so there is no plausible argument that NetChoice is acting in bad faith to "salvage a lost case" or "to present theories seriatim in an effort to avoid dismissal." *Id.* (cleaned up). And NetChoice's suggestion of the new theory is not untimely. To the contrary, NetChoice moves to add its additional constitutional claim that it only recently identified. And NetChoice disclosed this intent to the State promptly after the stay expired and before the State served any discovery.

**Conclusion**

NetChoice respectfully requests that the Court grant its Motion for Leave to File Second a Amended Complaint.

Dated: April 3, 2026                          Respectfully submitted,

/s/ Andrew C. White                          /s/ Serena Orloff
Andrew C. White (Bar No. 08821)              Serena M. Orloff*
awhite@silvermanthompson.com                 Steven P. Lehotsky*
Ilona Shparaga (Bar No. 21494)               Scott A. Keller*
ishparaga@silvermanthompson.com              Jeremy Evan Maltz*
SILVERMAN THOMPSON SLUTKIN &                 LEHOTSKY KELLER COHN LLP
WHITE, LLC                                   200 Massachusetts Avenue, NW,
400 E. Pratt Street, Suite 900               Suite 700
Baltimore, MD 21202                          Washington, DC 20001
(410) 385-2225 (t)                           (512) 693-8350
(410) 547-2432 (f)                           serena@lkcfirm.com
                                             steve@lkcfirm.com
                                             scott@lkcfirm.com
                                             jeremy@lkcfirm.com

                                             *admitted pro hac vice


*Attorneys for Plaintiff NetChoice*

14